COMMONWEALTH *vs.* BENEFICIAL FINANCE COMPANY
& others.

Suffolk.   May 25, 26, 1971. — November 4, 1971.

Present: CUTTER, SPIEGEL, REARDON, & BRAUCHER, JJ.

*Conspiracy. Bribery. Corporation,* Foreign corporation, Criminal responsibility, Bribery, Conspiracy, Corporate entity. *Jurisdiction,* Foreign corporation. *Small Loans. Constitutional Law,* Separation of powers, Equal protection of laws, Due process of law, Confrontation of witnesses, "Selective prosecution." *Massachusetts Crime Commission. Special Commission. Jury and Jurors. Grand Jury. Practice, Criminal,* Trial of defendants together, Trial of indictments together, Grand jury proceedings, Double jeopardy, Service of process, Judicial discretion, Motion, Conspiracy case, Examination of jurors, Fair trial, Mistrial, New trial, Published article, Special question to jury, Verdict, Charge to jury, Attendance of witnesses, Variance, Suppression of evidence by prosecutor, Assistance of counsel. *Evidence,* Of conspiracy, Acts and declarations of conspirator, Contradiction of witness, On cross-examination, Of bias. *Agency,* What constitutes. *Limitations, Statute of. Error,* Whether error harmful.

At the hearing of pre-trial motions to dismiss indictments returned by a special grand jury as a result of investigations developed by the Massachusetts Crime Commission pursuant to c. 146 of the Resolves of 1962, evidence warranted conclusions that, although the Commission participated in the grand jury proceedings, it never purported to have authority "to prosecute persons shown ... to have committed crimes," and that, although its agent presented evidence to the grand jury as a special assistant attorney general, he only assisted "to the extent required" by the chief prosecutor for the Attorney General, who "conducted and controlled the presentation" of the cases; no violation of art. 30 of the Declaration of Rights of the Massachusetts Constitution was shown. [203-206]

Proceedings upon indictments returned by a special grand jury were not vitiated "because of the presence of an excessive number of prosecutors" during the grand jury's deliberations and votes where it appeared that, although at all times during the proceedings some prosecutors were present in the grand jury room, the number present at any one time "was no greater than was necessary," they were present "in their official capacities," and their presence did

not affect the grand jurors [207–209]; nor were the proceedings vitiated because the prosecutors drew up the indictments before presenting evidence, and presented them in groups of fifteen to twenty, referring the grand jury to "the area of the evidence" [208].

Warranted findings of fact and rulings of law by a judge at pre-trial hearings with respect to indictments returned by a special grand jury as a result of the investigations of the Massachusetts Crime Commission disclosed no error in a conclusion that the defendants were not denied equal protection of the laws because of the revelation to personnel of the Commission, and to others, of matters occurring before the grand jury by a paid employee of the Commission who presented evidence to the grand jury as special assistant attorney general. [209–210]

The simultaneous sitting of a special grand jury and a regular grand jury, unobjectionable under Massachusetts law, presented no Federal constitutional problem. [210–211]

Preparation by the board of election commissioners of a city in 1963 of a jury list from which members of a special grand jury were chosen, by picking 18,000 names from the current list of registered city voters and then narrowing down that number to 3,000 names by eliminating persons exempted from jury service by G. L. c. 234, § 1, as amended through St. 1949, c. 347, § 1, and by eliminating other persons as requested, did not violate "Applicable statutes" in that the names were not picked from the more numerous names on the city police list [212–213]; nor render "ineffective" St. 1924, c. 311, § 1, which added as "liable" for jury service qualified but non-registered voters [213]; no abuse of the board's discretion under G. L. c. 234, § 4, as amended, to prepare a jury list of qualified persons was shown [214]; and no constitutional defect proved by reason of "any systematic or intentional exclusion of any . . . group in the community" [214–215].

Exclusion of statistical tables prepared for and offered by defendants to challenge the method of selection of a grand jury was within the discretion of a judge hearing pre-trial motions. [215]

The prohibition against questioning set forth in G. L. c. 234, § 24, as amended by St. 1956, c. 278, starts "after a juror has been summoned" for jury service by either one of the two methods detailed therein following "service of the venire on the municipality"; the receipt by prospective grand jurors of a "juror's identification card" from the county probation office, and questioning of them by police, before the receipt of summonses, did not violate § 24. [215–218]

The sending by a county probation office of a "juror's identification card" to a juror drawn from a municipal jury list, seeking only "information commonly required in all inquiries dealing with personal identity," did not bear on the juror's "background in connection with his jury duty," and did not violate G. L. c. 234, § 24, as amended by St. 1956, c. 278. [218–219]

A telephone call to a prospective grand juror, presumably in violation of G. L. c. 234, § 24, as amended by St. 1956, c. 278, by one not connected with the Commonwealth was not a basis for abating an indictment returned by the grand jury on the motion of a defendant who showed no prejudice. [219]

There was no error in the denial of pre-trial motions for severance of trial of many indictments for bribery and conspiracy against many individuals and corporations, notwithstanding contentions that "prejudicial evidence was presented" against certain defendants which was inadmissible against other defendants [220–221]; that the defences of certain defendants were antagonistic to defences of other defendants [221]; that the joinder of indictments against certain defendants for soliciting bribes with indictments against other defendants for giving bribes resulted "in the seepage" against the latter "of evidence not otherwise admissible" against them [221–222]; that trying certain defendants with other defendants deprived the former "of the constitutional right to call other defendants as witnesses on their behalf" [222]; and that the right of certain defendants to cross-examine other defendants with respect to inculpatory extrajudicial statements was impaired [222–223].

There was no abuse of discretion in the allowance by a judge of a motion of the Commonwealth for a joint trial of many indictments for bribery and conspiracy against individuals and corporations based on the grounds that the indictments pertained to the same basic factual transactions, that many witnesses were linked to the same defendants, that complexity and hardship on the defendants would be avoided, and that there was a near coincidence of dates and time spans covering alleged criminal conduct. [223–224]

Conviction of defendants for conspiring to bribe a public officer during a period of six years "next preceding the . . . filing of this indictment," which occurred in 1964, was not a bar to trial of the defendants for conspiring to bribe the same officer from January 1, 1957, "continuing up to and including the day of . . . filing of this indictment," which was returned the same day as the first indictment, where a replication filed by the Commonwealth put double jeopardy directly in issue and bills of particulars and documents established that trial of the first indictment was concerned with a conspiracy to bribe the officer in connection with a particular administrative hearing in 1962 and that the second indictment was aimed at a continuing conspiracy to bribe him by annual payments from 1957 through most of 1963 in connection with his usual official duties. [224–226]

Absence of any statute conferring on a Massachusetts court jurisdiction over a foreign corporation did not preclude the court from acquiring jurisdiction over such a corporation for a criminal offence subject to the court's jurisdiction. [226–227]

There was no merit in a contention that foreign corporations

operating a business here through subsidiary business trusts could not be held criminally responsible for acts of employees of the trusts committed here. [227–228]

G. L. c. 223, § 38, and § 37, as amended through St. 1962, c. 750, § 71, apply only to service of process in civil actions against corporations. [228]

With respect to the service of summonses under indictments against three foreign corporations engaged in the small loans business through subsidiaries, it was held that a trustee of three Massachusetts business trusts through which one of the defendants carried on business here was the proper agent for service on that defendant; that the divisional supervisor of fifteen Massachusetts business trusts through which the second defendant did business here was the proper agent for service on it, and that the district supervisor of a subsidiary of the third defendant was its proper agent. [228–229]

Following a plea of not guilty to an indictment and the expiration of the time for filing special pleas and motions, a motion to dismiss the indictment for alleged insufficiency of evidence before the grand jury, filed two days after the defendant received the "Grand Jury transcript," which was not shown to contain all the evidence before it, was not timely under Rule 101A of the Superior Court (1964), and there was no abuse of discretion in the court's denial of the motion. [229–231]

A finding that the defendant, regional director of public relations for a foreign corporation engaged in the small loans business here, participated in a conspiracy to bribe the Commonwealth's supervisor of loan agencies in connection with certain Rate Board proceedings was warranted by initial evidence that the defendant's duties included keeping in touch with legislative and administrative officials, that, one week before an industry meeting he agreed with co-conspirators to present a "united front" as to recommendations regarding a "program" of payments to the supervisor, that at such meeting the defendant did not disavow the "program" of payments adopted, and that later he stated to co-conspirators that his superior would "be in" the "program"; it was without consequence that the defendant did not play an active role. [249–251]

A finding that the defendant, executive vice-president and a director of a foreign corporation engaged in the small loans business here, participated in a conspiracy to bribe the Commonwealth's supervisor of loan agencies in connection with certain Rate Board proceedings was warranted by initial evidence that the defendant attended a meeting of co-conspirators at which a "program" of payments to the supervisor was discussed, that the defendant protested the amount originally suggested but finally stated that "[a]t the $25,000 figure perhaps we have no choice, but . . . not one penny more," and that a co-conspirator responded, "Apparently we

can agree on the $25,000." [251-252]

Standards of criminal responsibility of a corporation for acts of its directors, officers, employees and agents, discussed. [254-280]

The quantum of proof necessary to sustain the conviction of a corporation for a criminal act of its agent is met if it is shown that the corporation has placed the agent in a position where he possessed enough authority and responsibility to act in its behalf in handling the particular corporate activities in which he was engaged at the time the act was committed. [280-281]

At the trial of a conspiracy indictment against a foreign money lending corporation having operational and geographical divisions and many loan offices in Massachusetts, evidence warranted a conclusion that two employees of the defendant, a "divisional director" in its public relations department and his subordinate, were clothed with sufficient authority to deal personally with the Commonwealth's supervisor of loan agencies and to participate in a "program" of payments to him in connection with certain proceedings before the Rate Commission; it was inconsequential that the defendant's law department also dealt with such proceedings, and on all the evidence the defendant's motion for a directed verdict was properly denied. [283-284]

At the trial of a conspiracy indictment against a foreign corporation which was the beneficiary of various Massachusetts business trusts conducting a small loans business here, evidence warranted conclusions that a director and executive vice-president of the defendant possessed sufficient authority to act on its behalf in dealing personally with the Commonwealth's supervisor of loan agencies, and that the corporate official's acts, conduct and admissions in participating in bribery of the supervisor were also those of the defendant, although it never specifically authorized bribery, and on all the evidence its motion for a directed verdict was properly denied. [285]

At the trial of an indictment for conspiracy to bribe the Commonwealth's supervisor of loan agencies in connection with Rate Board hearings, against a foreign holding company carrying on a small loans business here through three Massachusetts business trusts and a subsidiary corporation, evidence respecting the public relations duties of an employee of the subsidiary and the position and authority of another of the subsidiary's employees as vice-president and director warranted a conclusion that the two employees possessed sufficient authority to deal with the supervisor, particularly in connection with the hearings, and that the employees' acts, statements and knowledge in the bribery were those of the subsidiary [288]; and evidence that the defendant wholly owned and financed the subsidiary, that there was between them an interpenetration of corporate officers and a dependency of business activity, and that the defendant held itself out as a single operating entity under its name, warranted a finding of an agency

relationship of the subsidiary and its two employees with the defendant which empowered the employees to act on its behalf, although neither of them was a director, officer, or employee of the defendant, and on all the evidence its motion for a directed verdict was properly denied [289–294].

Denial of motions for a continuance and for a mistrial of indictments in the "small loans" cases, based on newspaper accounts of a "nolle pross" of indictments against the Commissioner of Banks shortly before the selection of the jury was a discretionary matter, particularly in the absence of a clear showing of prejudice. [295]

At the trial of indictments, denial of a motion to poll prospective jurors with respect to bias possibly created by articles read or by pre-trial discussions among the veniremen, further than they had already been questioned by the judge, was within his discretion. [295–296]

At the trial of indictments, denial of motions for a mistrial and to poll the jury based on three articles published during the trial, two of which the judge determined were not prejudicial and the third of which did not specifically relate to the proceedings before the court, was within the discretion of the judge, particularly in view of his prompt, clear and forceful instructions to "totally disregard" outside sources. [297–298]

There was no error in the denial of requests, during the empanelling of the jury for the trial of indictments and again at the beginning of the trial, for instructions that the jury were "not to read any newspaper accounts or listen [to] or watch radio or television reports concerning any of the proceedings," where the defendants showed no prejudice and the judge's instructions were sufficiently clear and strong to counteract adverse publicity. [298–299]

At the trial of an indictment, there was no merit in a contention that the defendants were deprived of due process and a fair trial in that answers of the jury to special questions undermined their subsequent "general" guilty verdict under G. L. c. 278, § 11, since the answers were not inconsistent with, and were superseded by, the general verdict. [299–300]

After a jury returned verdicts of guilty in criminal cases, there was no error in the trial judge's refusal to poll the individual jurors. [300–301]

No error appeared at the trial of a conspiracy indictment in the refusal of certain requests by the defendants for instructions adequately covered by the charge. [301]

Where the charge as a whole at the trial of a conspiracy indictment against a corporation and two of its employees and other parties sufficiently informed the jurors that in order to find the corporation guilty they must first find that either or both of the employees had conspired with someone outside of the corporation, and guilty verdicts were returned against all the defendants, there was no merit in the corporation's contention that it was being held to account merely for an intra-corporate agreement. [301]

At the trial of an indictment, there was no error in the denial of a

request for an instruction that the defendant could not be found guilty under G. L. (Ter. Ed.) c. 268, § 7, of an offer or promise of a bribe to a public officer if the bribe was made to him with the sole intent that he pass it on to members of a board, where there was considerable evidence that part of the bribe was to go to the officer personally [301–302]; nor was there merit in a contention that the bribe was not designed to influence his official conduct, where evidence warranted findings that the defendants believed him to be a key figure at the board's hearings, and that he "used the real or supposed" power of his office to obtain money for himself [302].

At the trial of indictments for bribery under G. L. (Ter. Ed.) c. 268, § 7, in which the jury were carefully and correctly instructed as to the burden of proof on the Commonwealth, there was no merit in the defendants' contention of impermissible invasion of the fact-finding province of the jury in that the judge charged that if one recipient of the bribe was a member of the Rate Board, and if the other recipient was the Commonwealth's supervisor of loan agencies, then each was an "officer" under the statute, as matter of law. [302–303]

At the trial of a conspiracy indictment against a corporation and an executive thereof, there was no error in the omission of a specific instruction that the jury were "entitled to believe that [the trial testimony of the Commonwealth's principal witness] was newly fabricated" because of his earlier failure to mention any statement by the executive at a meeting of conspirators discussed at length by the witness. [303]

Acquiescence in a criminal conspiracy need not be indicated by words. [303]

At the trial of indictments for bribery of a public officer in connection with proceedings of the Rate Board, the judge correctly charged that the defendants' belief in the legality of the rate which they sought was no defence if they did actually bribe the officer. [304]

The charge at a trial need not call attention to every subsidiary fact and every possible inference. [304–305]

With respect to a conspiracy indictment, there was no merit in contentions that an ex parte hearing on the Commonwealth's applications for issuance of process to out-of-State witnesses, under G. L. c. 233, §§ 13A–13D, prejudiced the trial judge and deprived the defendants of a fair trial and of their constitutional right of confrontation, where the judge made no preliminary "findings of conspiracy," merely discharged his statutory duty, and none of such witnesses testified. [305–307]

At the trial of an indictment against a corporation engaged in the small loans business, testimony that a particular attorney attended hearings and meetings relative to the small loans industry, and that he represented the defendant at a certain Rate Board hearing, warranted a finding that he was an agent of the defendant, and justified the admission in evidence of statements read by him at the hearing. [307]

Commonwealth *v.* Beneficial Finance Company.

At the trial of a conspiracy indictment against a corporation and its vice-president, evidence sufficiently linked the defendants to certain co-conspirators, and particular conversations of the co-conspirators were properly admitted in evidence against the defendants. [307–308]

There was no error at a criminal trial in the exclusion of immaterial evidence and challenged hearsay evidence offered by the defendants, nor in disallowance of their proposed extension of cross-examination. [308–309]

At the trial of a conspiracy indictment against named defendants and "divers other persons . . . unknown" to bribe a certain public officer, there was no error in denial of a motion for a mistrial by reason of the judge's preliminary ruling that another public officer, who was not mentioned in the indictment, could be named "a co-conspirator," where the presumption that he was unknown to the grand jury was not rebutted. [309–310]

Where a judge made preliminary rulings during the trial of conspiracy indictments that the defendants could be found to have conspired to bribe certain public officials, and the judge simultaneously lifted limitations on the applicability to particular defendants only of certain evidence to the extent requested by the prosecutor without admitting it against all of the defendants and shortly thereafter informed the jury of the changes in limitations and instructed them to recall and apply the limitations, there was no merit in contentions that the judge's recital was too complex and intricate for the jury [310–311]; that there was error in refusing an instruction that if the jury were uncertain as to what evidence might be considered against a defendant, they must return a verdict for that defendant [311–312]; that it was improper to admit evidence against some defendants who were co-conspirators but not against all of them [312]; and that due process rights to a fair trial were violated by the judge's allowance of "mutual agreements" between the prosecutor and certain defendants as to the striking of evidence [313–314].

At the trial of an indictment for conspiracy to give bribes with an indictment for conspiracy to accept them, there was no impropriety in the expansion of evidence originally admitted against only the recipients of bribes to defendants charged only with giving bribes. [314–315]

There was no merit in a contention of a defendant convicted with others of conspiracy that the judge's procedure with respect to limitations of evidence to particular defendants denied it the opportunity of cross-examination, where during the course of the trial all of the evidence could have been admitted against all of the defendants. [315]

There was no error in the denial of motions for a new trial of indictments against many corporations and individuals engaged in the small loans business for conspiracy and bribery in connection with certain Rate Board proceedings, based on nondisclosure by the

prosecutor of expense vouchers of a conspirator who was the Commonwealth's principal witness and had testified about restaurant meetings at which co-conspirators discussed bribery, where the judge found that the vouchers were not of the significance claimed, that before trial the prosecutor had to examine about twenty-four ordinary file drawers full of records and documents, that he seasonably delivered to the defendants material which he thought related to the indictments, that he acted with "reasonableness, diligence, and good faith," and that he made no "deal" with the witness. [315–320]

There was no error in the denial of motions for a new trial of indictments based on nondisclosure by the prosecutor of portions of the grand jury testimony of the Commonwealth's principal witness which the defendants alleged "would have materially affected his credibility," where such portions added little to the trial testimony and were plainly not material, or were not inconsistent with the witness's grand jury testimony, or were of only minor importance. [320–321]

There was no error in the denial of motions for a new trial of indictments based on the prosecutor's alleged improper deterrence of defence counsel from cross-examining the Commonwealth's principal witness with respect to his grand jury testimony where defence counsel misinterpreted the prosecutor's truthful statement that to do so "would result in the introduction in evidence of another crime" and dropped cross-examination. [321–322]

At the trial of indictments for offering bribes to public officers against corporate and individual defendants who had participated in a conspiracy to make the offer, evidence that each defendant had specifically delegated to one of the co-conspirators the authority to offer the bribes warranted conviction of each defendant as a principal. [323]

Conviction of a public relations representative of a corporation engaged in the small loans business of conspiracy to bribe the Commonwealth's supervisor of loan agencies was warranted by the evidence, particularly by initial evidence that the defendant's position entailed representing the corporation at a meeting of the Rate Board and at meetings of other government officials, that he met with co-conspirators and joined in making calculations as to the conspirators' relative shares in the bribery "program," and that he said his superior would take care of the corporation's participation in it. [352–353]

Conviction of the supervisor of public relations employees of a corporation engaged in a small loans business of conspiracy to bribe the Commonwealth's supervisor of loan agencies was warranted by the evidence, particularly by initial evidence that the defendant stated to one who was or had been a co-conspirator that the bribery "program" begun "should continue" and that the defendant would obtain monies to pursue it "without the knowledge of his superiors." [353–355]

A six year pattern of sustained activity by public relations employees of a corporation engaged in the small loans business in dealing with legislators, small loans officials, and industry representatives warranted a conclusion that there was a strong and apparent nexus between the employees' corporate duties and their activities in a conspiracy to bribe the Commonwealth's supervisor of loan agencies, and the corporation was properly found criminally responsible for such activities. [356–358]

At the trial of an indictment for conspiracy to bribe the Commonwealth's supervisor of loan agencies against a holding company carrying on a small loans business through a subsidiary corporation, evidence that an agency relationship existed between the defendant and employees of the subsidiary who dealt with the supervisor, and correspondence of a high official of the defendant indicating acquiescence in bribery activities of one of the employees, combined with other evidence, warranted findings that the defendant conspired to bribe the supervisor through the agency of the employees, although they were not its officers, directors or employees, and that it was guilty as charged. [358–360]

At the trial of an indictment for conspiracy to bribe the Commonwealth's supervisor of loan agencies against a corporation engaged in the small loans business, evidence with respect to envelopes given by the defendant's president to a co-conspirator and delivery thereof to the supervisor, and testimony as to an agreement by the president and the co-conspirator, to pay a bribe, which the supervisor received, together with evidence of bribe payments by the co-conspirator, warranted conclusions that the defendant through its president conspired to bribe the supervisor and was guilty as charged. [360–361]

Prosecution for a conspiracy which began more than six years before the date of an indictment therefor but which continued to that date was not barred by the statute of limitations; nor was prosecution barred by lack of an overt act or of any renewal of the conspiracy during the six year period of limitation. [361–362]

The record of the trial of an indictment disclosed no abuse of discretion in the judge's refusal to poll prospective jurors concerning their pre-trial readings or discussions of the case, or in refusing to instruct them not to read articles or watch and listen to broadcasts during the trial. [362–363]

At the trial of a conspiracy indictment in the "small loans" cases after completion of trial of other conspiracy indictments in such cases, there was no abuse of discretion in the judge's exclusion of evidence that the Commonwealth's principal witnesses, whom the jury were informed were involved in the consumer finance industry and had personally participated in the conspiracy, but who were not named as defendants, knew the sentences and the administrative sanctions imposed on the defendants in the earlier trial. [363–364]

At the trial of a conspiracy indictment, after the judge's preliminary ruling that evidence warranted a finding of a conspiracy in which a

Commonwealth v. Beneficial Finance Company.

corporation and two of its employees and a second corporation participated, there was no error in the subsequent admission in evidence of certain letters and memoranda from the files of one of the employees against all the conspirators. [364-365]

The record of conviction of the Commonwealth's supervisor of loan agencies upon a bribery indictment returned as a result of investigations by the Massachusetts Crime Commission did not support a contention of the defendant, who was not the only public official indicted, that he was the victim of "selective prosecution" in violation of the equal protection clause of the United States Constitution. [365]

At a conspiracy trial, testimony of the Commonwealth's principal witness on cross-examination with respect to the defendant's possession of a copy of an incriminating paper was not a renunciation of the witness's direct testimony but was consistent therewith. [365-366]

There was no error at a criminal trial in the refusal of requests for instructions dealing with motives and inconsistent statements of witnesses where the charge adequately covered the relevant factors in the evaluation of testimony. [366]

At a long conspiracy trial against numerous individuals and corporations, there was no abuse of discretion in the judge's refusal to allow a motion for a mistrial of a corporate defendant based on the lapse of about two and one-half months between the day it rested and the day the case was submitted to the jury, during which period all of the other defendants rested. [366-367]

There was no merit in contentions of an attorney who appeared pro se at his own request at the trial of indictments that his convictions must be reversed because of his alleged imcompetence, where he was unable to point to even one instance thereof; because of the judge's alleged failure to advise him of his right to counsel as required by Rule 3:10 of this court, where the record showed the contrary; or because the written waiver of counsel required by the rule was not filed, where exchanges between the defendant and the judge indicated that the purpose and spirit of the rule were fulfilled. [367-368]

At a conspiracy trial against numerous defendants, there was no error in the rationale stated by the judge for his selective expansion of limitations on evidence after his preliminary ruling of conspiracy, or in his instructions to the jury as to remembering such limitations. [369-370]

At the trial of an indictment for conspiracy, there was no error in the denial of motions for a mistrial filed following a preliminary ruling that one deceased prior to the return of the indictment and not mentioned therein could be found to have been a co-conspirator, although his identity and participation were known to the grand jury, where the judge found that the defendants were not prejudiced by any variance between the indictment's allegations and the proof, or by the preliminary ruling. [370-371]

Commonwealth *v.* Beneficial Finance Company.

At the trial of an indictment for conspiracy, evidence warranted a
finding of a single conspiracy to bribe a public officer over a seven
year period in connection with his duties rather than a finding of
such conspiracy and of a separate conspiracy to bribe him in
connection with a particular hearing in one of those years; it was
without significance that one conspirator believed that there were
two conspiracies and that the participants in the bribe payments
were not identical. [371-372]

There was no error at the trial of an indictment for a single continuing
conspiracy in an instruction to the jury to acquit all the defendants
if evidence established more than one conspiracy, in view of the
judge's further instructions on the necessity of finding a single
conspiracy and that the jury "should consider separately" each
defendant's participation therein. [372]

One may be convicted of a conspiracy although no overt act in
furtherance thereof is shown and its purposes are not carried out.
[372-373]

SEVENTY INDICTMENTS found and returned in the Superior
Court on February 11, 1964, and May 8, 1964.

Pre-trial motions were heard by *Quirico,* J., and the
cases were tried before him.

*Raymond W. Bergan,* of Virginia, *& Edward B. Hanify*
(*Thomas M. Joyce & Francis X. Hanlon* with them) for
Household Finance Corporation; *Walter J. Hurley,* for
Nathaniel W. Barber, was also with them and submitted
a brief.

*Edward O. Proctor* (*George J. Leary & Daniel B. Bick-
ford* with him) for Beneficial Finance Co.

*Daniel F. Featherston, Jr.,* for Liberty Loan Corporation.

*Lawrence R. Cohen* (*Newton H. Levee* with him) for
Local Finance Corporation.

*James W. Kelleher* (*William C. Madden & Daniel H.
Kelleher* with him) for Francis T. Glynn & others.

*Francis J. DiMento* for James S. Pratt.

*Robert V. Mulkern* for Lyle S. Woodcock.

*Robert F. Muse* for Martin J. Hanley, *& Martin J. Han-
ley,* pro se.

*John Curtin, Jr., William G. Young & Henry S. Healy,*
Special Assistant Attorneys General (*Ruth I. Abrams,* As-
sistant Attorney General, with them) for the Common-
wealth.

SPIEGEL, J.   We have before us appeals emanating from two separate series of indictments and two separate jury trials of various individual and corporate defendants.

All of these appeals were taken under G. L. c. 278, §§ 33A–33G, and are before us because of the convictions of a number of individuals and corporations.  The corporations convicted in the first trial were Beneficial Finance Company (Beneficial), Household Finance Corporation (Household) and Liberty Loan Corporation (Liberty).  The individuals convicted in the first trial were John M. Farrell, Francis T. Glynn, Nathaniel W. Barber, James S. Pratt, Lyle S. Woodcock, Morris Garfinkle and Martin J. Hanley.  In the second trial the corporate defendants convicted were Beneficial, Household and Local Finance Corporation (Local).  The individuals convicted in the second trial were Hanley, Farrell, Glynn, Barber, Pratt and Edward R. Newhall.

These cases have become generally known as the "small loans" cases.  In each case the defendants were charged with various offences under numerous indictments returned in 1964 by a special grand jury.  The offences charged were offering or paying, or soliciting or receiving, bribes, or conspiring to do so.[1]  These indictments were presented to the special grand jury as a result of an investigation developed by the Massachusetts Crime Commission (Commission). The Commission was specifically created by the Legislature "to investigate and study as a basis for legislative action the existence and extent of organized crime within the Commonwealth and corrupt practices in government at state and local levels."  Resolves of 1962, c. 146, approved July 27, 1962.

Some insight into the sheer detail involved in reviewing the proceedings may be gleaned from the fact that "[p]re-trial motions on these indictments were heard for sixty-five

---

[1] A chart listing the defendants as well as other individuals and corporations involved in the first and second trials, together with the numbers on the indictments, the disposition thereof, and the status of appeal is appended hereto and marked Appendix B.

court days ending May 9, 1966.  The transcript of the pre-trial proceedings covers 4,730 pages.  The decisions disposing of the various motions cover almost 700 pages. . . . [After hearing the judge made extensive findings and rulings on the pre-trial motions.]  Forty-nine of the indictments were grouped for [the first] trial which began on July 18, 1966.  The trial lasted about five months and generated a voluminous record."  See *Barber* v. *Commonwealth,* 353 Mass. 236, 237–238.  The transcript of evidence consists of 103 volumes containing more than 7,500 pages.

The evidence in the first trial, pertinent portions of which we summarize in detail later in this opinion, is here synopsized.  This evidence tends to show that during the year 1962, several licensed small loans companies (corporate defendants), together with certain of their officers and employees (some of whom are defendants), conspired to bribe Hanley and Garfinkle in their capacities as public officials.  The purpose of the alleged conspiracy and the payment of the bribe money was to insure the maintenance of a maximum interest rate which companies licensed to do business in the Commonwealth were permitted to charge.  Hearings on this matter were conducted by the Small Loans Regulatory Board (Rate Board) in 1962 and the bribe money allegedly paid to Hanley was intended to "fix" the results of these hearings.

The second trial began on July 17, 1967, and required 222 trial days (over a period of about twelve months).  Twenty-one of the indictments were grouped for the trial.  The transcript of this trial consists of 223 volumes containing more than 11,800 pages.  Collectively (pre-trial and both cases), the defendants took more than 5,400 exceptions and assign about 700 numbered multiple assignments of error.  The findings, rulings and decisions of the judge (covering all proceedings) contain more than 1,400 printed pages.

The evidence in the second trial, set out in detail in the subsequent portion of this opinion, tends to show that

over a period of some seven years (1957–1963) a number of small loans companies (including the corporate defendants), together with a number of their officers and employees (including the individual defendants named in the conspiracy indictment), allegedly conspired to bribe Hanley. His office as a public official clothed him with extensive powers to approve or disapprove the activities of small loans companies doing business in the Commonwealth. The bribes were alleged to have been paid to Hanley over this period to induce Hanley (1) to approve various requests pertaining to routine matters; (2) to refrain from taking action adverse to certain of the defendants and co-conspirators at rate hearings held during 1957; and (3) to obtain approval of various changes in small loans regulations.

Although these cases were argued consecutively, some of the issues involved necessarily overlapped. The pre-trial issues in both cases were argued jointly. In the interest of lucidity and conciseness this opinion consists of three parts.

First, we treat with the pre-trial issues raised by all or some of the defendants whether in the first or second trials. Subsequently we deal with specific issues raised in the first trial and finally with issues raised during the second trial.[2]

Prior to dealing with the issues involved in these appeals, we believe it to be opportune and fitting to make some general observations.

Many of the exceptions are but conglomerate fragments which are obviously of little, if any, merit but in any event are not worthy of discussion and would merely serve to needlessly clutter this opinion. Others present a facade of substantial issues, but when considered in depth, present no problem requiring our comment. Others may show some technical error but are, at best, harmless. We have endeavored to consider and to give scrupulous attention to

---

[2] A table of contents listing each issue discussed in these three sections and referring to the discussions by page number is appended hereto and marked Appendix A.

every assignment of error argued by the defendants. If some assignment of error is not specifically referred to in this opinion, a conclusion that we did not reflect on it would be far from accurate. We recognize the formidable task facing defendants' counsel, as well as the prosecution, in arguing these appeals. We commend counsel for the defendants, as well as counsel for the Commonwealth, for the excellence of their briefs and their obvious devotion to the task confronting them. The briefs filed and the oral arguments of counsel were noteworthy and of valuable assistance to us in the writing of this opinion.

In the case of *Barber* v. *Commonwealth*, 353 Mass. 236, 239, we indicated that defendants' counsel were vigilant throughout a lengthy first trial in their efforts to protect the rights of the defendants. This has been equally true throughout the second trial. However, it should be borne in mind that although "a defendant is entitled to a fair trial, he is not guaranteed a perfect one. *Root* v. *Cunningham*, 344 F. 2d 1, 3 (4th Cir.). *Johns* v. *Smyth*, 176 F. Supp. 949, 952 (E. D. Va.)." *Barber* v. *Commonwealth, supra*, at 240.

## PART I.

### PRE-TRIAL ISSUES.

All but two of the pre-trial issues raised have been argued extensively by Household. The other defendants in many instances confined their arguments to an adoption of Household's. For this reason, these issues may be most efficiently dealt with by treating with them as argued by Household, listing for each issue the other defendants who have adopted Household's argument on the specific issue. We deal finally with the pre-trial issues which have been raised separately by other defendants and which are not covered in the Household brief.

Household raises three issues attacking the validity of the indictments because of the various aspects of the method by which evidence was presented to the special grand jury.

1. The first of these is the allegation that "[t]he indict-

ments were invalid because legislative agents, paid by legislative funds, utilized a legislative investigation to prepare and develop a case for presentation to the special grand jury and then presented that case in violation of [art. 30 of] the Declaration of Rights." Beneficial, Liberty, Local, Barber, Pratt, Glynn, Farrell, Woodcock and Newhall have all adopted Household's argument on this point. It was raised in the pre-trial proceedings by motions to dismiss filed by six corporate defendants. The judge heard seventeen witnesses and admitted in evidence twenty-six exhibits relative thereto. He made extensive findings of fact and rulings of law and denied the various motions.

First, Household argues that at the time of its investigation into the small loans companies the Commission was preoccupied with law enforcement rather than remedial legislation to an extent that was in derogation of art. 30 and its mandate "to investigate and study *as a basis for legislative action*" (emphasis supplied). This objection was raised in the case of *Gardner* v. *Massachusetts Turnpike Authy.* 347 Mass. 552. There, the respondents cited the Third Report of the Commission (cited also by Household here) in support of a similar contention. We rejected it, holding that "[t]he practice of the Commission as to use of the evidence to convict wrongdoers does not take its program outside the resolve [expressly authorizing the Commission to submit evidence to the Attorney General or other law enforcement agency] or violate art. 30. . . . [W]e think that the respondents show no more than a commission determined to be effective in its assigned legislative task of the discovery of corruption in government and, in connection therewith, rightly and lawfully dealing with evidence of corruption which that task brings to light." P. 558. Similarly, in the case of *Commonwealth* v. *Favulli*, 352 Mass. 95, 101–102, we held this same report consistent with the Commission's legislative function.

Household argues that these cases are not dispositive because it has presented the court with much more evidence of "the Commission's drive to expose, indict and punish"

than was present in the records of those cases. However, the evidence to which it refers (statements from Commission reports and from the minutes of the Commission meetings, as well as statements made by the Chairman of the Commission under various circumstances) was also cited to the judge. They are contained or referred to in the judge's findings of fact. In dealing with them he noted that the statements, taken in context, "are coupled with further language which indicates clearly that the Commission recognizes that it has no power or authority to conduct criminal prosecutions, that such power and authority is vested in the Attorney General, and that it is speaking in terms of cooperating with the Attorney General in submitting evidence of criminal activity to him for his decision whether he will prosecute." On this basis the judge concluded that "[t]he Commission never stated, contended, or took the position that it had the authority, power, or duty to prosecute persons shown by its investigations to have committed crimes. . . . The Commission, which belonged to the Legislative Branch of the government of the Commonwealth, did not exercise, or attempt to exercise, any powers of the Executive Branch in the matter of the enforcement of the criminal laws, the prosecution of criminal offenses, or in any other matter." This conclusion is supported by the evidence as a whole and is dispositive of the issue of the claimed inconsistency between the Commission's concern with the indictment and conviction of lawbreakers exposed by its investigations and its primary legislative purpose.

Secondly, Household attempts to demonstrate that the Commission improperly dominated the grand jury proceedings through the medium of Mr. Simonds, who was simultaneously investigating the case as an agent of the Commission while he presented the evidence to the grand jury as a special assistant attorney general. The findings of the judge on the conduct and control of the grand jury proceedings, however, clearly bring this point within the holding in *Commonwealth* v. *Favulli*, 352 Mass. 95, 102–103, that par-

ticipation of the Commission in grand jury proceedings was not improper as long as control remained in the Attorney General. These findings establish, as in the *Favulli* case, that the decision to present the matter to the grand jury was that of the Attorney General and that he at all times "conducted and controlled the presentation of this case to the Special Grand Jury." The judge found that the Attorney General exercised this control through his assistants Mr. Skinner and Mr. Travers, the latter being directly in charge. The function of Mr. Simonds, as special assistant to the Attorney General, was only "[to assist] to the extent required by [Mr.] Travers."

Since the relevant question is *power* and not *participation* and since the judge's findings establish that *power* with respect to the grand jury proceedings rested at all times in duly authorized members of the Executive Branch other than Mr. Simonds, there is no significance in a possible "merger of the powers" in the person of Mr. Simonds. Furthermore, any such inference is precluded by the judge's finding, amply supported by the evidence, that Mr. Simonds's appointment as a special assistant attorney general "was an appointment in fact and in law; and it was not a sham to enable the Crime Commission to present evidence directly to a Grand Jury." "In appearing before the Special Grand Jury, [Mr.] Simonds did so as a Special Assistant Attorney General, under the direction and control of the Attorney General; and not as counsel for the Commission."

2. The second issue raised by Household is directed at the grand jury proceedings in that "the indictments should have been abated because of the presence of an excessive number of prosecutors while the Special Grand Jury was deliberating and voting and because of the conduct of the prosecutors during such deliberations." Beneficial makes a similar argument, while also adopting that of Household. Liberty, Barber, Woodcock and Pratt have likewise adopted Household's argument. The issue was raised by pleas in

abatement (filed separately by Household and certain individual defendants), focusing respectively on the presence and conduct of the prosecutors.

Motions to dismiss the indictments filed by certain corporate defendants also raised this issue in addition to the issue previously treated with by us. The assignments of error which raise this point are directed to the judge's two decisions on the pleas in abatement and his decision on the motions. Each of these three decisions overruled so much of the various pleas and motions as rested on the grounds here argued by Household.

The facts as found by the judge in these three decisions relative to the presence and conduct of multiple prosecutors before the grand jury and the conclusions he drew from them are as follows. At all times during the grand jury deliberations and voting, which took place on May 7, 1964, and the next day, at least two or three, and at most five, prosecutors were present in the grand jury room. The five were the Attorney General, Assistant Attorneys General Travers, Skinner and Bachman, and Special Assistant Attorney General Simonds. All five had been present at some point during the presentation of evidence to the grand jury and each one of them, except Mr. Skinner, had participated at some point in the examination of witnesses, Mr. Travers and Mr. Simonds having played the leading roles in this process. The judge made findings as to the procedure followed in reading to the grand jury the 129 indictments, which had been prepared in advance by Mr. Simonds and Mr. Travers, and in having them signed by the Attorney General. The judge concluded that "the number of prosecutors present before the Special Grand Jury at any one time during its hearings, deliberations, and voting was no greater than was necessary. All of the prosecutors who were thus present were there in their official capacities, discharging their public duties in connection with this case, and their presence before the Special Grand Jury was necessary at all times when they were present." He then held that the grand

jurors were not intimidated, coerced, or influenced by the presence of the several prosecutors.

On the alleged impropriety of the conduct of the prosecutors before the grand jurors, the judge found that there was none. Since "[t]here is no law which requires that a Grand Jury adopt a vote requesting a prosecutor to prepare an indictment before a prosecutor may do so," he ruled that it was proper for the prosecutors to draw up the 129 indictments in advance; as a means of assisting the grand jury in dealing with a very complex array of evidence. In presenting the indictments to the grand jury in groups of fifteen to twenty, he found that a prosecutor would refer the jurors to "the area of the evidence on which they were being asked to deliberate and consider the indictments being offered" and that it "was not a statement of what the evidence was or had been on that phase of the case, but it was a reference sufficient only for the jurors to identify the part of the case in connection with which they were being asked to consider the indictments. It was not a summation or argument on the evidence. It served only to identify that phase of the case on which the indictments were being offered from any of the other phases on which the jurors may have heard evidence over the preceding three months."

These findings, all of which are supported by the evidence and the conclusions drawn from them, are not erroneous as matter of law and are dispositive of the objections raised. The test we stated in *Commonwealth* v. *Favulli*, 352 Mass. 95 (decided after these findings were made), regarding the circumstances under which multiple prosecutors may properly be present before the grand jury applies equally to presence at the voting stage as to presence during presentation of the evidence and deliberations. The distinction Household attempts to make between voting and the other stages is not supported in our law. Indeed, in the *Favulli* case; as here, it appears that multiple prosecutors were present while the grand jury voted. The "controlling principle," we articulated there, is that "[t]he prosecutor has discretion as to the use of assistants and . . . may have

present from time to time such reasonable number as he deems appropriate." P. 106. Under this standard the finding of the judge that "the number of prosecutors present before the Special Grand Jury at any one time . . . was no greater than was necessary" clearly negates the contention that an improper number was present.

The *Favulli* case also states the "controlling principle" to be applied to the conduct of prosecutors: "In presenting cases to the grand jury the prosecutor and his assistants must scrupulously refrain from words or conduct that will invade the province of the grand jury or tend to induce action other than that which the jurors in their uninfluenced judgment deem warranted on the evidence fairly presented before them." P. 106. The findings of the judge, although not worded in precisely these terms, clearly establish compliance by the prosecutors with this standard in their conduct before the grand jury. His conclusions are likewise consistent with our earlier holding in *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 310, a case of extreme and clearly improper conduct by a prosecutor, that a prosecutor present during grand jury deliberations "cannot participate in the deliberations or express opinions on questions of fact or attempt in any way to influence the action."

3. Having argued the foregoing two issues Household further maintains that "[t]he record as a whole demonstrates that . . . [it], and others similarly situated, have been denied the equal protection of law guaranteed by both the Federal and State Constitutions." Liberty, Barber and Pratt adopt Household's argument on this point. This identical point was raised by various defendants in seeking amendments to pleas in abatement and in their challenges to the array of grand jurors. After a hearing on the pleas and challenges in their entirety, with particular reference to the alleged violation of constitutional rights, the judge ruled that "there was no such denial of the constitutional rights of any of such defendants."

The evidence at the hearing consisted of a stipulation

entered into by the parties which contained specified portions of evidence previously introduced at certain hearings on particular issues raised by the pleas, plus certain documentary items. In ruling on the issues raised the judge did not make separate findings of fact or rulings of law. He relied instead on findings of fact made by him in eight previous decisions on specific issues raised by the various pleas, and on portions of his findings of fact made in his decision and order on motions to dismiss the indictments. In addition the judge referred to his findings of fact and rulings of law in other decisions on various pleas in abatement "which may relate to the constitutional issues now under consideration." These adequately disposed of the constitutional objections raised, without requiring further discussion on our part.

In their argument before us the defendants have centered their constitutional objection on eight aspects of the grand jury proceedings. Five of these are embodied in the two issues raised by them dealing with the grand jury proceedings which we have considered above. The other three aspects of the proceedings objected to by the defendants are the fact that Mr. Simonds revealed to personnel of the Commission, and to others, matters occurring before the grand jury; that, while acting as special assistant attorney general, Mr. Simonds continued to receive compensation from the Commission; and that the indictments were returned by a special grand jury sitting simultaneously with the regular grand jury for Suffolk County. The first two of these latter three objections were disposed of as separate issues by the judge in his decisions on pleas specifically raising these issues which were incorporated by reference in his decision on the constitutional questions raised by the pleas in their entirety. The findings of fact contained therein are supported by the evidence, and the rulings of law drawn from them are devoid of error.

The only objection that remains is the one directed at the simultaneous sitting of a special grand jury and a regular grand jury. The permissibility of this practice varies

from State to State, depending on their relevant statutory and constitutional provisions, but it presents no Federal constitutional problem. *Commonwealth* v. *Favulli;* 352 Mass. 95, 107–108. We discovered no basis in this Commonwealth for objection to the practice.

Having disposed individually of the objections on which the defendants base their allegation of a constitutional violation, we cannot see that they gain any additional strength by cumulation.

4. Household focuses its pre-trial objections on an even earlier stage in the proceedings: the selection of the special grand jury which returned the indictments. Household raises two objections to the procedure used, the first being that "the jury lists from which the jurors were drawn were prepared in violation of the requirements of the statutes of this Commonwealth and of the Constitution[s] of the United States and this Commonwealth." Household's argument, which is directed also at the array of petit jurors in the two trials, has been adopted by Beneficial, Liberty, Local, Barber, Pratt, Glynn, Farrell, Woodcock, Hanley and Newhall. It was raised on numerous occasions by Household and other defendants prior to and during both trials by pleas in abatement, challenges to the array of grand and petit jurors, challenges to the panel of talesmen, motions for a lawful jury, and motions to discharge venire, all of which were unsuccessful. The judge on at least one occasion held a hearing on the factual allegations made therein. With respect to other pleas, the evidence was stipulated. Following a hearing held on certain "pleas in abatement and challenges to the array of grand jurors alleging that they were drawn from lists of registered voters in violation of applicable statutes," the judge made extensive findings of fact, which are summarized below. Although these findings deal only with the procedure used to prepare the 1963 jury list for the city of Boston, from which twenty-two of the twenty-three members of the grand jury were picked, that procedure involves all the features which the defendants allege are in

violation of statute and of the Federal Constitution in the drawing up of the lists from which the grand and both petit juries were chosen. No other procedure need therefore be detailed.

The 1963 jury list for the city of Boston contained about 9,000 names, of which about 3,000 were not carried forward from prior lists. To obtain these 3,000 names the Boston board of election commissioners (election board) started from the current list of registered Boston voters, containing 309,082 names, and picked 18,000 names from it according to a random selection process which is not here under attack. The names picked were then narrowed down to 3,000 by eliminating those exempted from service by G. L. c. 234, § 1; those over the age of sixty-five and under the age of twenty-five;[3] women who requested to be excused under G. L. c. 234, § 4; Federal, State and county employees who requested to be excused; and others who so requested or for whom requests were made by public officeholders on the ground of economic hardship.

The election board had available to it but did not use as a source for the jury list the 1963 police list for Boston, which contained the names of persons resident in Boston as of January 1, 1963, of age twenty or over who were not registered voters. The list contained 438,776 names, 129,694 more than the list of registered voters. Of these, the judge found that eleven per cent (48,265) were not qualified to vote and therefore were ineligible for jury duty, without estimating the number in addition who were exempt from duty under G. L. c. 234, § 1. The election board used the voter list in preference to the police list because it felt that if the police list were used "it would result in a larger number or percentage of those summoned being rejected or eliminated for lack of qualifications to serve as jurors than would be the case if the list of registered voters were used."

First, Household argues that the election board's use of

_____

[3] Those under the age of twenty-five and over the age of seventy are exempt by G. L. c. 234, § 1.

the list of registered voters as a source rather than the police list violated G. L. c. 234, § 1, as amended through St. 1949, c. 347, § 1, which provides in relevant part that, "A person of either sex qualified to vote for representative to the general court, whether a registered voter or not, shall be liable to serve as a juror." We agree with the judge, however, that § 1 is not mandatory and adopt his ruling that "[a]lthough c. *234*, *§ 1*, fixes the outer limits of the group of persons '*liable*' for jury service, it does not require or compel the persons charged with responsibility for preparing annual jury lists to include thereon persons from every group, class, or category of persons liable for jury service. . . . [A]lthough the Board did not avail itself of the largest group available, or of the longest list of names available, when it used the list of registered voters as the source of the names of persons placed on the 1963 Jury List, it did not thereby violate the applicable statutes."

Such a reading of §. 1 does not make the 1924 (St. 1924, c. 311, § 1) amendment, which adds qualified but non-registered voters, "ineffective," as Household argues. The amendment permitted the election board, by drawing from such a pool, to compile a jury list containing names of people who before the amendment would have been ineligible to serve. Since 1967, the election board has in fact used the police list as its source for the jury list.

Secondly, Household argues that the election board's elimination of 15,000 names from its list of 18,000 was improper because some people were automatically excluded who were not within the legally exempt categories listed in § 1, and some were excluded at their own request or the request of others for whose exclusion there was no statutory basis. However, the categories of exempt persons in § 1 are not preclusive. The defendants cannot complain that some public employees were excluded at their own request since they have shown no harm stemming from this practice. In addition, the judge specifically found that Federal, State, county and city employees were represented on the jury list. Nor was it improper to exclude some persons at their

own request, or that of public officeholders, when, as the
judge found, on adequate evidence, the reason for their ex-
clusion was the economic hardship which jury service would
entail.

In reducing the list from 18,000 to 3,000, there is no evi-
dence that the election board abused the discretion clearly
left to it by the statutory scheme.   The statute does not
mandate a specific procedure, but simply lists persons
eligible and exempt, and from this group directs the elec-
tion board to prepare a list of persons "of good moral char-
acter [and] of sound judgment" whom it determines to be
qualified.   G. L. c. 234, § 4, as amended through St. 1955,
c. 38, § 1.

Finally, Household claims that the jury chosen as a re-
sult of the procedure used was substantially different in
composition from that which would have resulted had it
been drawn from the police list and had only those legally
exempt or unsuited in character been excluded.   For this
reason it is argued that the procedure was constitutionally
defective.   This contention fails because, as the judge
ruled, the defendants have not proved "that there has been
any systematic or intentional exclusion of any economic,
social, religious, racial, political, or geographical group in
the community." [4]   *Ballard* v. *United States,* 329 U. S. 187,
195.   *Hoyt* v. *Florida,* 368 U. S. 57, 59.   *Swain* v. *Alabama,*
380 U. S. 202.   *Young* v. *United States,* 212 F. 2d 236, 238
(D. C. Cir.).   *Dow* v. *Carnegie-Illinois Steel Corp.* 224 F. 2d
414, 425 (3d Cir.).   *Commonwealth* v. *Slaney,* 350 Mass. 400,
402.   The notion that unregistered voters constitute such
a class was rejected in *Gorin* v. *United States,* 313 F. 2d 641
(1st Cir.), in language which is thoroughly applicable to
this issue and which was quoted at length by the judge.
The mere fact that a different method of selection might
have resulted in a jury made up somewhat differently in

---

[4] The further issues of whether the defendants have standing to raise this
argument and whether they must, in any event, show prejudice need not be
reached.

no way implies that the method used did not yield "a cross-section of the community," which is all that the Constitution requires. *Commonwealth* v. *Ricard,* 355 Mass. 509, 512. *Thiel* v. *Southern Pac. Co.* 328 U. S. 217, 220.

The judge determined that the elaborate statistical tables prepared from published lists by an expert for the defendants and designed to compare the composition of the 1963 jury list, the 1963 registered voter list, and the 1963 police list did not present sufficient evidence on which to base any findings on this point. It was within his discretion not to be convinced by these tables, no matter how carefully and accurately they may have been drawn as a matter of statistical analysis. In light of his extensive discussion of them in his rulings, we are unable to discern any substance to the argument that the judge dismissed them peremptorily.

Likewise, the judge acted within his discretion in refusing to admit similar tables based on interviews with persons not before the court. The defendants concede that the tables were based on hearsay evidence and can point to no statute or case in this Commonwealth requiring their admission. The fact that some commentators have recommended admission of properly conducted surveys, and that some courts in other jurisdictions have admitted them, does not mean that the judge here was in error in excluding tables based on data from a private survey specifically conducted in behalf of the defendants.

5. Household's second objection to the selection of the special grand jury is directed at the questioning of prospective members by the probation department of the county of Suffolk and by the police of the city of Boston after their names had been drawn from the jury list by the election board. Household's argument that this procedure was in violation of G. L. c. 234, § 24, has been adopted by Liberty, Barber, Pratt, Glynn, Woodcock and Farrell. The issue was raised by "pleas in abatement based on alleged improper or unlawful questioning of prospective grand jurors," filed by Household and certain individual defendants. The judge held a hearing on the factual issues raised therein,

after which he made findings, rulings and an order denying the various pleas.

The judge found the following facts regarding the questioning objected to, and the evidence is sufficient to support his findings. Each of the twenty-eight prospective grand jurors drawn from the city of Boston received a "juror's identification card" from the probation department of the county of Suffolk asking for his name, address, age, date of birth and birthplace, occupation, height and weight, parents' names, and marital status. All these cards were received by the various jurors before they started to serve, with the exception of a card sent to one Joseph D. Casey. There was no evidence as to why these cards were sent out by the probation office or what use was made of them.

In addition to the probation office, the police commissioner of Boston was supplied by the city clerk with a list of names drawn. The police thereupon made up for each name a "Police Questionnaire" which inquired into the personal habits and character of the subject as well as routine statistics relative to him. These were eventually completed and returned to the office of the commissioner. Duplicate copies were kept by the commissioner and the originals were sent to the office of the district attorney for the county of Suffolk. Again, there was no evidence as to what use was made of the questionnaires, or whether any member of the Attorney General's office ever saw them prior to the hearing on the defendants' motions challenging the grand jury.

Eight grand jurors were visited and questioned by a police officer. Seven were asked only their name, address, marital status, business or occupation, name of employer, and, in some instances, whether they had previously served on a jury. Juror Casey was further asked as to his education, lodge affiliations, and political views. The judge found that all eight had been questioned before they had received a summons under G. L. c. 234, § 24, notifying them that they had been drawn to serve as grand jurors. Three other members received telephone calls from persons asking similar

questions, but there was no evidence as to the identity of such persons. The eleven members so called or visited testified that they had not been influenced thereby in their service as jurors. In addition the judge found that the above procedures involved no "intimidation or attempted intimidation" and that "no pressure or improper influence [was] brought to bear upon any such juror."

Household's objections are based on G. L. c. 234, § 24 (as amended by St. 1956, c. 278), which deals generally with individual notification of prospective jurors. The last sentence of § 24, added by St. 1956, c. 278, provides. that "[a]fter the service of such venire has been made, no person shall, except as otherwise provided by law, question any person so summoned for the purpose of obtaining information as to his background in connection with his jury duty." Assuming arguendo that this amendment applies to grand jurors as well as petit jurors (see G. L. [Ter. Ed.] c. 277, § 3), the objection raised is almost entirely obviated by the facts found by the judge and by his conclusion, "that the prohibition against questioning starts after a juror has been summoned" pursuant to the summons having been issued by either of the two methods detailed in the first part of § 24. We agree with the judge that this interpretation of the phrase "[a]fter the service of such venire," used as it is in conjunction with "any person so summoned," refers to "service of the venire on the municipality," and is more consistent with the language of § 24 than that which the defendants urge. As the judge noted, "At that time no juror has yet been drawn, and of course no person has been summoned to serve as a juror. Even after the municipality has made its drawing and listed the persons drawn to serve as jurors, there is no one who fits the statutory description of 'any person so summoned.'" It follows, therefore, and it was so held by the judge, that none of the juror's identification cards sent out by the probation office could have been in violation of § 24 with the exception of the card sent to juror Casey. Similarly, the questioning by the police

was not in violation of § 24 because it occurred before notification of the jurors. Of the telephone calls allegedly made, only that to juror Spanoghe occurred after she was summoned under § 24.

Since the police questionnaires were not sent to the jurors and could not, therefore, constitute questioning of "any person so summoned,"[5] the sole questions left for decision are whether the juror's identification card sent to juror Casey and the telephone call to juror Spanoghe were in violation of § 24.

The judge ruled that the identification card sent to juror Casey did not violate § 24 because the questions contained on it were not "for the purpose of obtaining information as to his background in connection with his jury duty," the only form of questioning prohibited by § 24. The judge concluded that the questions asked did not bear on juror Casey's "background in connection with his jury duty," since they sought only "information commonly required in all inquiries dealing with personal identity." We believe this conclusion is sound. It interprets the phrase "background in connection with . . . jury duty" in a way that is consistent with the purpose of the statute — to prevent in-

---

[5] The judge stated that he was not "condoning the practice," which seems open to question. Nonetheless, we are of opinion that it was not a violation of § 24. Since there is no evidence that the jurors (with one exception) were aware that such an investigation was being made, it is clearly not the kind of practice which tends to obstruct the honest and fair administration of justice and therefore is presumptively prejudicial, such as was treated with in *Sinclair* v. *United States*, 279 U. S. 749 (jurors shadowed during trial by private detective); *Gideon* v. *United States*, 52 F. 2d 427 (8th Cir.) (questionnaire sent to jurors with summons included question directly related to crime charged in the case); and *Cammer* v. *United States*, 223 F. 2d 322 (D. C. Cir.) (questionnaire sent by defendant's attorney to grand jurors who were Federal employees relative to effect of the government's loyalty program on them as grand jurors). The sole exception to this statement is juror Casey who was personally questioned by the police about his education, lodge affiliations, and political views and therefore was presumably aware of the more than rudimentary investigation being conducted by the police. Even in his case, however, the timing of the police questioning was such as to remove it from the statutory prohibition, and the cases in this Commonwealth are clear that such questioning is not in and of itself improper. *Commonwealth* v. *Cero*, 264 Mass. 264, 272–276. *Commonwealth* v. *Sherman*, 294 Mass. 379, 385–386. *Commonwealth* v. *Smith*, 350 Mass. 600, 602. These cases are not inconsistent with the Federal cases cited above dealing with practices which are so suspect as to warrant the presumption of prejudice.

quiry which would tend to detract from the jury's impartiality. It follows, therefore, that the identification cards involved here are harmless and fall outside the prohibition no matter when they were sent.

With respect to the telephone call to juror Spanoghe, the judge made no finding as to what questions she was asked. However, he made a subsequent ruling that the pleas were not legally sufficient, which is dispositive of that issue as well as of all the others raised by the questioning here involved. The ground for this ruling was that § 24 does not require as matter of law "that the return of an indictment by a Grand Jury . . . be declared invalid and set aside for the sole reason that a member of that jury was previously questioned in violation of § *24;* absent, as in this case, any actual coercion, intimidation, or improper influence on the juror, and absent any impairment of the impartiality of the juror." Without expressing an opinion as to whether prejudice must be shown in every case, we agree that it must be shown where the statute has been violated by one who is not connected with a party adversary to the party protesting the violation. Since, therefore, the judge found that "there was no evidence from which any responsibility for . . . [the call to juror Spanoghe] can be placed on the Commonwealth or any of its public prosecutors," it cannot form a basis for abating the indictments, even if we should assume that it was in violation of § 24.

6. Household and several other defendants argue that the joinder of indictments in both the first and second trials was prejudicial to them and that their various pre-trial motions for severance should have been granted.[6] The groupings were as follows: Forty-nine indictments involving a total of

[6] Other motions for severance were made during both trials after the judge had expanded the limitations on certain portions of the evidence to include certain defendants against whom such portions had not originally been admitted. The issue raised by these motions, which question the validity of expanding limitations in this manner, is dealt with in the conduct of the trial section of this opinion, *infra,* p. 310. To the extent that the defendants have raised this issue in connection with their pre-trial motions for severence, we deal with it here.

sixteen defendants were joined in the first trial. These contained conspiracy charges and substantive charges against several finance companies and individuals for bribing Hanley or, alternatively, Garfinkle; conspiracy charges against Hanley and Garfinkle; and felony charges against Hanley and Garfinkle separately for requesting and accepting bribes. This grouping was the result of a motion for joinder filed by the Commonwealth. After hearing, the judge allowed the motion on March 25, 1966.

The joinder at the second trial was the result of a similar motion by the Commonwealth. This grouping consisted of one conspiracy indictment against six corporations and eight individuals, one substantive indictment for bribery against Local alone, and nineteen substantive indictments against Hanley relating to his requesting and accepting gifts and gratuities.

The defendants Household, Beneficial, Liberty, Woodcock and Local have severally argued a total of four grounds to support their contention that the joinder in one or both trials was improper, and that severance along the lines that they sought should have been granted. Barber and Pratt have adopted Household's arguments with respect to both trials. We deal seriatim with the four grounds raised, identifying with respect to each ground the defendants who have raised it.

The first ground alleged, as expressed by the defendants Liberty and Woodcock in their consolidated brief covering the first trial, is that "[t]rying the defendants with others on an indictment of conspiracy gave unfair tactical advantage to the prosecution in that a substantial amount of prejudicial evidence was presented to the jury which was inadmissible against these defendants." Local makes a similar argument with respect to the second trial grouping, alleging in addition that although other defendants were also prejudiced by the joinder Local should have a new trial even if the other defendants do not "because certain items of prejudicial evidence . . . were not only damaging in the extreme, but were also unique as to Local."

It is true that joinder of conspiracy indictments with substantive indictments allowed evidence to be admitted against some defendants which was inadmissible as to others. However, this fact is not in and of itself enough to compel severance. *Commonwealth* v. *Sacco*, 255 Mass. 369, 413. *Commonwealth* v. *Bingham*, 158 Mass. 169, 171. *Katz* v. *United States*, 321 F. 2d 7, 8 (1st Cir.). *Caton* v. *United States*, 407 F. 2d 367, 372 (8th Cir.). At the time of the trial, joinder of conspiracy and substantive indictments was permissible.[7]

Another ground urged is related to the one stated above. Liberty and Woodcock in the first trial, and Household in the second trial, object in particular to the fact that the defences of certain of their codefendants (especially Hanley in the second trial), were antagonistic to their own. Thus, evidence which was prejudicial to them and which would not have been admissible had they been tried separately was admitted because it was relevant to the defence of others. However, this feature of joint trials, like the more general feature of evidence submitted being admissible against less than all of the defendants, does not require severance. *Commonwealth* v. *Millen*, 289 Mass. 441, 459–460. *Dauer* v. *United States*, 189 F. 2d 343, 344 (10th Cir.).

Thirdly, Liberty and Woodcock allege that the joinder in the first trial of indictments in which they were named as defendants with "a vast number of indictments in which they were not mentioned necessarily created improper prejudice." It is contended in particular that the joinder of indictments against them and other defendants relating to the giving of bribes, with indictments against Hanley and Garfinkle relating to the soliciting of bribes, "resulted in the seepage, nay transference, of evidence not otherwise admissible against these defendants." Liberty and Woodcock's reliance on *King* v. *United States*, 355 F. 2d 700 (1st Cir.), seems to us to be misplaced. In that case severance was

---

[7] This practice has since been prohibited by G. L. c. 278, § 2A, which we held nonretroactive in *Commonwealth* v. *French*, 357 Mass. 356, 375–376.

required because the two indictments involved, one against one defendant and one against the same defendant and another, related to two separate transactions. The court stated that joinder was permissible (even where proof of the other criminal transactions charged would not be admissible in a separate trial) where joinder of the indictments resulted in sufficient benefit to the court, as where there was "an overlapping of issues." P. 704. The example given of such an instance — "when some defendants are charged with transporting stolen goods in interstate commerce, and others are charged with receiving the goods, so stolen" — is closely analogous to the case at bar.

The fourth ground alleged by Liberty and Woodcock in the first trial is that "trying these defendants with other defendants deprived them of the constitutional right to call other defendants as witnesses on their behalf." They cite no case, however, supporting this proposition. There are, on the contrary, cases in the Federal Courts refusing severance despite the fact that one defendant is thereby deprived of another defendant as his witness. *Olmstead* v. *United States*, 19 F. 2d 842, 847–848 (9th Cir.). *Gorin* v. *United States*, 313 F. 2d 641, 645–646 (1st Cir.). The instant case is not one in which the defendants seeking severance have shown that their codefendants were in possession of exculpatory evidence. Compare *United States* v. *Echeles*, 352 F. 2d 892, 897–898 (7th Cir.). Nor has Liberty or Woodcock displayed any other substantial need for their codefendants' testimony. Compare *United States* v. *Gleason*, 259 F. Supp. 282, 284–285 (S. D. N. Y.). Indeed, they have failed to demonstrate even that any of their codefendants would have been willing to testify on their behalf in a separate trial.

Liberty and Woodcock further argue that joinder deprived them not only of the favorable testimony of their codefendants but also of the right to cross-examine codefendants whose extrajudicial statements inculpating Liberty and Woodcock were admitted through the witness Heath. They argue that the rationale of *Bruton* v. *United*

*States,* 391 U. S. 123, should be extended to this case.  The
statements here in question, however, were admitted under
a recognized exception to the hearsay rule for statements
of co-conspirators in furtherance of a conspiracy, unlike
the confession of one codefendant in the *Bruton* case.  The
court in the *Bruton* case explicitly declined to intimate that
the exclusionary rule it required in that case should extend,
under the Sixth Amendment, to evidence admitted under
"any recognized exception to the hearsay rule."  P. 128,
fn. 3.  Cf. *Dutton* v. *Evans,* 400 U. S. 74.  We see no reason
to so extend the *Bruton* rule.

We have dealt separately with all the grounds stated.
We are aware of the disadvantages accruing to the defen-
dants from joinder, and cited to us as reasons why joinder
was improper.  We believe that our foregoing discussion
demonstrates that none of them standing alone requires
severance.  The question then remains whether the judge,
in considering the disadvantages cumulatively, was com-
pelled to grant severance.  It is our view that it was for
the judge to weigh all the factors, which were reasonably
foreseeable, against the probable benefits of joinder as
sought by the Commonwealth.  The decision was for him
to make as matter of discretion, and we reverse him only if
there has been "a clear abuse of discretion" — that is,
"[i]f it clearly appear[ed] . . . that . . . [the] defendant
. . . [would] not receive a fair trial without a severance when
all the circumstances . . . [were] considered in the light
of sound judicial discretion and common sense."  *Baker* v.
*United States,* 329 F. 2d 786, 787 (10th Cir.).  *Johnson* v.
*United States,* 356 F. 2d 680, 682 (8th Cir.).  *Common-
wealth* v. *Geary,* 352 Mass. 427, 431.  *Commonwealth* v.
*Fancy,* 349 Mass. 196, 204–205.  *Barber* v. *Commonwealth,*
353 Mass. 236, 240–241.  "The protection of defendants'
rights . . ., while of paramount importance, cannot be
considered without reference to the orderly transaction of
judicial business. . . . The judge had to consider . . . the
cost to the public of a multiplicity of trials."  *Barber* v.
*Commonwealth, supra,* at 240.  The Commonwealth, in ask-

ing for joinder in the first trial, stated the following grounds: (1) the indictments pertained to the same basic factual transaction, involving the same witnesses, and grouping them would therefore provide a workable and not unduly long trial (see *Commonwealth* v. *Maloney*, 348 Mass. 610, 613); (2) there was a logical nexus among the witnesses and the defendants; (3) complexity and hardship on the defendants would be avoided; and (4) there was a near coincidence of dates and time spans covering the allegations of criminal conduct. Similar grounds could have been cited to support the second trial grouping. Weighing these considerations against the disadvantages to the defendants arising from joinder, from the point of view of the judge when he decided to grant the Commonwealth's motions, and even in the light of hindsight, we believe that the defendants have not demonstrated sufficient prejudice to them to override the overwhelming benefits of joinder. There was no abuse of the judge's discretion.

7. The final pre-trial issue raised by Household relates only to the second trial. Household, Glynn, Farrell and Newhall argue that "[t]he trial of Indictment 11908 should have been barred by principles of double jeopardy because of the prior conviction for a legally identical offense in the trial of Indictment 11900." Accordingly it is contended that it was error for the judge to deny Household's and other defendants' various motions to dismiss which raised this issue. Beneficial, Barber and Pratt have adopted Household's argument on this point.

Indictment 11900, tried in the first grouping, charged eight corporations and eight individuals with conspiring to bribe Hanley in his official capacity during a period of six years "next preceding the finding and filing of this indictment." Four co-conspirators were named but not charged in the indictment. Indictment 11908 charged seven corporations and eleven individuals in identical language with a similar conspiracy from January 1, 1957, "continuing up to and including the day of finding and filing of this indictment." Eight others were named as co-conspirators but not

defendants in that indictment. The two indictments had in common eleven defendants (six corporations and five individuals), and four named co-conspirators.

At the request of several defendants the Commonwealth filed bills of particulars with respect to both indictments. In addition, well before the filing of any motion based on double jeopardy in the second trial, the Commonwealth filed "Representations of Evidence in [S]upport of Motion for Joinder or Grouping." This document, together with the various bills of particulars, established that the conspiracy which was the subject of the first trial was a narrow conspiracy to bribe Hanley in connection with the Rate Board proceedings of 1962. By contrast, the conspiracy at which No. 11908 was aimed was continuing. Begun in 1957, it involved yearly payments to Hanley in order to insure in general that his official acts were in the best interests of the small loans industry.

In these circumstances the defendants' various motions were properly denied. Despite the identical charging language, the indictments were sufficiently dissimilar on their face with respect to dates and persons named to raise a question of fact as to whether the conspiracies charged in the two indictments were the same. Had there been no question that the indictments stemmed from the same occurrence, the issue of double jeopardy would have been one of law to be decided from the face of the indictments by the judge. The test would have been whether the same facts which would support a conviction in one indictment would likewise be sufficient to support a conviction in the other. *Commonwealth* v. *Roby*, 12 Pick. 496. *Morey* v. *Commonwealth*, 108 Mass. 433. *Commonwealth* v. *Robinson*, 126 Mass. 259. *Commonwealth* v. *DiStasio*, 297 Mass. 347. *Commonwealth* v. *Mahoney*, 331 Mass. 510. In the instant cases, however, where the indictments were as consistent with two factually distinct offences as with one, and where the Commonwealth put this question directly in issue by its replication (*Commonwealth* v. *Wermouth*, 174 Mass. 74, 78), the burden was on the defendants to establish the identity

of the facts involved. *Commonwealth* v. *Daley,* 4 Gray, 209. *Commonwealth* v. *Wermouth, supra.* They did not satisfy this burden in the face of the evidence submitted by the Commonwealth that No. 11908 referred to a conspiracy distinct from that for which the defendants had been convicted in the first trial. Although both indictments were framed in sufficiently general language so that the same facts could have been used to support a conviction for both, this did not entitle the defendants to a ruling that the first conviction was a bar to the second indictment, where further inquiry demonstrated that the two offences charged were not in fact the same. *Commonwealth* v. *Fredericks,* 155 Mass. 455, 457. *Commonwealth* v. *Wermouth,* 174 Mass. 74. *Commonwealth* v. *Sutherland,* 109 Mass. 342, 343. *Short* v. *United States,* 91 F. 2d 614, 624 (4th Cir.).

8. Three of the four foreign corporate defendants, Beneficial, Liberty, and Local, have raised the issue whether the court could exercise jurisdiction over them, and even if it could, whether service of process was properly made on them. Liberty and Local rely on Beneficial's statement of the applicable legal principles, detailing separately only their particular corporate structures against which they would have such principles applied, and the agent on whom service was made. The issue was raised by special appearances, pleas to the jurisdiction and motions to quash process filed separately by the three corporate defendants and others. Hearings were held on the various pleas, on which the judge made extensive findings of fact relative to the corporate defendants "doing business" in Massachusetts and to the agents on whom process was served. In each case the judge concluded that the court could exercise jurisdiction and that service had been properly made.

We agree with the judge's rejection of the defendants' preliminary argument "that Massachusetts cannot in any event acquire jurisdiction over them in any criminal case for the simple reason that it has no statute providing therefor, or giving the Court such jurisdiction." We think it is irrefutable, as the judge held, that "having jurisdiction over

the offense charged, . . . the Court need not rely on any statute. It has many powers not found in express language of statutes." See *Commonwealth* v. *New York Cent. & H. R. R.R.* 206 Mass. 417, 428–429; *Crocker* v. *Justices of Superior Court,* 208 Mass. 162, 171–172.

The second part of the defendants' argument on the question of jurisdiction is that they, the parent companies, were not doing sufficient business in Massachusetts to enable a Massachusetts court to exercise jurisdiction over them, as opposed to the subsidiary business trusts through which all three operated in this Commonwealth. However, we see the question of jurisdiction as indistinguishable from that whether under relevant principles of corporate responsibility, applied to the participation of agents of each corporate defendant in the offences charged, the particular corporate defendant may be held accountable. If under the applicable substantive law a foreign corporation is responsible for the acts of individuals which constituted a crime in this Commonwealth, it is inconsistent with the inherent power of a court to prosecute criminal offenders to insulate the corporation from liability on the basis of the manner in which the corporation generally runs its affairs.[8] Of course,

---

[8] The defendants' argument on this point is barren of merit. This is reflected by two separate proposed drafts of the American Law Institute. The Am. Law Inst., Model Penal Code, § 1.03 (1) (Proposed Final Draft, 1962) provides in pertinent part: "Except as otherwise provided in this Section, a person [including by definition a corporation] may be convicted under the law of this State of an offense.committed by his own conduct *or the conduct of another for which he is legally accountable if:* . . . (c) conduct occurring outside the State is sufficient under the law of this State to constitute a conspiracy to commit an offense within the State and an overt act in furtherance of such conspiracy occurs within the State" (emphasis supplied). Restatement 2d: Foreign Relations Law of the United States, § 18, provides: "A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or (b) (i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems."

The above simply reflect the elementary rule that a jurisdiction has inherent power to prosecute those who reside outside of its jurisdictional

the general corporate structure and its operational features are highly relevant to the question whether the acts of a given individual, who is formally the employee of one or of several subsidiary members of the network, may be attributed to the parent corporation. However, that network and structure in and of itself is not conclusive on the question of jurisdiction.

There is no need to further discuss the findings of the judge as to the corporate structures of the three defendants, or their arguments that the judge erroneously held that these structures established sufficient contacts with the Commonwealth to warrant the exercise of jurisdiction. We refer instead to that part of the opinion, *infra,* p. 253, wherein we deal with the corporate defendants' responsibility for the acts of their agents in this Commonwealth in furtherance of the conspiracy and discuss the corporate network of the several defendants to the extent that it is relevant.

Finally, we discern no substance to the defendants' claim that service was improperly made. Once power in the court is established, it may be implemented by any appropriate means. G. L. c. 220, § 2. The summonses used in this case were appropriate and sufficient to give the defendants fair notice of the indictments against them, as required by due process of law. *Commonwealth* v. *New York Cent. & H. R. R.R.* 206 Mass. 417, 429. *United States* v. *Standard Oil Co.* 154 Fed. 728, 731 (W. D. Tenn.). See *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316. The only requirement that remains is that service be on appropriate agents of the defendants,[9] and the judge's findings cover this matter.

boundaries and commit a crime within its boundaries. Thus, the only question that remains is the evidentiary matter of ascribing the acts of the defendants, who committed overt acts inside the Commonwealth, to the corporations on whose behalf they acted.

[9] General Laws c. 223, § 38, provides that service on a foreign corporation may be made as provided in § 37 on domestic corporations. Section 37 (as amended through St. 1962, c. 750, § 71), in part provides that service may be made on "the president, treasurer, clerk, cashier, secretary, agent or other officer in charge of its business." The judge correctly held that these sections were applicable only to civil actions. Therefore, service here is governed by the more flexible principle of due process as well as the general provisions of G. L. c. 220, § 2. See G. L. c. 223A, § 6.

In the case of Beneficial, one Frank J. McCann, trustee of all three of the Massachusetts business trusts, vice-president of Beneficial Management Corporation and supervising director for all of Beneficial's Massachusetts loan offices, was served. In the case of Liberty, service was made on the divisional supervisor of the fifteen Massachusetts business trusts through which it did business in Massachusetts. Similarly, in the case of Local, it was made on the district supervisor of the New England division of Provident Management Corporation, a subsidiary of Local which controlled the operations of the Massachusetts loan offices. We see no basis for reversing the judge's determination that each of these three men was a proper agent for service on the parent corporation.

9. The final pre-trial issue we treat with is raised by Liberty and Woodcock and relates to a "Motion for Leave to File Motion to Dismiss" and an accompanying "Motion to Dismiss." [10] This issue is unique to them. These motions were filed on September 28, 1966, the thirty-fourth day of the first trial. They claim that "as there was insufficient evidence presented to the grand jury, it was error of constitutional dimension to deny [the] defendants' motions." This contention is based on the testimony of one William F. Heath contained in the grand jury transcript which had been made available to the defendants two days before filing their motions. At the hearing on the motions these defendants also submitted the "Commonwealth's stipulation" which they maintain established that this portion of the transcript contained all of the evidence incriminating them which was presented to the grand jury. The stipulation in fact stated that "[t]o the best of the Commonwealth's knowledge" this portion was the only testimony relating these defendants to "the events occurring on October 17, 1962." It further stated, "[T]he Commonwealth does not recall any other grand jury witness who testified to any talk with Lyle S. Woodcock other than William F. Heath, either

---

[10] This was replaced the next day by a "Substitute Motion to Dismiss."

before or after October 17, 1962, relative to the matters on trial" (emphasis supplied).

The judge correctly ruled that under Rule 101A of the Superior Court (1964), [11] the motion was not timely. In addition he cited G. L. c. 277, § 47A, and a number of cases in support of his action. Both defendants had previously entered pleas of "Not Guilty," and the time for filing special pleas and motions had long since expired for both of them. The motion was therefore addressed to the sound discretion of the judge. He did not abuse this discretion in ruling that despite the fact that "the defendants did not receive the Grand Jury transcript until September 26, 1966," they had made "no showing of any reason sufficiently strong or impelling to require . . . [him] to exercise . . . [his] discretion to permit the defendants to file their proposed '*Substitute Motion to Dismiss*' at this stage of the proceedings, and during the course of the present jury trial." Return of an indictment on insufficient evidence is not an error of constitutional dimensions such as to compel a judge to consider an untimely motion. *Costello* v. *United States*, 350 U. S. 359, 363–364. *Lawn* v. *United States*, 355 U. S. 339, 349–350. Furthermore, assuming *arguendo* that a defendant may, at least in some cases, attack an indictment as based on insufficient evidence and that the portion of the transcript here submitted was insufficient to sustain the indictments against the defendants, the judge was correct in noting that the "stipulation does not state that there was no other evidence before the Grand Jury bearing on these indictments; and it does not exclude the possibility of such other evidence or of inferences from evidence. The

[11] "A plea of not guilty, whether voluntarily made by the defendant or entered by order of the Court, shall not be deemed to be a waiver of matters in bar or abatement or an admission of the validity of the indictment or complaint. A defendant at the time of the entry of such plea, or within ten days thereafter or within such further time as the Court may order, may file such motions and other pleadings relating to matters in bar or abatement or to the validity of the indictment or complaint as he may desire without at any time retracting the plea of not guilty.

"Lack of jurisdiction or the failure of the indictment or complaint to charge an offense may be raised at any time during the pendency of the proceedings."

records in this case show that these grand jurors were convened or impanelled on January 27, 1964, and that these indictments were returned on May 8, 1964. However, except for what is contained in . . . [the portion of the transcript submitted by these defendants], this Court has no information or knowledge of what evidence was before the grand jurors, or what knowledge or information they had, before they returned the indictments."

## PART II.

### THE FIRST TRIAL.

### A. THE EVIDENCE.

We summarize pertinent portions of the evidence most favorable to the Commonwealth.[12]  In 1962, the small loans

---

[12] In a conspiracy case, the trial judge must make, at least by implication, a preliminary ruling that, as matter of law, the evidence is sufficient to permit the jury to find that a conspiracy existed and certain persons were parties to it before granting a motion to admit the evidence of the acts, knowledge, and admissions of one conspirator against his co-conspirators. *Commonwealth* v. *French*, 357 Mass. 356, 379, fn. 27.  A preliminary ruling of this type is proper "when sufficient evidence has accumulated to support a fair inference of the existence of a conspiracy." *Commonwealth* v. *Benesch*, 290 Mass. 125, 132–133.  In the present case, the trial judge explicitly made a preliminary ruling as to the existence of a conspiracy and participants in the conspiracy.

Therefore, throughout the lengthy trial, items of evidence were admitted subject to limitations.  In order to recite the evidence without stating each limitation, we have adopted the following system employed by the Commonwealth which indicates what evidence was admitted against which defendants and subsequently expanded to include other defendants.  Each defendant is referred to in connection with a particular item of evidence by footnote.  In the footnote the following symbols are used to designate the particular defendants:  "H" is Household;  "B" is Beneficial;  "Lib" is Liberty;  "G" is Glynn;  "F" is Farrell;  "P" is Pratt;  "Br" is Barber;  "W" is Woodcock;  "Hly" is Hanley;  and  "Gkle" is Garfinkle.  Where evidence admitted against a defendant was limited to a specific indictment or count thereof, this is stated following the symbol used for that defendant.  Where original limitations were expanded to include other defendants, following the preliminary ruling by the judge as to the existence of a conspiracy, the expanded limitations are shown in parentheses following the original limitations.  Thus a footnote which reads "P, G, Hly 11976 (H, B)" means that the item of evidence referred to by the footnote was originally admitted against Pratt and Glynn, and against Hanley only on Indictment 11976, and that following the preliminary ruling the limitation was expanded to include Household and Beneficial.  A limiting footnote applies to the evidence immediately preceding it in that paragraph or following the next preceding footnote, if more than one footnote appears in a paragraph.  Evidence as to which no footnotes appear was admitted without limitation.

industry in Massachusetts was regulated by the Commissioner of Banks (Commissioner) who was head of the division of banks and loan agencies within the Department of Banking and Insurance. G. L. c. 26, §§ 1, 2. At that time, the law of this Commonwealth provided that any person who sought to engage in the business of making small loans had first to obtain a license from the Commissioner. G. L. c. 140, § 96. The Commissioner was also authorized to appoint a deputy to serve as supervisor of loan agencies. G. L. c. 26, § 4. In 1962, and at all times material to this case, the supervisor of loan agencies and Deputy Commissioner of Banks was Martin J. Hanley.

The permissible interest rate on small loans was regulated by the Rate Board which was within the division of banks and loan agencies. G. L. c. 26, §§ 1–5A. The Rate Board consisted of the State Treasurer, the Commissioner of Banks, the Commissioner of Corporations and Taxation and two persons appointed by the Governor, one of whom was required to be a representative of organized labor. G. L. c. 26, §§ 5, 5A. In 1962, the members of the Rate Board were John T. Driscoll, State Treasurer, Edward A. Counihan, Third, Commissioner of Banks, Guy J. Rizzoto, Commissioner of Corporations and Taxation, George P. Govostes, and Morris Garfinkle.

Among the corporations actively engaged in making "small loans" at interest rates established by the Rate Board were the following: Beneficial, Household, Liberty, American Investment Company of Illinois (American), Family Finance Corporation (Family), and State Loan and Finance Corporation (State).

Beneficial, a holding company incorporated in Delaware, is the sole owner of three Massachusetts business trusts licensed to carry on the small loans business in this Commonwealth. These are: Industrial Bankers, New England Equity, and Workingmens Loan Association. Collectively, these trusts have fifty-eight small loans offices throughout Massachusetts, each of which does business under the name of Beneficial. Beneficial is also the sole owner of a sub-

Commonwealth *v.* Beneficial Finance Company.

sidiary company, Beneficial Management Corporation (Beneficial Management) which handles the payroll and all of the legal, accounting and auditing services for Beneficial's three Massachusetts business trusts.[13]

In 1962, the defendant Glynn was "Director of Industry Relations" for the Beneficial Finance "System." He was formally an employee of Beneficial Management and on the payroll of one of Beneficial's business trusts.[14] On occasion he would report to the operating head of Beneficial's local division,[15] but he would report principally to Farrell, who was a vice-president of Beneficial Management.

Pratt was the New England "Regional Director of Public Relations" for Household.[16] In performing his duties he often visited the State House and would talk with personnel in the Department of Banking including those dealing with small loans.[17]

Barber, who was also engaged in public relations work on behalf of Household[18] was Pratt's superior and Pratt would report to him once a week by mail.[19]

Liberty, a Delaware corporation, owned the beneficial shares of several Massachusetts business trusts engaged in the business of making small loans in this State. Woodcock was an executive vice-president and a director of Liberty.[20]

American operated its small loans business in the Commonwealth under the name of Public Finance Corporation (Public). Heath was American's New England regional director and its operations vice-president. Four-fifths of his time was spent in "industrial relations" primarily in maintaining a good relationship "with the Small Loans Depart-

---

[13] B

[14] B, G

[15] G

[16] H, P

[17] P

[18] H, Br

[19] P

[20] Lib

ment, and the personnel thereof, and particularly [with] . . . Hanley."[21] In the performance of his duties he associated with the public relations men of other finance companies, primarily with Glynn of Beneficial, Pratt of Household and one Gordon J. Thomasch of State.

Heath was the Commonwealth's principal witness. He testified that between 1960 and September, 1963, he met socially with Glynn and with Hanley on the average of two or three times a week. These meetings generally involved "luncheons, dinners [and a] little socializing" at various Boston restaurants such as Locke-Ober's, Boston Club, Stella's, Giro's, Jacob Wirth's, Marie's Keyboard, Red Coach Grille and Pete's. Members of the banking department, legislators and representatives of other finance companies also attended. Heath met with Glynn and Hanley outside of Boston and at times overnight at such places as the "Motel 128 out in Dedham on at least a couple of occasions . . . Swampscott, on one occasion . . . at the Wequassett Inn and the Nauset Inn in Orleans on at least one occasion . . . [and] at the Orleans Inn on one occasion." In August, 1962, a four-day meeting was held at the Chatham Bars Inn. At all of these meetings the bills were paid pro rata by the public relations men of the various finance companies who were present.[22]

Pratt, of Household, was also present "once or twice a year" when Heath and Glynn met with Hanley.[23] Heath and Glynn helped Pratt make out the reports which were sent once a week to Barber stating where Pratt had been and to whom he had talked.[24] At this same time, Glynn, Pratt and Heath would meet as an "unofficial committee of three to get together and check with each other on matters of mutual interest in the absence of any association through

---

[21] Hly.

[22] Hly, G (B–11900, 11910)

[23] Hly, G, P (B–11900, 11910)

[24] P, G

which . . . [they] could work." Glynn acted as "sort of a chairman of the group."[25]  *Infra*, p. 246.

During the summer of 1962, the Legislature expanded the $1,500 limitation on small loans to include loans up to $3,000. Since the Rate Board was responsible for regulating the interest rate on such loans, it scheduled hearings on the maximum permissible interest rates which could be charged by licensed finance companies on loans of $1,501 to $3,000. The hearings were scheduled to begin on November 13, 1962. In the interim, the interest rate then applicable to loans of $1,001 to $1,500 was made applicable to loans between $1,501 and $3,000.

About the time of the enactment of the $3,000 ceiling on small loans, Hanley met with Glynn and Heath "three or four" times "in various restaurants." The three of them discussed the upcoming hearings before the Rate Board, and the possibility of paying money to Hanley to insure a favorable result from the Rate Board. Characterizing such payment as a "program," Hanley said that "if a program was going to be conducted, that he would handle the program, that there should be no interference from members of the industry, and that it would be his responsibility to deliver the votes." Hanley also said "that the industry would have to have the money put up in advance and that whoever was going to handle any program would have to have access to this money so that the transaction could be completed immediately and on time." Glynn and Heath said in substance that they "had no authority at that time to commit . . . [themselves] to a program, that there was about to be a meeting in New York at which, in . . . [their] opinion, such a decision would be made one way or the other." They further told Hanley that the industry would be content with the interest rates which were then in effect. Hanley replied that "he was happy about this situation" because he had feared that the industry

---

[25] G, P, (B, H)

might want a better rate than that presently in existence.[26]

Subsequent to these meetings with Hanley, Heath and Glynn met during the fall of 1962 on at least a half dozen occasions. They discussed between themselves the Rate Board hearings. Glynn told Heath that the defendant Farrell "had delegated to him the responsibility for setting up this meeting in New York." Glynn also said that "he was having difficulty in doing this, difficulty in contacting the various members of the industry who were attending this meeting." Heath responded that "[t]his makes no sense. You and I are working the lower echelon, and the people you are attempting to contact, it would seem to me that Mr. Farrell is in contact with these people at his level, and that protocol would indicate that he should set the meeting up." Later, Glynn told Heath that "Farrell had now taken over the arrangements of inviting the various members of the industry, and that the matter was out of his hands as far as talking to the individuals concerned." [27]

Approximately one week before the meeting in New York, which was scheduled for October 17, 1962, Heath met with Glynn and Pratt at Purcell's restaurant for lunch. Glynn began discussion of the Rate Board hearings saying, "We are going up to this New York meeting. They will expect us to make recommendations. We should present a united front, if possible, so let's see if we are in agreement. We do not know whether the industry will decide upon a program or not. If they do decide upon a program, we should have a united front." Heath and Pratt each stated that he agreed with Glynn's analysis of the situation. Glynn then said that "[i]f the industry decides to adopt a program, they will ask us to give our recommendation as to what our opinion is of what the total cost of this program might be." Heath again agreed with Glynn but Pratt questioned whether the industry was going to be interested in the

[26] Hly, G (B)

[27] Hly, G (B)

program. Glynn responded: "I believe we should recommend that the cost of such a program would be between fifty and seventy-five thousand dollars." Heath said, "I agree with you . . . but I doubt very much if we can sell that size program in New York." Pratt also questioned the cost of the program by stating, "You will never sell that size program to the industry." Subsequently, Heath said: "We are in agreement . . . and as far as I am concerned we will recommend the same program." Pratt responded by saying: "We are in agreement." Glynn next stated that "Hanley was a key figure in the forthcoming rate hearings" and that a member of the Rate Board was also a key figure. Glynn mentioned that "Hanley might require as high as $25,000 and that the other member of the Rate Board would have to be treated equally." Heath concurred with Glynn, and Pratt said that "[w]e will have to have at least three votes of the Board."[28]

Approximately two or three days prior to the New York meeting Glynn told Heath that "[w]e will have a meeting in New York at the Hotel Commodore at 10 o'clock on October 17th." [29]  The day before the meeting Hanley telephoned Heath and Heath told him, "We will have the answer when I come back from New York as to whether there will or will not be a program."[30]  Heath arrived in New York by train that same night.

The next morning he went to a conference room on the second floor of the Hotel Commodore at approximately 10 A.M.  At the meeting were Glynn and Farrell of Beneficial, Pratt and Barber of Household, Godshall of Family, Thomasch of State, Woodcock of Liberty and a lawyer, one Mr. Taulbee.  Farrell acted as chairman of the meeting.[31]

After lunch, which began about 1 P.M., while everyone was

---

[28] G, P (B, H)

[29] G

[30] Hly, G

[31] F, G, Br, P, W (B, H, Lib)

present except Mr. Taulbee, there was a discussion regarding the Rate Board hearings. Heath testified that everybody present "engaged in that discussion, to various degrees." Farrell initiated discussion concerning a "program." He said: "We now have another decision to make, gentlemen, and that is whether we should consider conducting a program to insure a favorable decision by the Rate Board, or should we go on the merits?" Glynn spoke next, saying, "Hanley is putting pressure on us. When we return from this meeting, we must have an answer on this subject. . . . 'There seems to be no formal preparation for a rate hearing,' and that those of us on the local scene would come to the conclusion that a program should be adopted." Heath agreed. Glynn then resumed speaking. He said: "The conditions of this program are that Mr. Hanley will handle the program. Mr. Hanley will be responsible for obtaining the necessary votes. There is to be no interference on the part of any members of the industry. The money will have to be put up in advance, in escrow . . . so that it will be available immediately upon the decision of the Rate Board." Farrell asked Glynn: "Frank, will you give us your estimation of the cost of this program?" Glynn replied: "We feel the program will cost between fifty and seventy-five thousand dollars." Then "everybody talked at once."[32]

Woodcock was the first to speak out. He said in substance "that the cost of this program was completely ridiculous, out of order, out of control, and that his company would have nothing to do with a program of that size." Barber agreed that the cost was too high saying that "[t]he cost of this program is ridiculous, unheard of, preposterous." Farrell also said that the "cost of this program seems to be completely out of line, but I still think we should give the matter some consideration. . . . Heath, you are on the local scene with Frank; what is your opinion?" Heath replied: "I am in general agreement with Glynn. However,

[32] F, G, Br, P, W (B, H, Lib)

I feel that this program could be handled for approximately half of the minimum figure, or $25,000." Heath further said that he "did not envy the gentleman who handled the program; that the problem is to convince Mr. Hanley that $25,000 was all there was, and there was no more. It was 'take it, or leave it.' And, '. . . if the money was piled up in neat little piles in front of Mr. Hanley,' it was my opinion, '. . . he would take it.'" Glynn responded to Heath "that the figure . . . [Heath] had recommended was ridiculous; such a program would fall flat on its face." However, Woodcock affirmed Heath's estimation saying, "At the $25,000 figure perhaps we have no choice, but I want it clearly understood that the figure is $25,000 and not one penny more, and no one is to come back at a later date and request that the figure be raised, under any conditions." Farrell then confirmed the "program" at that price, stating that "[a]pparently we are in agreement on the $25,000 figure."[33]

The next person to speak asked, "Who is going to handle this program?" Farrell responded, "I presume Frank [Glynn] will," but Glynn then stated, "I will have nothing to do with such a program. I have no intention of going back to Mr. Hanley and making a fool of myself with such a proposition." Heath also refused, saying "Not me. . . . I will have nothing to do with this. I am only giving you my impression of how it can be done. I have had no experience with Rate Boards, and I know no one on the Rate Board." Barber then interjected: "I would like you gentlemen to consider a suggestion that I have. I believe that I might be the logical man to handle this program. Heath and Glynn have to work on a daily basis with Mr. Hanley. I am a stranger. I can come into this State of Massachusetts on a one-shot deal. If Mr. Hanley gets mad at me, there is no harm done. I will not take advantage of the entree. . . . I will not step on Heath and Glynn's toes. I

---

[33] F, G, Br, P, W (B, H, Lib)

will not stay in the state.  I will come in and get out, and Mr. Heath and Mr. Glynn should have no concern over my coming in."  Glynn responded to Barber's offer saying, "I doubt very much if Mr. Barber will have any success, but I will step aside."[34]

The next question posed at this meeting concerned the apportionment of costs for the "program."  Farrell stated: "I presume we will allocate the expenses among the big three on a pro rata basis of outstandings and possibly with the smaller companies on a flat payment."[35]  Subsequently, Godshall of Family and Thomasch of State stated that they did not have sufficient authority to commit their companies. Godshall said: "I have no authority to commit my company. I will report back."  Similarly, Thomasch stated: "I do not have authority to commit my company, and I will make my report to my superiors."  Farrell then replied: "I understand, and I myself will be in contact with Mr. Whilden of Family and Mr. Winston of State Finance and Loan Company."  No other representative at the meeting asserted that he did not have authority to commit his company and the meeting ended shortly thereafter at approximately 4 P.M. [36]

Previously that morning, before the meeting began, Hanley telephoned Glynn.  Glynn reported this call to Heath.  Later that morning Hanley again called, while the meeting was in progress, and again spoke directly to Glynn.  Heath also spoke to Hanley at that time.[37]

Heath returned to Boston the same night and received a call from Hanley.  Heath told Hanley that "a problem had arisen at the meeting; that . . . [Glynn] had dropped the ball; that . . . [Glynn] was staying over an extra day;

---

[34] F, G, Br, P, W (H, B, Lib)

[35] "Outstandings" are the aggregate amount of loans owed to a particular loan office.

[36] F, G, Br, P, W (H, B, Lib)

[37] Hly, G (B)

and that, when he came in, undoubtedly he would fill Martin in." [38]

Toward the end of October or the beginning of November, before the commencement of the Rate Board hearings, Heath had several conversations with Hanley wherein Hanley asked, "Where is Mr. Barber?" Heath would say, "I haven't the slightest idea." Glynn was present at one of these meetings and also said, "I don't know where he is." Later, Glynn and Heath asked Pratt in substance, "Where is Barber? Is he coming in or isn't he?" Pratt replied: "Mr. Barber will be in. He is tied up at the moment on other matters." [39]

On November 8, 1962, Heath went to Glynn's room at the Parker House, where he was joined by Glynn, Hanley and another man. They had just had lunch together. At the room, Hanley asked Glynn to call Barber in Washington to assure him that he (Glynn) had not been interfering in the program and would not interfere. Glynn placed the call and Heath heard him say, "Hi, Nat." At that point Hanley left the room, saying that he was going down to the Pub. Glynn told Barber that he (Glynn) had no intention of interfering in the program. The conversation lasted about twenty minutes during which Glynn's voice became loud and he "finally slammed the phone down on the receiver." [40]

In mid-November, 1962, Glynn called Heath and told him he was at the Boston Club with Garfinkle and another member of the Rate Board. Glynn "chuckled" when Heath said: "You wouldn't be lousing things up, would you?"

---

[38] Hly (F, G, Br, P, W, H, B, Lib — The subsequent admission was limited to the conspiracy to bribe Hanley indictment, and count 1 of the offer to bribe Hanley indictments.)

[39] G, Hly (F, Br, P, W, H, B, Lib — The subsequent admission was limited to the conspiracy to bribe Hanley, and count 1 of the offer to bribe Hanley indictments.)

[40] G, H (F, Br, P, W, H, B, Lib — The subsequent admission was limited to the conspiracy indictments, and to count 1 of the substantive indictments for all of these defendants except Beneficial as to which the evidence was admitted on both counts, to wit, the offer to bribe Hanley and Garfinkle.)

The Rate Board hearings began on November 13, 1962. The Department of Banking, recognized as a party in interest, was represented by Hanley. He cross-examined witnesses and presented argument to the Rate Board.

During the course of the hearings in the last week of November, Heath received a call from Hanley asking Heath to meet him at the Statler Hotel. When Heath arrived, he was met by Hanley, who then left, returning about two hours later with Garfinkle. The three of them then went into a dining room to have lunch. During lunch, Heath told Garfinkle, at Hanley's request, that during a meeting in New York Barber had been authorized to conduct negotiations on the "program" and that Glynn had no authority to negotiate. Garfinkle replied, "Thank you, Bill [Heath] I've been confused. Mr. Glynn has been talking to me. Mr. Hanley says he has no authority to. I realize the danger of talking to unauthorized persons." Garfinkle then recounted an incident about a former member of the Rate Board, not related to the 1962 Rate Board, who had been promised $5,000, but never received it.[41]

In the latter part of November, Heath again received a call from Hanley, who said that he wanted Heath to step in and handle the program. Heath refused to do so, saying, "I have no intention and will not step into this program until at least two conditions are met: One, that Mr. Barber personally call me and inform me that he is stepping out of this program; two, that my home office call me and instruct me to step into this program." [42]

Approximately a week later, Heath received another call from Hanley. Hanley said: "Bill, Frank's messing around has raised the ante. It is now necessary to raise another ten thousand dollars. Otherwise, the program is in danger of collapse." Heath repeated that he would not step into

---

[41] Hly (F, G, Br, P, W, H, B, Lib)

[42] Hly (F, G, Br, P, W, H, B, Lib)

the program until the two conditions previously mentioned had been met.[43]

About a week later, approximately the third week in December, Hanley again called Heath. Hanley said that the program was in danger of collapse unless another $10,000 was raised, and it was possible that the Rate Board might bring out a substantial reduction in interest which could cost the industry a considerable amount of money. Heath reiterated his previous conditions.[44]

About the middle of December, Heath saw Barber at a hearing at the State House.[45] Barber said to him: "I just left Martin [Hanley] across the street. He is putting pressure on me to raise another $10,000. I am unable to obtain it from the original group. Do you think that Charlie McDermott and his group could raise the additional $10,000?" Heath suggested that Barber call McDermott directly to see if his group would. Heath and Barber then went to the Parker House. Barber told Heath he was going down to his room to call McDermott.[46] Shortly thereafter, Glynn met Heath in the room and said he had just been drinking at the Pub with Hanley, Garfinkle and Govostes, another member of the Rate Board. Glynn suggested that Heath go back there with him. Heath accompanied Glynn back to the Pub and there they sat down with Hanley, Garfinkle and Govostes.[47]

During the next few days Heath met Glynn on a couple of occasions and asked him if he had "heard any more as to whether McDermott had given Mr. Barber an answer on the additional $10,000?" Glynn replied that "Charlie McDer-

---

[43] Hly (F, G, Br, P, W, H, B, Lib)

[44] Hly (F, G, Br, P, W, H, B, Lib)

[45] It is not clear from the transcript whether this was a Rate Board hearing.

[46] Br (F, G, P, W, H, B, Lib — The subsequent admission was limited to the conspiracy indictments and count 1 of the substantive indictments except as to Household, against whom the evidence was admitted on both counts.)

[47] G (Br, P, F, W, H, B, Lib)

mott told Mr. Barber that his group would have nothing to do with the raising of the additional $10,000. This was a chain program, and let the chains [48] handle it, and his group would have nothing to do with it." [49]

On December 27, 1962, the day the Rate Board made its decision, Glynn and Heath were in the corridor outside the hearing room where the Rate Board was meeting in executive session. Heath said: "What's going on in there, Frank?" Glynn responded, "They're about to adjourn the hearings, and they are placing the responsibility for such adjournment upon Martin." Heath stated that it seemed peculiar to him that Hanley "would stand still for this." [50]

That same day, after the Rate Board hearing had been opened to the public, the chairman of the Rate Board stated: "On the basis of the record, and particularly the request of Mr. Hanley, representing the Banking Department, the . . . [Rate Board] by unanimous vote hereby terminates this hearing." [51] Thus, the Rate Board concluded its hearings at that time without changing the existing interest rates on loans between $1,501 and $3,000.

During the first week in January, 1963, Heath asked Glynn whether "Mr. Barber had come into Massachusetts to deliver the package?" Glynn said that Barber had not. [52]

---

[48] A "chain" refers to a small loans company having more than one office.

[49] G (F, Br, P, W — The subsequent admission was limited to the conspiracy indictments and count 2 of the substantive indictments.)

[50] G (F, B, P, W, H, B, Lib — The subsequent admission was made as to all indictments against the corporate defendants but was limited as to the individual defendants on the conspiracy indictment and to count 1 of the substantive indictments.)

[51] Hanley's "request" was embodied in a statement which reads as follows: "[T]he Department [of Banking] wishes to indicate with reluctance that due to the absence of these vital figures in the figures reported by the industry for the year 1961 that it is utterly impossible for anyone to determine at this time the precise amount of a book asset base and, therefore, the Department has absolutely no alternative but to suggest that this Board take no action upon the matter . . . until the 1962 figures have been received and processed by the Banking Department, which should occur to the best of the Department's knowledge and prediction some time in July or September of next year."

[52] G (F, Br, P, W, H, B, Lib — The subsequent admission was made as to all indictments against the individual defendants but was limited to count 2 on the substantive indictment, that is, the offer to bribe Garfinkle.)

There was further testimony from one Jerome Troy, judge of the Municipal Court of the Dorchester District, that he was a long-time friend of Hanley's, and that he and Hanley went to Washington together on or about January 22, 1963. They stayed at the Wardman Park Hotel and the bill was paid for by Household. While in Washington Hanley and Troy visited the offices of one of the finance companies and had lunch with two men, one of whom Troy had met at the finance company office.

Shortly after this trip, Heath met Glynn and asked him if Barber had come to Boston and delivered the "package" to Hanley. Glynn replied, "No, he did not come in, but Marty [Hanley] and Jerry Troy went down to Washington, at which time the package was delivered." [53]

Approximately nine months later, in September, 1963, Pratt telephoned Heath and told him that Barber was in town and would like to talk to him (Heath). Pratt said: "We are at the Statler Hotel. Will you come over and join us?" Heath replied that he would, and later met Barber at the hotel. Barber told him that Hanley and Troy had been in Washington and that he (Barber) had taken them to lunch. Heath asked, "Was that $25,000 mission ever completed?" Barber replied: "Yes, it was." "For once American . . . brought in their proportional share early."

The above evidence comprises most of the *essential* testimony and exhibits presented to the jury in the first trial. Other pertinent evidence not recited above which is particularly applicable to the case of a specific defendant or which relates to a specific issue will be recounted in the portion of the opinion where such issue is discussed. In certain instances, because of the many issues involved in these appeals, there will be some degree of overlapping and restatement of evidence.

---

[53] G (B — The subsequent admission was made on the conspiracy indictments and on count 1 of the substantive indictment.)

B. THE SUFFICIENCY OF THE EVIDENCE.

THE INDIVIDUAL DEFENDANTS.

1. *Pratt* — The first issue we treat with concerns the sufficiency of the evidence to link Pratt to the alleged conspiracy. The evidence initially admitted against Pratt, and offered as tending to connect him to the conspiracy may be divided into four categories: (1) Evidence concerning Pratt's position and duties in connection with his employment by Household Finance Corporation; (2) His meeting with Heath and Glynn at Purcell's restaurant within one week before the Commodore Hotel meeting; (3) The general industry meeting of October 17, 1962, at the Commodore Hotel in New York City; and (4) The incident in early November, 1962, when Pratt told Glynn, "Barber is tied up but he will be in."

The first category of evidence shows that Pratt came to Massachusetts in 1959 as Household's regional director for public relations in New England. As part of his duties, Pratt kept in touch with members of the Legislature and personnel in both the Department of Banking and the small loans division. He presented to them Household's position on legislative and regulatory matters, visited the State House, and attended the hearings of legislative committees. He also attended certain hearings of the Department of Banking, the Rate Board, and was present at a meeting of the small loans division. Early in 1962, Barber became Pratt's superior and Pratt reported to Barber once a week by mail. Pratt informed Barber where he (Pratt) had been and to whom he had talked.

Pratt associated with Glynn of Beneficial and Heath of American. Glynn and Heath helped Pratt make out his reports. These three men constituted an "unofficial committee," with Glynn as "sort of a chairman," so that each of them might check with the others on matters of mutual interest. Heath and Glynn kept Pratt informed about matters of which Pratt might otherwise have had no knowledge. Pratt attended at least one function at which Hanley

was present and also had luncheons with Hanley, Heath and Glynn once or twice a year. On such occasions the bill was divided among the public relations men present and Pratt paid Household's pro rata share.

The second category of evidence concerns the meeting at Purcell's restaurant. In its brief, the Commonwealth chooses not to rely on this evidence in trying to link Pratt to the conspiracy in view of the fact that the defendants Pratt, Glynn, Barber, Farrell, Hanley, Woodcock, Liberty, Household and Beneficial all argue that they are entitled to a new trial on the ground that Heath's expense vouchers covering the period in which the luncheon took place were not disclosed to them by the Commonwealth until after the first trial had been completed. This issue is discussed *infra*, p. 315 of this opinion wherein we conclude that there was no error in the admission of this evidence and that the defendants are not entitled to a new trial on this ground. Therefore, we recite that part of the evidence concerning this meeting as it relates to Pratt's participation in the conspiracy.

Heath met Glynn and Pratt at Haley's restaurant in Boston and the three of them then went to Purcell's restaurant for lunch. This occurred approximately one week before the meeting in New York. Glynn began to discuss the forthcoming meeting in New York and said: "We are going up to this New York meeting. They will expect us to make recommendations. We should present a united front, if possible, so let's see if we are in agreement. We do not know whether the industry will decide upon a program or not. If they do decide upon a program, we should have a united front." Heath and Pratt each agreed that they should present a united front on the presentation of a "program." But when Glynn suggested a program costing between $50,000 and $75,000, Pratt said: "You will never sell that size program to the industry." After further discussion concerning the recommendations that they would make in New York, Pratt said: "We are in agreement." The discussion then turned to the fact that Hanley was the "key

figure in this program." Pratt agreed with this analysis of the situation and said: "We will have to have at least three votes of the Board."

The third category of evidence shows that on October 17, 1962, Pratt attended the meeting at the Hotel Commodore in New York City. All of those present were active in the small loans industry, including Barber, Pratt's superior, Farrell of Beneficial, and others. At least one of the purposes of the meeting as announced by Farrell, the meeting's chairman, was to review the preparations for the forthcoming Rate Board hearing and to determine whether to adopt a Rate Board "program." Farrell said in substance: "We now have another decision to make, gentlemen, and that is whether we should consider conducting a program to insure a favorable decision by the Rate Board, or should we go on the merits?"

In response to Farrell's statement, Glynn said: "'Hanley is putting pressure on us. When we return from this meeting, we must have an answer on this subject. . . . There seems to be no formal preparation for a rate hearing,' and . . . those of us on the local scene would come to the conclusion that a program should be adopted." Heath agreed with Glynn that a program should be adopted. There is no evidence that Pratt, the third member of the "unofficial committee" on the "local scene" said or did anything during this discussion. However, he did not disavow any aspect of the obvious conspiratorial plan. Other details of this meeting we have previously recounted and we do not repeat them. In substance, the evidence shows that a plan was agreed upon to pay Hanley $25,000 and that Barber, Pratt's superior, agreed to come into "Massachusetts on a one-shot deal" as a stranger and "handle this program."

The fourth and last category of evidence involves a statement made by Pratt during the first week in November, shortly before the commencement of the Rate Board hearing. Pratt met with Heath and Glynn and each of them inquired about Barber. Heath said: "Is he coming in or

isn't he?" Pratt replied, "Mr. Barber will be in. He is tied up at the moment on other matters."

Pratt argues, in essence, that this evidence was insufficient to link him to the alleged conspiracy because "he neither said nor did anything at all which in any way advanced the object of the conspiracy or could be construed as a promise to do so." On the other hand, the Commonwealth argues that there is evidence of affirmative action by Pratt in furtherance of the conspiracy and that even had there been no evidence of an affirmative act on the part of Pratt, his "knowing acquiescence" in and agreement to the plans of the other conspirators was sufficient. On this latter point, the Commonwealth relies on the case of *Commonwealth* v. *Favulli,* 352 Mass. 95, 113.

The principles which are determinative of the offence of conspiracy are well settled. In the oft cited case of *Commonwealth* v. *Hunt,* 4 Met. 111, 123, Chief Justice Shaw, in a classic passage, stated the definition of conspiracy to be a "combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." The requirement of "concerted action" does not mean that either one or all of the conspirators must commit some overt act in furtherance of the unlawful agreement. "[T]he offence is complete, when the confederacy is made, and any act done in pursuance of it is no constituent part of the offence, but merely an aggravation of it." *Commonwealth* v. *Judd,* 2 Mass. 329, 337. However, "it may be assumed that mere knowledge of an unlawful conspiracy is not sufficient to make one a member of it, but that he must actively participate therein and must do something in furtherance of it before he is liable as a member." *Commonwealth* v. *Beal,* 314 Mass. 210, 222. Accord, *United States* v. *Falcone,* 311 U. S. 205. *Thomas* v. *United States,* 57 F. 2d 1039 (10th Cir.).

Although the need for concerted action or active participation requires actual commitment to the conspiratorial plan, contrary to the contention of the defendant it is not

necessary that one play an active role in the actual execution of the object of the conspiracy. The language in the *Beal* case, *supra*, that one "must do something in furtherance of it" we construe to mean simply that one must be shown to have at least communicated to other conspirators his willingness to join in the conspiracy. The very fact that one gives his affirmative acquiescence to the object of a conspiracy may in many cases be doing "something in furtherance of it." A particular defendant's participation in a conspiracy may be proved where his approval of the plan stimulates the activities of others to carry out the conspiracy, even though his participation does not involve an overt act, such as the handing of bribe money to a public official. In this context, the line that separates mere knowledge of the fact that a conspiracy exists from participation in the conspiracy is often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant had crossed that line. *Egan* v. *United States*, 137 F. 2d 369, 378.

In the present case, there is ample evidence that Pratt agreed to participate in a plot, euphemistically characterized as a "program," to bribe Hanley. As one of the three members of the "unofficial committee" Pratt agreed at the meeting at Purcell's that this "committee" should present a "united front" concerning their recommendations on the adoption of a "program." He agreed that a "program" should be adopted, only disputing the amount to be contributed. The fact that he remained silent at the New York meeting where the "program" was formulated and the conspiracy completed is inconsequential. It is not unreasonable to assume that Glynn as "chairman" of the "unofficial committee" could be expected to present their views as he did and that Barber, as Pratt's superior, would speak on behalf of Household. The previous agreement among Glynn, Pratt and Heath at Purcell's, Pratt's presence and silent acquiescence at the Commodore meeting, and his statement that "Mr. Barber will be in," constitute sufficient evidence of affirmative conduct to link him to the conspiracy.

Even should we assume, as Pratt argues, that there is no direct evidence of his agreement to join in the conspiracy he would not be absolved of his participation therein. "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 494.

Having concluded that there is evidence of affirmative conduct by Pratt, we do not consider here whether "knowing acquiescence" in the circumstances of this case is sufficient to link Pratt to the conspiracy. This issue and the *Favulli* case, *supra*, with respect to it were discussed at length in the briefs. We hold that the judge's instructions to the jury on this point were correct (*infra*, p. 303) and discern no reason for further comment relative thereto.

The evidence originally admitted against Pratt was sufficient, as matter of law, to warrant the admission in evidence against Pratt of the acts, knowledge and statements of the other conspirators. There was no error in the denial of Pratt's motion for a directed verdict. *Commonwealth* v. *Stasiun*, 349 Mass. 38, 51.

2. *Woodcock* — Woodcock, an executive vice-president and director of Liberty, is the only other individual contesting the sufficiency of the evidence to charge him with the conspiracy. The essence of his argument is that the Commodore Hotel meeting amounted to only an "inchoate agreement" with each of the participants having to go back and report to his respective corporation and that none of the individuals present had the authority to bind their corporations. On this basis Woodcock argues that the only evidence allegedly incriminating him is one statement that he made at the Commodore Hotel meeting, which tends to prove, if anything, that the agreement was never consummated.

In the following part of this opinion we discuss whether Woodcock and the other participants in the Commodore Hotel meeting had the authority to speak on behalf of their corporations. Here, we confine our discussion to whether the evidence was sufficient to permit a finding that Woodcock conspired as an individual to bribe a public official.

The evidence concerning Woodcock shows that he was present at the Commodore Hotel when Farrell brought up the subject of a "program to insure a favorable decision by the Rate Board." After Glynn reported that the program would cost between "fifty and seventy-five thousand dollars," Woodcock said that "this program was completely ridiculous, out of order, out of control, and that his company would have nothing to do with a program of that size." Further discussion ensued and Heath said that "this program could be handled for . . . $25,000." With the amount hanging in the balance, Woodcock then said: "At the $25,000 figure perhaps we have no choice, but I want it clearly understood that the figure is $25,000 and not one penny more, and no one is to come back at a later date and request that the figure be raised, under any conditions." Farrell then responded: "Apparently we can agree on the $25,000."

The above evidence clearly supports a finding that Woodcock knowingly and intentionally agreed with Farrell, Glynn, Barber and Pratt to bribe Hanley. In the context of the discussion, Woodcock's statements that "we have no choice" and "I want it clearly understood that the figure is $25,000 and not one penny more" is more than sufficient "to support a fair inference of the existence of a conspiracy." *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133. The judge properly admitted evidence of the acts, knowledge and statements of other conspirators against Woodcock. The judge was correct in denying Woodcock's motion for a directed verdict. *Commonwealth* v. *Riches,* 219 Mass. 433, 438.

## C. THE SUFFICIENCY OF THE EVIDENCE.

### THE CORPORATE DEFENDANTS.

Having concluded that the evidence was sufficient to establish that the defendants Pratt and Woodcock were part of a conspiracy joined in by Farrell, Glynn and Barber to bribe Hanley and Garfinkle, we turn to the question of whether there was sufficient evidence to support a finding that Beneficial, Household, and Liberty were parties to the conspiracy. Each of the corporate defendants raised this issue by means of a motion for a directed verdict. In view of the fact that this issue is discussed extensively in the briefs of the respective corporate defendants as well as in the Commonwealth's brief,[54] and because the legal principles involved permeate these cases, in this part of the opinion we discuss at length the applicable legal standards concerning the extent to which a corporation may be held criminally responsible for the acts of its directors, officers and agents. We then summarize the evidence admitted against the respective corporations and apply the appropriate legal standard to the evidence. We also note here that in their pre-trial briefs three of the corporate defendants raised the question whether the Superior Court had jurisdiction over them. Since we disposed of the defendant's jurisdictional contentions in the pre-trial portion of this opinion on the ground that these contentions essentially involve the sufficiency of the evidence to charge the foreign corporate defendants with the acts of the respective individual defendants, we herewith treat the jurisdictional question on that basis.

With this in mind, perhaps it would be helpful at this

---

[54] The first trial briefs for Beneficial alone devote forty-five pages to the issue of corporate responsibility. First trial briefs submitted on behalf of Household cover sixty-eight pages, the Liberty brief covers thirty-four pages. The Commonwealth's first trial briefs take up sixty-three pages. Second trial briefs on this issue utilize approximately the same amount of space.

point to briefly summarize the relationships between the various corporate defendants and individual defendants: (1) Household was held criminally responsible, in part, for the criminal conduct of Barber and Pratt. Barber and Pratt were employees of Household, but were neither directors nor officers. (2) Liberty was held liable, in part, for the criminal acts of Woodcock, who was one of Liberty's two executive vice-presidents and one of its eleven directors. (3) Beneficial was held criminally responsible, in part, for the conduct of Farrell and Glynn who were neither directors, officers nor employees of that corporation. Farrell was a vice-president and Glynn was an employee of Beneficial Management, a wholly owned subsidiary of the defendant, Beneficial. Other evidence pertaining to the criminal responsibility of the corporate defendants will be summarized as we treat with each of them.

1. *Standards of Criminal Responsibility* — The defendants and the Commonwealth have proposed differing standards upon which the criminal responsibility of a corporation should be predicated. The defendants argue that a corporation should not be held criminally liable for the conduct of its servants or agents unless such conduct was performed, authorized, ratified, adopted or tolerated by the corporations' directors, officers or other "high managerial agents" who are sufficiently high in the corporate hierarchy to warrant the assumption that their acts in some substantial sense reflect corporate policy. This standard is that adopted by the American Law Institute Model Penal Code, approved in May, 1962. Section 2.07 of the Code provides that, except in the case of regulatory offences and offences consisting of the omission of a duty imposed on corporations by law, a corporation may be convicted of a crime if "the commission of the offence was authorized, requested, commanded, performed or recklessly tolerated by the board of directors or by a high managerial agent acting in behalf of the corporation within the scope of his office or employment." The section proceeds to define "high managerial agent" as "an officer of a corporation . . . or any other

agent . . . having duties of such responsibility that his conduct may fairly be assumed to represent the policy of the corporation." [55]

The Commonwealth, on the other hand, argues that the standard applied by the judge in his instructions to the jury was correct. These instructions, which prescribe a somewhat more flexible standard than that delineated in the Model Penal Code, state in part, as follows: "[T]he Commonwealth must prove beyond a reasonable doubt that there existed between the guilty individual or individuals and the corporation which is being charged with the conduct of the individuals, such *a relationship that the acts and the intent of the individuals were the acts and intent of the corporation.* Or, to put it differently, the Commonwealth must prove beyond a reasonable doubt that when the individuals were acting criminally in committing the acts which constitute the crime, and in having the intent required for the crime, *the corporation was actually so acting and intending,* and therefore is criminally liable. The Commonwealth must prove that.

"How is that to be shown? How is the jury to determine whether the Commonwealth has proved that? First let me say that the Commonwealth does not have to prove that the individual who acted criminally was expressly requested or authorized in advance by the corporation to do so, nor must the Commonwealth prove that the corporation expressly ratified or adopted that criminal conduct on the part of that individual or those individuals. *It does not mean that the*

---

[55] Section 2.07 of the Model Penal Code was materially amended between 1955 (Tentative Draft No. 4, p. 22; see pp. 146–155, for the comments on the unamended section) and its adoption in 1962 (Proposed Final Draft, pp. 35, 38) by adding the italicized words "or recklessly tolerated." These words seem to expand corporate criminal liability to include at least cases where high managerial officers shut their eyes to (or try to remain aloof from and apparently unaware of) criminal activity by subordinates undertaken for the corporation's benefit. Cf. Restatement 2d: Agency, § 217D, comment d (1957): "Apart from statute, an employer is not subject to a penalty for an unauthorized act constituting a crime committed by an ordinary servant in the scope of employment if the basis for liability is a 'specific criminal intent. However, . . . an employer may be penalized for the act of an advisory or managerial person acting in the scope of employment."

*Commonwealth must prove that the individual who acted criminally was a member of the corporation's board of directors, or that he was a high officer in the corporation, or that he held any office at all.* If the Commonwealth did prove that an individual for whose act it seeks to hold a corporation criminally liable was an officer of the corporation, the jury should consider that. *But more important than that, it should consider what the authority of that person was as such officer in relation to the corporation.* The mere fact that he has a title is not enough to make the corporation liable for his criminal conduct. The Commonwealth must prove that the individual for whose conduct it seeks to charge *the corporation criminally was placed in a position by the corporation where he had enough power, duty, responsibility and authority to act for and in behalf of the corporation to handle the particular business or operation or project of the corporation in which he was engaged at the time that he committed the criminal act with power of decision as to what he would or would not do while acting for the corporation, and that he was acting for and in behalf of the corporation in the accomplishment of that particular business or operation or project, and that he committed a criminal act while so acting.*

"The Commonwealth must prove all that beyond a reasonable doubt before you can hold a corporation criminally liable or guilty by reason of the criminal acts or conduct of an individual.

"You will note from what I said that it is not necessary that the Commonwealth prove that an individual had any particular office or any office at all or that he had any particular title or any title at all. It isn't the title that counts. *It isn't the name of the office that counts, but it's the position in which the corporation placed that person with relation to its business, with regard to the powers and duties and responsibilities and authority which it gave to him which counts.* If it placed him in a position with such power, duty, authority, and responsibility that it can be found by you that, when he acted in the corporation's business, the

corporation was acting, then you may find the corporation equally guilty of the criminal acts which he commits and of the intent which he holds, if you first find that the individual was guilty of the crime.

"*Now, this test doesn't depend upon the power, duty, the responsibility, or the authority which the individual has with reference to the entire corporation business. The test should be applied to his position with relation to the particular operation or project in which he is serving the corporation*" (emphasis supplied).

The difference between the judge's instructions to the jury and the Model Penal Code lies largely in the latter's reference to a "high managerial agent" and in the Code requirement that to impose corporate criminal liability, it at least must appear that its directors or high managerial agent "authorized . . . or recklessly tolerated" the allegedly criminal acts. The judge's instructions focus on the authority of the corporate agent in relation to the *particular* corporate business in which the agent was engaged. The Code seems to require that there be authorization or reckless inaction by a corporate representative having some relation to framing corporate policy, or one "having duties of such responsibility that his conduct may fairly be assumed to represent the policy of the corporation." Close examination of the judge's instructions reveals that they preserve the underlying "corporate policy" rationale of the Code by allowing the jury to infer "corporate policy" from the *position* in which the corporation placed the agent in commissioning him to handle the particular corporate affairs in which he was engaged at the time of the criminal act. We need not deal with the Model Penal Code in greater detail. Although we give it careful consideration (see e.g. *Commonwealth* v. *McHoul,* 352 Mass. 544, 547–555) as a scholarly proposal, it has not been enacted in Massachusetts and does not purport to be a restatement of existing law. It is not clear (see fn. 55, *supra*) that if the Code had been in effect in Massachusetts, when the acts alleged and proved were

committed, the corporate defendants would have been in a better situation, in view of the proof here of concerted criminal conduct (in a "program" designed to be of benefit to finance companies) by plainly significant representatives of three or more competing financing companies and the sums involved. We do not consider whether the circumstances would permit inferences of facts constituting a violation of the Code. The judge correctly charged the jury on the basis of decided cases, rather than on the basis of a proposed model code.

It may also be observed that the judge's standard is somewhat similar to the traditional common law rule of respondeat superior. However, in applying this rule to a criminal case, the judge added certain requirements not generally associated with that common law doctrine. He further qualified the rule of respondeat superior by requiring that the conduct for which the corporation is being held accountable be performed *on behalf of the corporation.* This factor is noted as important in the commentary to § 2.07 (1) of the Model Penal Code. It may well be that there is often little distinction between an act done *on behalf of a principal* and an act done *within the scope of employment,* which is the traditional requirement of the doctrine of respondeat superior. Nevertheless, in the circumstances of this case it might reasonably be concluded that the explicit instruction of the judge that the jury look to the authority vested in the agent by the corporation to act within the particular sphere of corporate affairs relating to the criminal act, together with the explicit instruction that such act be performed on behalf of the corporation, required, in effect, the type of evidence which would support an inference that the criminal act was done as a matter of corporate policy. We deem this to be a valid conclusion, especially in view of the quantum of proof required in a criminal case in order to prove guilt beyond a reasonable doubt.

The defendants seek to make the question of corporate criminal responsibility one of first impression in this Com-

monwealth. They argue that there is "no Massachusetts case" dispositive of the question as to when a corporation may be held criminally liable for the acts of its servants or agents *where the offence is one which involves specific intent.* Conversely, the Commonwealth contends that the standard applied by the judge was expressed long ago in the case of *Telegram Newspaper Co.* v. *Commonwealth,* 172 Mass. 294, 299. This case, it is argued, serves as precedent for the rule that corporate criminal responsibility can be predicated on the acts of an agent who is neither a director nor an officer of the corporation.

In seeking to resolve the adverse contentions posed above, and in order to formulate a correct standard in the perspective of precedence, we think it would be helpful at this point to review the decisions in this Commonwealth as well as cases in other jurisdictions which in some way deal with this issue. No Massachusetts case has been brought to our attention involving the prosecution of a corporation for bribery or for criminal conspiracy, although there have been cases holding corporations civilly liable for conspiracy. E.g. *Aberthaw Constr. Co.* v. *Cameron,* 194 Mass. 208, 213; *Lovejoy* v. *Bailey,* 214 Mass. 134, 153; *Potter Press* v. *C. W. Potter, Inc.* 303 Mass. 485, 493. In fact, there appear to be only four reported instances in this Commonwealth where a corporation has been sought to be held liable for a classic common law crime.

The first is the *Telegram* case, *supra,* which involved the conviction of two newspaper publishing corporations for criminal contempt. The corporations published articles relating to a pending trial in the Superior Court. The treasurer and manager of one newspaper and the editor and publisher of the other were discharged in the trial court "on the ground that they were not shown to be directly responsible for the publications." *Telegram Newspaper Co.* v. *Commonwealth,* 172 Mass. 294, 299. The Superior Court made no finding whether "there was an intent to influence the trial of the cause referred to on the part of anybody," and this court assumed "that the person or persons who wrote and caused

the articles to be published . . . acted without any intent to prevert the course of justice." *Ibid.* Having made this assumption the court framed the basic issue in the case as follows: "As the only intent which can be imputed to the corporations is the intent of its officers or agents, the question is whether the publication of these articles without any intent to pervert the course of justice can be adjudged a contempt." *Ibid.* Despite the fact that there was no evidence that any officer or director of the defendant corporations either authorized or ratified the publications, which were written by a subordinate employee (a reporter), the court affirmed the convictions.

In the present case, the judge treated the *Telegram* case as "persuasive authority for the rule that there can be corporate criminal responsibility for the actions of an agent who is neither a Director nor an officer of the corporation." Household, however, argues that the *Telegram* case was a case of strict liability involving a crime which did not require specific intent and that there is a sharp distinction between the violation of regulatory or "public welfare" statutes and common law crimes which are mala in se as charged here. It is argued that this dichotomy exists throughout the criminal law relating to corporate criminal responsibility and that this Commonwealth only has cases dealing with the so called public welfare offences.

We note that although there is language in the *Telegram* case which is somewhat ambiguous, and tends to obscure whether specific intent was a requisite element in that case, Professor Ballantine has stated, in his discussion of the criminal liability of corporations, that the *Telegram* case "involves a specific intent as a necessary element." Ballantine, Private Corporations, 311 (1927). In any event, we think it is clear that the crime of criminal contempt cannot be equated to minor regulatory offences such as a parking violation and that the judge properly applied it as precedent for the rule that a corporation can be held criminally responsible for the acts of one who is neither a director nor officer. The Model Penal Code, § 1.04 (Proposed Official

Draft), defines "violations" as offences which do not carry
the penalty of imprisonment, and includes only petty of-
fences and the Supreme Court of the United States has
recognized that criminal contempt is not a petty offence.
*Bloom* v. *Illinois*, 391 U. S. 194, 207. In addition, it is a
crime generally included in that class of offences which are
mala in se. See Anderson, Wharton's Criminal Law &
Procedure, § 53 at p. 121–122.

The most recent case in this Commonwealth dealing with
the prosecution of a corporation for a common law crime
also involved criminal contempt. In *Worcester · Tel. &
Gazette, Inc.* v. *Commonwealth*, 354 Mass. 578, 581, we held
that conviction of a newspaper corporation and of a re-
porter for criminal contempt violated their First Amend-
ment rights of freedom of the press and speech where the
publication was not made with wilful design to affect a trial
and did not present a clear and present danger to the ad-
ministration of justice. In view of the fact that this *Telegram*
case was decided on Federal constitutional grounds it did
not involve the question of corporate criminal responsibility
and therefore sheds no light on the question.

The third case is *Commonwealth* v. *Louis Constr. Co. Inc.*
343 Mass. 600, in which a corporation and its president,
treasurer and sole stockholder were convicted of larceny.
Without alluding to the question of corporate criminal re-
sponsibility, we there held that the evidence was insufficient
to warrant the convictions.

The fourth case we have found involving the prosecution
of a corporation for a crime involving specific intent is
*Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, in which
a corporation was convicted of larceny, along with the
chairman of the board of directors. The chairman had full
control of the corporation and all of its transactions, and
his wife owned all of the corporation's stock. The convic-
tions were affirmed, but the question of the corporation's
liability was not argued on appeal nor mentioned in the
opinion. The focal point of the decision was the responsi-
bility of an *individual for the acts of a corporation* which the

court found to be the *individual's agent.* The court stated that "[w]here a principal is in full control and participates in an agent's act by close direction and assent, principal criminal responsibility attaches to him." *Commonwealth* v. *Abbott Engr. Inc., supra,* at 580.

The *Abbott* case is akin to a long line of decisions in this Commonwealth holding that before criminal responsibility can be imposed on the master, based on a master-servant relationship under the doctrine of respondeat superior, actual participation in, or approval of, the servant's criminal act must be shown. The first case we discovered considering this question was *Commonwealth* v. *Nichols,* 10 Met. 259, in which a store owner was convicted of selling liquor without a license when his servant actually made the sale. The court ruled as follows: "The question here raised as to the liability of the principal to be punished criminally for the acts of his agent or servant, in which he does not directly participate personally, is certainly not free from difficulty. As to civil liabilities, a broader and more general principle of responsibility applies, and the master or principal may be held to answer in damages for default and misdoings with which he had no other connexion than that which arises from the fact that the injury was occasioned by one employed in his service. As a general rule, something beyond this is necessary to charge the master criminally for acts done by the servant. There must be such a direct participation in the act, or such assent and concurrence therein, as would involve him morally in the guilt of the action. Hence the cases are comparatively rare, and may be considered as exceptions to the general rule, where by legal rules a party is charged criminally for acts of his servant done without his knowledge and assent. . . . But if a sale of liquor is made by the servant without the knowledge of the master, and really in opposition to his will, and in no way participated in, approved or countenanced by him, and this is clearly shown by the master, he ought to be acquitted." Pp. 260–263.

Other cases involving the illegal sale of liquor by a servant are *Commonwealth* v. *Putnam*, 4 Gray, 16, *Commonwealth* v. *Uhrig*, 138 Mass. 492, *Commonwealth* v. *Wachendorf*, 141 Mass. 270, *Commonwealth* v. *Briant*, 142 Mass. 463, *Commonwealth* v. *Stevenson*, 142 Mass. 466, *Commonwealth* v. *Hayes*, 145 Mass. 289, and *Commonwealth* v. *Rooks*, 150 Mass. 59. In each of these cases the court reiterated the rule that the mere fact of agency is not enough to impose criminal liability on the master. In *Commonwealth* v. *Stevens*, 153 Mass. 421, 429, another illegal liquor case, the court phrased the rule as requiring that the master "in some way participates in, countenances, or approves the criminal act of his servant."

Each of the above cases involved crimes which are mala prohibita as opposed to crimes which are mala in se. However, it appears that in cases which are generally classified as mala in se, the above rule was not changed. For example, in *Commonwealth* v. *Anthony*, 306 Mass. 470, a case in which one partner was sought to be held liable for the larcenous acts of another partner, the above rule was cited at p. 478 of the opinion. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 402, and *Commonwealth* v. *Abbott Engr. Inc.*, *supra*, 580.

The thrust of each of the cases cited above involving a human principal is that it is fundamental to our criminal jurisprudence that for more serious offences guilt is personal and not vicarious. "One is punished for his own blameworthy conduct, not that of others." *Commonwealth* v. *Stasiun*, 349 Mass. 38, 48, citing Perkins, Criminal Law, 550, and Sayre, Criminal Responsibility for the Acts of Another, 43 Harv. L. Rev. 689. Professor Sayre's article is heavily relied on by Beneficial for the proposition that the considerations proposed by Sayre apply with equal weight to corporations. However, we do not think that the Sayre article, or the rule in the master-servant cases, is helpful to these corporations. The essence of Sayre's discussion is that, as to certain crimes, a theory of vicarious liability is an inadequate basis for imposing criminal liability on a natural

person who can suffer imprisonment or ignominy for the acts of his agents. *Id.* at 722–723. (We, too, have recently rejected the concept of individual guilt by mere association. *Commonwealth* v. *Pina, ante* **139,** **143.**) In fact, Professor Sayre explicitly refrains from dealing with the problem of imposing corporate criminal liability when he states: "The·problem of the criminal liability of a corporation for the acts of corporate agents depends upon a consideration of two quite distinct problems, one a problem of agency, and the other a problem of the law of corporations. The first involves the general question of criminal responsibility for the acts of another. Would the principal be criminally liable for the acts of the agent if the principal were a natural person instead of a corporation? The second problem involves the entirely distinct question of when the acts and intent of a natural person, for example of a vice-president or general manager, are to be treated as those of the corporation itself. In . . . [this article], only the first of these two problems is considered." Sayre, Criminal Responsibility for the Acts of Another, **43 Harv. L. Rev. 689.**

As alluded to by Professor Sayre, and pointed out by the Commonwealth in its brief, the very nature of a corporation as a "person" before the law renders it impossible to equate the imposition of vicarious liability on a human principal with the imposition of vicarious liability on a corporate principal. "A corporation can act only through its agents. . . . [C]orporate criminal liability is necessarily vicarious." Note, Criminal Liability of Corporations for Acts of Their Agents, **60 Harv. L. Rev. 283.** See Francis, Criminal Responsibility of the Corporation, **18 Ill. L. Rev. 305, 308;** Lee, Corporate Criminal Liability, **28 Col. L. Rev. 1, 13.** Since a corporation is a legal fiction, comprised only of individuals, it has no existence separate and distinct from those whom it has clothed with authority and commissioned to act for it whether such individuals are directors, officers, shareholders or employees. Thus, the issue is not whether vicarious liability should be imposed on a corporation under the "direct participation and assent rule" of the master-

servant cases cited above, but rather, whether the acts and intent of natural persons, be they officers, directors or employees, can be treated as the acts and intent of the corporation itself. For the foregoing reasons, despite the strenuous urging of the defendants, we are unconvinced that the standard for imposing criminal responsibility on a human principal adequately deals with the evidentiary problems which are inherent in ascribing the acts of individuals to a corporate entity.

Since we have exhausted our review of Massachusetts cases in point, we turn to cases in other jurisdictions discussing the problem of corporate criminal responsibility. We note, however, that in view of the fact that the crimes alleged here, namely, conspiracy and the substantive offences of bribery, are mala in se, we necessarily exclude discussion of those cases which *clearly* involve "public welfare" offences by a corporation, unless such cases cast some insight into the question before us. Generally, these cases concern public nuisances resulting from the nonperformance of a nondelegable duty, rather than the rule of respondeat superior. Cardozo, J., *People ex rel. Price* v. *Sheffield-Farms-Slawson-Decker Co.* 225 N. Y. 25, 27–30.[56]

---

[56] In Massachusetts, the following cases may be classified among the type of offences referred to above. *Commonwealth* v. *Proprietors of Newburyport Bridge,* 9 Pick. 141 (indictment alleging proprietors neglected to provide repairs for bridge as required by statute); *Springfield* v. *Connecticut River R.R.* 4 Cush. 63 (nuisance for locating track on portion of heavily traveled public way); *Commonwealth* v. *Nashua & Lowell R.R.* 2 Gray, 54 (obstructing highway); *Commonwealth* v. *Hancock Free Bridge Corp.* 2 Gray, 58 (nuisance for not keeping in repair road which was part of corporation franchise); *Commonwealth* v. *Proprietors of New Bedford Bridge,* 2 Gray, 339 (obstructing waterway by bridge without suitable draws); *Commonwealth* v. *Vermont & Mass. R.R.* 4 Gray, 22 (nuisance relating to the construction of a grade crossing); *Commonwealth* v. *Old Colony & Fall River R.R.* 14 Gray, 93 (gravel embankment within the limits of a highway). These cases were nothing more than a logical extension of earlier cases of the same sort relating to what were, in effect, private nuisances, see e.g., *Riddle* v. *Proprietors of the Locks & Canals on Merrimack River,* 7 Mass. 169 (trespass on the case for damage to a raft occasioned by the neglect of the proprietors to maintain canal deep and wide enough to allow raft to pass). Later cases are *Commonwealth* v. *Ober,* 286 Mass. 25, and *Commonwealth* v. *Minicost Car Rental, Inc.* 354 Mass. 746, where owners of automobiles were held liable for violations of parking regulations, even though the violations apparently occurred without their knowledge.

We first treat with the case of *New York Cent. & H. R. R.R.* v. *United States*, 212 U. S. 481, a case relied upon by both the judge and the Commonwealth. There, the Supreme Court of the United States upheld the constitutionality of a statute which specifically made corporations liable for the acts of their officers, agents or employees acting within the scope of their employment. The statute in question prohibited shippers from receiving rebates from common carriers and specifically provided as follows: "In construing and enforcing the provisions of this section the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier acting within the scope of his employment shall in every case be also deemed to be the act, omission, or failure of such carrier as well as that of the person." 32 Stat. 847–848, § 1. Citing the *Telegram* case, 172 Mass. 294, *supra*, among others, the court made a number of pertinent observations and rulings from which we quote at some length: "A corporation is held responsible for acts not within the agent's corporate powers strictly construed, but which the agent has assumed to perform for the corporation when employing the corporate powers actually authorized, and in such cases there need be no written authority under seal or vote of the corporation in order to constitute the agency or to authorize the act. . . . We see no valid objection in law, and every reason in public policy, why the corporation which profits by the transaction, and can only act through its agents and officers, shall be held punishable by fine because of the knowledge and intent of its agents to whom it has intrusted authority to act in the subject matter of making and fixing rates of transportation, and whose knowledge and purposes may well be attributed to the corporation for which the agents act. While the law should have regard to the rights of all, and to those of corporations no less than to those of individuals, it cannot shut its eyes to the fact that the great majority of business transactions in modern times are conducted through these bodies, and particularly that interstate commerce is almost entirely

in their hands, and to give them immunity from all punishment because of the old and exploded doctrine that a corporation cannot commit a crime would virtually take away the only means of effectually controlling the subject matter and correcting the abuses aimed at." Pp. 493–496. The court concluded that "[a]pplying the principle governing civil liability, we go only a step farther in holding that the act of the agent, while exercising the authority delegated to him to make rates for transportation, may be controlled, in the interest of public policy, by imputing his act to his employer and imposing penalties upon the corporation for which he is acting in the premises." *Supra,* p. 494.

Household argues that the *New York Central* case is one in which Congress clearly dispensed with the necessity of proving corporate intent and is therefore distinguishable from the case before us. While we agree that the thrust of the opinion in that case is addressed to the constitutionality of the statutory imputation of the agent's acts to the corporation, we think that the case falls outside the class of offences generally denominated as "public welfare" offences and is akin to the *Telegram* case in that it serves as precedent for the proposition that a corporation may be held criminally responsible for the acts of one who is neither a director, officer nor "high managerial agent" of the corporation. In this regard, the case illustrates the public policy rationale for imposing vicarious liability upon a corporation and thus warranting the treatment of corporations in a manner different from that of individuals for the acts of their agents. This rationale was subsequently developed and applied in lower Federal court cases which dealt with crimes requiring specific intent. These cases are discussed *infra* and each cited and applied the rule of the *New York Central* case.

In the often cited case of *Egan* v. *United States,* 137 F. 2d 369, 379 (8th Cir.), a case similar in many aspects to the ones before us, a public utility holding corporation

and its president were convicted of conspiracy to violate statutes prohibiting public utilities from making political contributions. The corporation attacked the sufficiency of the evidence to impute criminal responsibility to it on the ground that the acts of its officers in making the political contributions were not shown to be authorized by the corporation either by an express or an implied act of the board of directors. In its opinion, the court set forth the gist of the judge's charge to the jury and noted that this charge was "manifestly based upon the opinion of the Supreme Court in *New York Cent. & H. R.R.* v. *United States,* 212 U. S. 481 . . . ." Upholding the instructions to the jury, the court said: "The test of corporate responsibility for the acts of its officers and agents, whether such acts be criminal or tortious, is whether the agent or officer in doing the thing complained of was engaged in 'employing the corporate powers actually authorized' for the benefit of the corporation 'while acting within the scope of his employment in the business of the principal.' If the act was so done it will be imputed to the corporation whether covered by the agent or officer's instructions, whether contrary to his instructions and whether lawful or unlawful. . . . The court is not concerned with whether political contributions were authorized by a resolution of the board of directors or acquiesced in by a majority of the board. Our inquiry concerns only the powers of the corporation, the business it was authorized to carry on in the exercise of those powers, and whether the officers of the company in making political contributions were engaged in carrying on that business within the scope of their official duties." *Egan* v. *United States, supra,* at 379.

Another Federal case applying the above standard is *C. I. T. Corp.* v. *United States,* 150 F. 2d 85 (9th Cir.). This case is significant in that a large national money lending corporation was held criminally responsible for the criminal acts of a minor branch manager. The corporation was convicted of conspiracy to make false credit statement applications to the Federal Housing Administration, a crime

which under the statute specifically required the element of knowledge. On appeal, the corporation argued that the branch manager was too low in the corporate hierarchy and that he had no corporate power to commit the acts complained of with the criminal intent imputable to the corporate entity. In refuting this argument the court said: "We do not agree. It is the function delegated to the corporate officer or agent which determines his power to engage the corporation in a criminal transaction." P. 89. The court then discussed the delegation of authority to the branch manager and after quoting at length from the *New York Central* case, observed that although that case required no showing of a criminal intent, "*the principle it states has been accepted in the circuits as controlling in corporate crimes in which intent is an essential factor*" (emphasis supplied). *Supra,* at 90. The court then cited various cases from different circuits and specifically ruled that "[w]e do not regard any of these cases distinguishable from the instant case because the corporate function criminally performed was vested in an agent of higher dignity than the salesman in the" case of *Zito* v. *United States,* 64 F. 2d 772, 775 (7th Cir.), or than the branch manager in the present case, *C. I. T. Corp.* v. *United States, supra,* at 90. It should be noted that in the *Zito* case, *supra,* where a corporation was convicted of conspiracy to violate the National Prohibition Act, the acts of a salesman were imputed to the corporation solely on the basis that he was an agent of the corporation and had authority to sell its products.

The standard applied in the above cases clearly focused on the scope of authority of the agents to act in the narrow sphere of corporate business relating to the criminal act. This essential consideration was succinctly set forth in somewhat different terms in the case of *United States* v. *Nearing,* 252 Fed. 223, 231, (S. D. N. Y.) wherein Judge Learned Hand stated that "the criminal liability of a corporation is to be determined by the *kinship of the act to the powers of the officials, who commit it*" (emphasis supplied). In the *Nearing* case, the corporation was indicted for conspiracy to violate

the Espionage Act through the publication of a pamphlet calculated to cause insubordination in the armed forces. In a pre-trial opinion discussing the sufficiency of the indictment, Judge Hand made the following observations: "Finally, the defendants urge that a corporation cannot be guilty of the crime of conspiracy, or of any crime involving specific intent. This question simply turns upon how far the law has gone in imputing to a corporation the acts of its agents. . . . Now there is no distinction in essence between the civil and the criminal liability of corporations, based upon the element of intent or wrongful purpose. Each is merely an imputation to the corporation of the mental condition of its agents."

We treat the *Egan, Nearing* and *C. I. T.* cases as strong precedent for the rule that a corporation is criminally liable for the acts of an agent who has been vested with the authority to act on behalf of the corporation in the sphere of corporate business in which he commits the criminal act. Numerous other Federal cases have been brought to our attention which also support this rule. Some of these are the following: *United States* v. *Van Riper*, 154 F. 2d 492, 492–493 (3d Cir.) (manager of gas station — violation of price control regulations established under War Powers Act); *United States* v. *George F. Fish, Inc.* 154 F. 2d 798, 801 (2d Cir.), cert. den. 328 U. S. 869 (salesman — knowing violation of Emergency Price Control Act of 1942); *United States* v. *Armour & Co.* 168 F. 2d 342, 343–344 (3d Cir.) (salesmen at three Pennsylvania branches, branch manager at Norristown, and assistant manager at Noble Street, Philadelphia — violation of regulations promulgated under the Emergency Price Control Act prohibiting tie-in sales); *United States* v. *Steiner Plastics Mfg. Co. Inc.* 231 F. 2d 149, 153 (2d Cir.) (production manager or either of three factory employees — conspiracy to falsify approval stamps on fighter plane cockpit canopies being manufactured for the Navy and actual falsification of them); *United States* v. *Milton Marks Corp.* 240 F. 2d 838, 839 (3d Cir.) (general foreman — knowingly presenting a false claim to the United

States); *Continental Baking Co.* v. *United States*, 281 F. 2d 137, 148–151 (6th Cir.) (plant manager at Memphis, Tennessee, depot managers and supervisors — conspiracy to fix the prices of bakery products in the Memphis area — Sherman Act); *United States* v. *American Stevedores, Inc.* 310 F. 2d 47, 48 (2d Cir.), cert. den. 371 U. S. 969 (comptroller — tax evasion); *Steere Tank Lines, Inc.* v. *United States*, 330 F. 2d 719, 720–724 (5th Cir.) (truck drivers and dispatchers — knowing falsification of records by motor carrier); *United States* v. *American Radiator & Standard Sanitary Corp.* 433 F. 2d 174, 204–205 (3d Cir.) (sales manager — conspiracy to fix prices of plumbing fixtures — where the court specifically approved a charge essentially identical to that in the present case).

Household, Beneficial and Liberty all vigorously attack these cases in an attempt to distinguish them from the cases before us. The thrust of their argument is that all of these cases fall into one of two categories; either they involve public welfare and regulatory statute crimes in which intent was not an element, or if the crimes did include intent as a necessary element, then they assert that the corporations were only held liable if one high in the corporate hierarchy directed, approved or acquiesced in the agent's criminal act. In support of this argument, Household cites several law review articles in which their authors have attempted to categorize these cases in a similar manner.[57]

---

[57] The defendants appear to principally rely on the Note, Criminal Liability of Corporations for Acts of Their Agents, 60 Harv. L. Rev. 283, 289, and on the Note, Corporate Criminal Liability for Acts in Violation of Company Policy, 50 Georgetown L. J. 547, 549, to substantiate the categorizations made above. The question of corporate criminal responsibility has of course been discussed extensively by text writers and in law reviews. See Anderson, Wharton's Criminal Law & Procedure, § 52, p. 120; Fletcher, Cyc. Corporations (Rev. Ed.) § 4959; Lee, Corporate Criminal Liability, 28 Col. L. Rev. 1; Edgerton, Corporate Criminal Responsibility, 26 Yale L. J. 827; Mueller, Mens Rea and the Corporation, A Study of the Model Code Position on Corporate Criminal Liability, 19 U. of Pittsburgh L. Rev. 21. The Mueller article, which is also heavily relied on in support of the defendants' view of the Model Penal Code standard, does, however, make the following statement in referring to "high managerial agents." "Not the mode of acquisition of a corporate office but the scope of trust and power is the proper criterion." Mueller, *supra*, at 40. We think this test is easily equated to the "scope of authority" or "kinship of authority to the act" test employed by the judge.

We think that the answer to these contentions is twofold. First, the defendants' attempted categorization of the above cases into two neat little groups greatly oversimplifies the complex and multifaceted issues which confronted the various courts in the cases we have cited. The principal cases of *Egan, C. I. T.*, and *Nearing* all entail prosecutions for the crimes of conspiracy, a crime requiring specific intent. In addition, the object of the conspiracies in those cases involved a wide scope of serious criminal activity, usually in matters tending to be of benefit to the corporation, extending from violations of the Espionage Act in the *Nearing* case, through the making of illegal political contributions in the *Egan* case, various types of fraudulent acquisitive crimes in the cases of *C. I. T., Steiner Plastics, Milton Marks*, and *American Stevedores*, and conspiracy to violate the Sherman Act through price fixing in the cases of *Continental Baking Co.* and *American Radiator*. Furthermore, as we previously noted, even if the statute in the *New York Central* case dispensed with the necessity of proving corporate intent, the *Egan* case and other Federal cases specifically expanded the rule of that case to cases involving crimes requiring specific intent. Secondly, the argument that only high corporate officers were involved has no basis in fact. In the *C. I. T.* case, a minor branch manager was involved, and in the *Zito* case, a salesman. In addition, although the criminal acts in the *Egan* case were performed by an officer of the corporation, the court consistently stressed, as is shown from the language previously quoted, that the corporation could be held responsible for the acts of either officers or agents. Indeed, the court emphatically stated that the focal point of inquiry is not whether corporate authorization or participation was shown in the upper echelon of the corporate ranks, but whether the agent or officer in doing the criminal act "was engaged in 'employing the corporate powers actually authorized' for the benefit of the corporation 'while acting within the scope of his employment in the business of the principal.'" P. 379.

Household argues that in applying the foregoing standard

of corporate criminal responsibility, we are merely applying the rule of respondeat superior as it is applied in civil cases and that we are "reaching out to state a completely new rule of law." We agree that the above cases, as well as the judge's instructions to the jury, essentially employ the rationale underlying the doctrine of respondeat superior. However, we do not agree that application of this doctrine to a criminal case involving specific intent is a "completely new rule of law." The courts in the *New York Central* case and the other Federal cases cited above, especially in the *Egan* case, unequivocally focus their inquiry on the scope of authority which the corporation has conferred upon its agents to act on behalf of the corporation in managing the particular activities in which the agents were engaged when they committed the criminal act. P. 379.

It may be that the theoretical principles underlying this standard are, in general, the same as embodied in the rule of respondeat superior. Nevertheless, as we observed at the outset, the judge's instructions, as a whole and in context, required a greater quantum of proof in the practical application of this standard than is required in a civil case. In focusing on the "kinship" between the authority of an individual and the act he committed, the judge emphasized that the jury must be satisfied "beyond a reasonable doubt" that the act of the individual "*constituted*" the act of the corporation. Juxtaposition of the traditional criminal law requirement of ascertaining guilt beyond a reasonable doubt (as opposed to the civil law standard of the preponderance of the evidence), with the rule of respondeat superior, fully justifies application of the standard enunciated by the judge to a criminal prosecution against a corporation for a crime requiring specific intent.

The foregoing is especially true in view of the particular circumstances of this case. In order to commit the crimes charged in these indictments, the defendant corporations either had to offer to pay money to a public official or conspire to do so. The disbursal of funds is an act peculiarly within the ambit of corporate activity. These corporations

by the very nature of their business are constantly dealing with the expenditure and collection of moneys. It could hardly be expected that any of the individual defendants would conspire to pay, or would pay, the substantial amount of money here involved, namely $25,000, out of his own pocket. The jury would be warranted in finding that the disbursal of such an amount of money would come from the corporate treasury. A reasonable inference could therefore be drawn that the payment of such money by the corporations was done as a matter of corporate policy and as a reflection of corporate intent, thus comporting with the underlying rationale of the Model Penal Code, and probably with its specific requirements.

Moreover, we do not think that the Model Penal Code standard really purports to deal with the evidentiary problems which are inherent in establishing the quantum of proof necessary to show that the directors or officers of a corporation authorize, ratify, tolerate, or participate in the criminal acts of an agent when such acts are apparently performed on behalf of the corporation. Evidence of such authorization or ratification is too easily susceptible of concealment. As is so trenchantly stated by the judge: "Criminal acts are not usually made the subject of votes of authorization or ratification by corporate Boards of Directors; and the lack of such votes does not prevent the act from being the act of the corporation."

It is obvious that criminal conspiratorial acts are not performed within the glare of publicity, nor would we expect a board of directors to meet officially and record on the corporate records a delegation of authority to initiate, conduct or conclude proceedings for the purpose of bribing a public official. Of necessity, the proof of authority to so act must rest on all the circumstances and conduct in a given situation and the reasonable inferences to be drawn therefrom.

Additional factors of importance are the size and complexity of many large modern corporations which necessitate the delegation of more authority to lesser corporate

agents and employees. As the judge pointed out: "There are not enough seats on the Board of Directors, nor enough offices in a corporation, to permit the corporation engaged in widespread operations to give such a title or office to every person in whom it places the power, authority, and responsibility for decision and action." This latter consideration lends credence to the view that the title or position of an individual in a corporation should not be conclusively determinative in ascribing criminal responsibility. In a large corporation, with many numerous and distinct departments, a high ranking corporate officer or agent may have no authority or involvement in a particular sphere of corporate activity, whereas a lower ranking corporate executive might have much broader power in dealing with a matter peculiarly within the scope of his authority. Employees who are in the lower echelon of the corporate hierarchy often exercise more responsibility in the *everyday operations* of the corporation than the directors or officers. Assuredly, the title of office that the person holds may be considered, but it should not be the decisive criterion upon which to predicate corporate responsibility.

The validity and soundness of these considerations are especially reflected in the activities of public relations men in the employ of many large corporations. This is graphically illustrated in the *Egan* case, 137 F. 2d, 369, *supra*. That case is particularly applicable to the ones before us because of its inquiry into the type of authority exercised by the officers and agents who made the political contributions for which their corporations were held responsible. The court characterized the activities of these agents as being "authorized public relations activities . . . within the defendant corporation's powers." In reviewing the evidence relating to this type of authority, the court highlighted the following factors: "The evidence shows that the corporation in the exercise of this power regards its public relations and its good will as matters of great importance. It has a right to do so and it does send its officers to appear before legislative committees to influence those legislatures and to persuade

them to pass laws advantageous to the company's interest and to reject proposed laws inimical to its interest. In the exercise of its powers, it has a right to do so and it does send its officers to state capitals to influence the individual members of the legislatures to be friendly to its interests. It sends its officers to appear before state and municipal boards and officers having power to impose taxes upon its property for the purpose of presenting arguments and data in its interest. To cultivate and develop the friendship of its patrons, prospective patrons, legislators and taxing authorities the company gives entertainments for invited guests including legislators, members of tax boards, patrons and others whose friendship it deems important. It maintains a 'lodge' at the lake above its dam in the Ozark Mountains to which it invites for free entertainment state officers and candidates for office."

The similarity between the kinship of authority and the acts of the agents in the *Egan* case with the kinship between the acts and authority of the individuals in the present cases is striking. It approaches the incredible for us to conclude from the evidence in the instant case that the public relations men, in their constant and prolonged communications with Hanley, were engaging in independent endeavors. The inference is obvious that their concerted activities along the lines outlined in our summary of the facts could not have been carried on without the knowledge or at least the reckless toleration of highly placed corporate executives.

To permit corporations to conceal the nefarious acts of their underlings by using the shield of corporate armor to deflect corporate responsibility, and to separate the subordinate from the executive, would be to permit "endocratic" corporations to inflict widespread public harm without hope of redress. It would merely serve to ignore the scramble and realities of the market place.[58] This we de-

---

[58] The term "endocratic" was coined by Dean Rostow and means a "large, publicly-held corporation, whose stock is scattered in small fractions among thousands of stockholders." Note, Increasing Community Control Over Corporate Crime — A Problem in the Law of Sanctions, 71 Yale L. J. 280, 281, n. 3.

cline to do. We believe that stringent standards must be adopted to discourage any attempt by "endocratic" corporations' executives to place the sole responsibility for criminal acts on the shoulders of their subordinates.

We believe that our decision is supported by basic considerations of public policy. The President's Commission on Law Enforcement and Administration of Justice, Task Force Report — Crime and Its Impact — An Assessment (1967) provides a sound rationale for imputing criminal responsibility to the corporation for the acts of lower echelon corporate officials who have the authority to act on behalf of the corporation. The report states at p. 104 that "[w]hite collar crime also does serious damage to social and economic institutions. . . . Thus, crimes such as bribery and violation of conflict of interest statutes strike deeply at responsible, impartial government." The report further points out at p. 108 that "[a] pervasive problem affecting enforcement is the fact that white collar crime is often business crime and business crime is often corporate crime. Where corporate defendants are involved, the only criminal sanction available is the fine. As noted previously, fines may be inadequate as deterrents for a variety of reasons. There are also serious practical problems in imposing sanctions upon corporate employees. It is very difficult to obtain the conviction of the true policy formulators in large, complex corporations. The top executives do not ordinarily carry out the overt criminal acts — it is the lower or middle management officials who, for example, attend price-fixing meetings." The President's Commission concluded, at p. 108, that "where corporate misconduct is involved, the offenders — and particularly the offenders against whom evidence of guilt can be obtained — act as part of a corporate hierarchy and, ordinarily, follow a pattern of corporate behavior. Individual responsibility is therefore reduced — the offenders are often following orders from above, either explicit or implicit. Moreover, the fact that acts are performed to further the interests of the corporation, and not merely the offenders' personal

interests, helps to rationalize misconduct. Thus in the *Electrical Equipment* cases, personal explanations for the acts were, for the most part, sought in the structure of corporate pressures. The defendants almost invariably testified that they came new to a job, found price-fixing an established way of life, and simply entered into it as they did into other aspects of their job."[59]

The above considerations seem to us to support the principles stated in the judge's charge for adjudicating the criminal responsibility of these corporate principals. We are aware that *some* jurisdictions and legal writers have approved the Model Penal Code,[60] even as contained in the 1955 draft. Indeed, the 1955 comments on the Code (prior to the addition of the significant words "or recklessly tolerated") merely say that the limitations on corporate liability there set out are "generally consistent with the position of the English courts and those of *some* American

---

[59] The public policy rationale underlying our decision is also illustrated in a recent article by Professor Alan M. Dershowitz. He discusses the effect of criminal sanctions on the treasuries of large "endocratic" corporations. He states that "[t]he criminal fine as presently administered against the endocratic corporation guilty` of acquisitive crime is thus little more than 'a reasonable license fee' for engaging in such conduct and may be practically ignored as *de minimis* in an analysis of the profit diminishing effect of present sanctions." Note, Increasing Community Control Over Corporate Crime — A Problem in the Law of Sanctions. 71 Yale L. J. 280, 287. The article goes on to refer to "the presently insubstantial nature of the criminal fine" and "the difficulty of pinpointing guilt above the level of overt actors, the real formulators of endocratic corporate. policy have little cause to fear corporate penalties. These phenomena help to explain why, in the area in which effective criminal sanctions *should* achieve the highest degree of overall deterrence, they are essentially ineffective, as evidenced by the startling rate of acquisitive crime recidivism among endocratic corporations." *Id.* at 293, citing Sutherland, White Collar Crime, 25. After analyzing criminal anti-trust cases in which the scope of authority test is well established, Dershowitz concludes that greater penalties are necessary in order to obtain adequate deterrence. We, of course, have no occasion to express an opinion concerning any administrative action which may follow as a consequence of convictions in these cases.

[60] Statutes recently enacted in New York, Georgia and Illinois have adopted similar standards. See New York Penal Law, c. 40 of Consolidated Laws, Title B, art. 20, § 20.20, Amendment, Laws of 1965, c. 1030. Illinois Crim. Code, c. 38, Title II, art. 5, § 5-4. Georgia Code Anno. Title 26, § 26-803 `(1969). Legal writers indorsing the Model Penal Code standard or something analogous thereto are Mueller, Mens Rea and the Corporation, A Study of the Model Code Position on Corporate Criminal Liability," 19 U. of Pittsburgh L. Rev. 21, 41 (high managerial agents or "inner circle"), Winn, The Criminal Responsibility of Corporations, 3 Cambridge L. J. 398, 414 ("primary representatives"), and Welsh, The Criminal Liability of Corporations, 62 L. Q. Rev. 345, 362 ("governing body"). See fn. 57, *supra*.

States" (emphasis supplied). Model Penal Code, § 2.07, comment p. 151 (Tent. Draft No. 4, 1955).[61] This may mean that the majority of jurisdictions in this country do not adhere to the standard proposed in 1955.

One such State appears to be Wisconsin. For example, in the case of *Vulcan Last Co.* v. *State,* 194 Wis. 636, a corporation was convicted of violating a statute which prohibited employers from attempting to influence the votes of employees through threats of discharge or reduction of wages. The corporate employee involved was a superintendent. In refuting the argument that the corporation could not be held responsible for the conduct of the superintendent the court stated: "Corporations must of necessity act through their agents. When these agents act within the scope of their authority their acts are the acts of the corporation, for which the corporation is liable both civilly and criminally. *If the acts are within the scope of the authority* of the agent, the corporation is liable criminally for the *act although the act may not have been expressly authorized by the corporation,* even if the corporation has expressly forbidden its agent to act in the manner that made it answerable to punishment under the criminal law" (emphasis supplied). P. 643.

Other States have taken a similar view or have employed language consistent with that of the *Vulcan* case. These include the following: *State* v. *Lehigh Valley R.R.* 90 N. J. L. 372, 92 N. J. L. 261, affd. 94 N. J. L. 171, 175 (manslaughter); *State* v. *Western Union Tel. Co.* 13 N. J. Super. 172, 221, affd. 12 N. J. 468, app. dism. 346 U. S. 869 (bookmaking); *State* v. *Salisbury Ice & Fuel Co.* 166 N. C. 366, 367 (false pretences); *State* v. *Eastern Coal Co.* 29 R. I. 254, 265–269 (criminal conspiracy).

Cases relied upon by the defendants which apparently support what they conceive as the Model Penal Code principle are *Grant Bros. Constr. Co.* v. *United States,* 13 Ariz. 388,

---

[61] English cases in support of the underlying rationale of the Code include *Director of Pub. Prosecutions* v. *Kent & Sussex Contractors, Ltd.* [1944] 1 K. B. 146, 155–156, *Rex* v. *I. C. R. Haulage, Ltd.* [1944] 1 K. B. 551, and *John Henshall (Quarries) Ltd.* v. *Harvey* [1965] 2 Q. B. 233, 241.

and *People* v. *Canadian Fur Trappers Corp.* 248 N. Y. 159.
Particular emphasis is placed on the *Canadian Fur Trappers*
case for the proposition that a corporation can be held
criminally responsible "only for acts which it authorizes
through action of its officers or which . . . [are] done with
the acquiescence of its officers." 248 N. Y. at 164. It
should be noted, however, that the *Canadian Fur Trappers*
case involved a closely held corporation in which four
brothers "constituted the corporation and were its only
officers." P. 165. Thus, the court in that case had only to
confine its opinion to the acts of individuals who were, in
fact, the corporation. See fn. 62, *infra*. It seems appro-
priate to distinguish a situation of that kind from large,
endocratic corporations such as are involved in the present
case.

Considering everything we have said above, we are of
opinion that the quantum of proof necessary to sustain the
conviction of a corporation for the acts of its agents is
sufficiently met if it is shown that the corporation has placed
the agent in a position where he has enough authority and
responsibility to act for and in behalf of the corporation in
handling the *particular* corporate business, operation or
project in which he was engaged at the time he committed
the criminal act. The judge properly instructed the jury
to this effect and correctly stated that this standard does
not depend upon the responsibility or authority which the
agent has with respect to the entire corporate business, but
only to his position with relation to the particular business in
which he was serving the corporation. Some of the factors
that the jury were entitled to consider in applying the above
test, although perhaps not in themselves decisive, are the
following: (1) the extent of control and authority exercised
by the individual over and within the corporation;[62] (2) the

---

[62] With regard to a small closely held corporation, in which the individual
*is* the corporation, this factor may be considered somewhat decisive. Cf.
*Mininsohn* v. *United States*, 101 F. 2d 477 (3d Cir.); *Old Monastery Co.* v.
*United States*, 147 F. 2d 905, 908 (4th Cir.); *United States* v. *Empire Pack-
ing Co.* 174 F. 2d 16, 19 (7th Cir.); *People* v. *Canadian Fur Trappers Corp.*
248 N. Y. 159, 164; *State* v. *Graziani*, 60 N. J. Super. 1, cert. den. 363 U. S. 830.

extent and manner to which corporate funds were used in the crime;[63] (3) a repeated pattern of criminal conduct tending to indicate corporate toleration or ratification of the agent's acts.[64] Applying these criteria within the "kinship of the act to authority" test to the present case we next consider the evidence admitted against Household, then Liberty, and lastly, Beneficial.

2. *Household* — Household argues that even applying the "kinship of authority" test to the present case, there is no basis on which the trial court could justify the conclusion that either Pratt or Barber had enough power, duty, responsibility or authority, in handling the matters concerning the Rate Board or involving Hanley in his official capacity, to make the statements and acts of these employees binding upon the corporation.

The judge, without reciting the evidence concerning the relationship between Barber, Pratt and Household, simply ruled that a finding was warranted that the "relationship disclosed by the evidence, whether it be of agency, employment, or office holding, or a combination of them, existed . . . between the individuals Barber and Pratt and the corporation *Household*," and that the "statements, acts and conduct of the individual defendants Pratt and Barber . . . were done and performed by them for and in behalf of *Household*, within the scope of their authority to act for and in behalf of *Household*, and were otherwise in all respects such that they were and constituted the statements, acts and conduct of *Household*."

We agree with the judge that there was sufficient evidence of authority to submit the case to the jury. The evidence shows that Household is a Delaware corporation,

---

[63] *Egan* v. *United States*, 137 F. 2d 369, 379 (8th Cir.), cert. den. 320 U. S. 788. *United States* v. *Carter*, 311 F. 2d 934 (6th Cir.). *United States* v. *Knox Coal Co.* 347 F. 2d 33, 40–41 (3d Cir.). Use of corporate funds has been noted to be evidence of ratification in *Continental Baking Co.* v. *United States*, 281 F. 2d 137, 149 (6th Cir.).

[64] Cf. *Continental Baking Co.* v. *United States*, 'supra; United States v. Knox Coal Co.*, supra; *People* v. *Canadian Fur Trappers Corp.*, supra, at 164.

engaged in lending money, with its national headquarters and principal place of business in Chicago, Illinois. Household is divided into various geographical divisions as well as into departments and sub-departments. Among the major departments of Household are those described as "Operations," "Advertising," "Auditing" and "Public Relations." The New England area, including Massachusetts, is termed the "Northern Division" within Household's geographical schema. In this area, Household had ninety-one loan offices. Forty of these were located in Massachusetts.

During the years involved in this case, the "Northern Division" was under the supervision of one Don H. Ellis, a vice-president and "director of supervision" of Household. Ellis testified that although his duties primarily involved "operations," a "Department that serves the public by making loans and collecting the money back;" there is communication within the corporate structure between one department and another. For example, if the advertising department was conducting activities in the "Northern Division," then Ellis would be so informed.

The director of public relations for Household during the period covered by these indictments was one Harold Haugan. Haugan, like Ellis, was a vice-president of Household, and was so listed on Household's annual report to its stockholders. As director of public relations, it appears that Haugan was equal or superior to Ellis in the corporate hierarchy. The annual report lists the names of these two men in such a fashion as to warrant this inference. On the same page of the annual report, just below the listing of the corporate vice-presidents, there is a list of "Other Staff Executives." The defendant Barber is listed among these executives. The annual report also designates Barber as "Divisional Director" of "Public Relations." From the positioning of Barber's name in the annual report, a jury would be warranted in drawing the inference that Barber's status in the corporate hierarchy was comparable to that of Household's controller. In addition, there was evidence that

Barber attended a high level executive conference, which was held annually in Fort Lauderdale, Florida.

The defendant Pratt was one of Haugan's subordinates in the public relations department. It is apparent that Pratt was also subordinate to Barber and the jury would have been warranted in so inferring. Household hired Pratt in 1957. He commenced work in the public relations department in 1959. Pratt covered the New England area of Household's public relations activities and worked in Massachusetts.

Among the duties of Household's public relations men was to "enhance the image of the company." In its general instructions manual, Household counseled its employees to refer problems involving persons in "public life" to the public relations department. Ellis testified that this manual states that "if there is a problem that involves a person in public life, an influential person, you name him, anybody . . . who is antagonistic towards the industry . . . then we refer it to the Public Relations Department."

The Commonwealth argues that the above evidence, specifically concerning Barber's rank in the corporate hierarchy, is sufficient to meet the "high managerial agent" test proffered by Household; that Barber is a "high managerial agent" whose acts, knowledge and admissions constitute the acts, knowledge and admissions of Household. We need not decide whether this evidence, specifically that which may be inferred from the annual report, sufficiently delineates Barber's power and authority within the corporate structure to warrant the conclusion that all requisites of the Model Penal Code standard as construed by the defendants are fulfilled. However, we are of opinion that it could have been found that Barber's authority within the public relations department as "divisional director" clothed him with sufficient authority to deal with Hanley in Hanley's capacity as supervisor of loan agencies. The very nature of public relations activities, together with the specific instructions in Household's manual to refer problems involving persons in "public life" or "influential persons" to the

public relations department, warrants the conclusion that Barber and Pratt possessed the authority to deal with the Hanley "program." Cf. *Egan* v. *United States*, 137 F. 2d 369, 380 (8th Cir.).

The fact that there is evidence that the law department of Household also dealt with the Rate Board proceedings of 1962 does not alter this result. The jury would be warranted in concluding from the testimony of Ellis that there was at least some degree of inter-departmental communication within Household's corporate structure. The fact that Household authorized its law department to deal with the Rate Board hearings did not preëmpt its public relations department from dealing personally with Hanley. It was within the province of the jury to decide whether Barber, in his position as "divisional director" and Pratt, in his position as Household's sole public relations man in Massachusetts, possessed a sufficient quantum of authority to deal with Hanley. All of the evidence recounted above warranted the submission to the jury of the acts and statements of the other conspirators. This evidence, in toto, more than justifies the conclusion that Household, through its employees Barber and Pratt, acting within the authority conferred on them, conspired to bribe Hanley and Garfinkle. Household's motion for a directed verdict on the conspiracy indictment was, therefore, properly denied.

3. *Liberty* — Liberty, like Household, argues that there is insufficient evidence of the defendant Woodcock's authority to act on its behalf in conspiring to bribe Hanley and Garfinkle. In view of what we have said with respect to Household, we are of opinion that, a fortiori, Liberty's argument is devoid of merit.

Liberty is a publicly held corporation, incorporated in the State of Delaware. It is the beneficiary of various Massachusetts business trusts conducting the small loans business in Massachusetts. Woodcock was one of Liberty's two executive vice-presidents and also one of its eleven directors. In 1960, Woodcock attended a series of meetings or hearings in Massachusetts involving changes in the regulations governing the supervision of the small loans industry by the

small loans division. On September 8, 1961, the head clerk of the small loans division returned certain surety bonds and small loans office license applications to Woodcock at Liberty's office in St. Louis. Three days later, on September 11, 1961, Woodcock wrote to the small loans division on stationery indicating that he was writing from Liberty's "Executive Offices" in St. Louis and in his official capacity as executive vice-president. On November 19, 1962, again in his capacity as executive vice-president, Woodcock wrote directly to Hanley informing him that Liberty's treasurer, O. H. Love, would appear on Liberty's behalf at the 1962 Rate Board hearings.

The foregoing evidence clearly demonstrates that Woodcock possessed sufficient authority to act on behalf of Liberty in dealing with Hanley and the Rate Board hearings. As a high corporate official, indeed one of its directors, Woodcock had dealings with the small loans department over a three year period, as well as dealings with Hanley directly. This evidence, together with the position he held in the corporate hierarchy, is sufficient to support a finding that Woodcock's acts, conduct and admissions were also those of Liberty. The fact that the Commonwealth did not produce evidence showing Woodcock's specific authorization to offer a bribe to Hanley is inconsequential. As we previously stated, evidence of specific prior authorization of criminal activity by the board of directors of a large publicly held corporation is not readily susceptible of investigation and discovery, nor is such authorization likely to have occurred. Even on the defendants' view of the Model Penal Code standard, which appears to be met in the case of Woodcock, such a quantum of proof would not be required.

The judge rightly admitted the acts and statements of the other conspirators against Liberty, and correctly denied Liberty's motion for a directed verdict on the conspiracy indictment.

4. *Beneficial* — The conviction of Beneficial presents a more involved situation regarding the sufficiency of evidence than that of the other loan companies. This is due to the

interlocking corporate structure of the "Beneficial Finance System" (a term used by Beneficial to describe itself and its wholly owned subsidiaries),[65] rather than the sufficiency of the evidence against Farrell and Glynn, both of whom were employees of the "System." Indeed, Farrell and Glynn emerge as two of the major proponents of the plot to bribe Hanley and Garfinkle, there being an overwhelming amount of evidence relative to the participation of each.

The evidence discloses that Farrell and Glynn were not formally the employees of the defendant Beneficial. Farrell was vice-president and director of Beneficial Management. Similarly, Glynn was employed by Beneficial Management and was formally on the payroll of Industrial Bankers, a Massachusetts business trust completely owned and controlled by Beneficial. · In addition to Industrial Bankers, Beneficial fully owns and operates two other Massachusetts business trusts — New England Equity and Workingmen's Loan Association. These three trusts engage in the consumer loan business within the Commonwealth and operate a total of fifty-eight licensed small loans offices. The parent, Beneficial, controls the appointment of the trustees and officers of the three trusts and provides them with the funds necessary for continued operation.

Beneficial Management also is a wholly owned subsidiary of Beneficial. Both corporations, parent and subsidiary, are Delaware corporations with their principal offices located in the Beneficial Building, 1300 Market Street, Wilmington 99, Delaware. Beneficial Management also has offices in Morristown, New Jersey. Beneficial Management provides auditing, accounting and legal services for these trusts. It is also its responsibility to distribute to the loan offices a detailed instruction book entitled "Beneficial Finance System, Service Staff Bulletins." This manual promulgates guidelines on the making and collecting of loans and the

---

[65] Beneficial states that it "is proud of its long association with Boston . . . . The Beneficial Finance System has been serving Boston since 1920 and has more offices in the Boston metropolitan area than any other consumer finance organization."

preparation of papers required by law. It is apparent that many of the officers and directors of Beneficial are also officers and directors of Beneficial Management.[66] In fact, Beneficial refers to the officers and key executives of Beneficial Management as "the men behind Beneficial." As a vice-president and director of Beneficial Management, the defendant Farrell is so listed.

The public relations area was handled for all of the individual Beneficial loan offices and business trusts in Massachusetts by the defendant, Glynn, Beneficial's director of industry relations. Although Glynn was on the payroll of Industrial Bankers, he was not assigned to any particular office or department of Industrial Bankers; nor was he the subordinate of any employee of that trust. He did public relations work and reported principally to Farrell.

Glynn's activities included ingratiating himself with legislators and members of the small loans division. He entertained Hanley extensively. Glynn expedited the procurement of an additional license for Beneficial or the movement of one of its offices. His primary function was to "sell Beneficial's position on any policies, matters of legislation, anything affecting regulations with the Department [of Banking], anything affecting annual and monthly reports with the Department, anything affecting the increase in license fees of the Department."

---

[66] The following chart compiled by the Commonwealth discloses a network of interlocking directorates and officeholders within the Beneficial Finance "System."

| | Beneficial | Beneficial Management | Industrial Bankers | New England Equity | Working-men's Loan Ass'n | 58 Individual Licensees |
|---|---|---|---|---|---|---|
| T. A. McGrath | President | Director | | | | |
| R. A. Tucker | Vice-President | Director | | | | |
| W. C. Thompson | Vice-President | | Trustee | Trustee | Trustee | |
| A. H. Strothman | Secretary | | Secretary | Secretary | Secretary | Secretary |
| O. W. Casperson | Director | Director | | | | |
| R. G. Dorr | Director | | | President | | |
| D. H. Finck | Director | Director | | | | |
| D. E. McMichael | Director | President | | | | |
| Frank J. McCann | | Vice-President | Trustee | Trustee | Trustee | |
| D. J. Paul | Director | Senior Vice President | Trustee | | | |

It is clear from the above evidence concerning Glynn's duties and Farrell's position within the Beneficial Finance "System," that Farrell and Glynn possessed sufficient authority to at least act on behalf of Beneficial Management in dealing with Hanley particularly in connection with Rate Board hearings. In this regard, the evidence of Farrell and Glynn's authority to deal with such matters is even more conclusive than that admitted against Barber, Pratt and Woodcock in our holding Household and Liberty liable for the acts of their employees. Farrell's position and authority as vice-president and director of Beneficial Management raises the inference that he was sufficiently highly placed in the corporate hierarchy of Beneficial Management to permit the jury to find that he was a "high managerial agent" whose "conduct may fairly be assumed to represent the policy of the corporation." Model Penal Code, § 2.07 (2) (c) (Proposed Official Draft). Farrell is pictured in Beneficial's annual report as one of "the men behind Beneficial" and his photograph appears on the page of that consolidated report devoted to Beneficial Management together with photographs of two other vice-presidents of Beneficial Management. Thus, we find no difficulty in holding, either according to the standard adopted by the judge or that of the Model Penal Code, that it could have been found that the acts, statements and knowledge of Farrell and Glynn were those of Beneficial Management.

However, the principal issue confronting us here is whether the evidence was sufficient as matter of law to warrant a finding that Farrell and Glynn *acted within the authority granted to them by Beneficial.* Beneficial vigorously argues that this court should not disregard Beneficial Management as a corporate entity, should adopt its view of the Model Penal Code standard, and therefore should conclude that Farrell was not a high managerial agent of the parent, Beneficial. On the other hand, the Commonwealth argues that the pervasive control of Beneficial Management by Beneficial and the "use of the former entity by Beneficial solely for its own ends within the 'Beneficial Finance

System' while representing to the public at large that such 'System' was a unitary, centrally controlled whole, and the delegation by Beneficial to Beneficial Management of the powers, duties, authority, and responsibilities for dealing with the Massachusetts small loans regulatory authorities," warrants looking through the corporate structure to the parent, Beneficial. The Commonwealth concludes that Farrell should be regarded as a "high managerial agent" of Beneficial whose actions bind that corporation.

Essentially, we are in agreement with the position of the Commonwealth. We concede that the law is well settled that the parent's ownership of the entire stock of its subsidiary as well as control over the latter's affairs do not, without more, warrant treating two separate and distinct corporate entities identically. *Berry* v. *Old So. Engraving Co.* 283 Mass. 441, 451. See *Brighton Packing Co.* v. *Butchers' Slaughtering and Melting Assn.* 211 Mass. 398, 403, 404; *Browne* v. *Brockton Natl. Bank,* 305 Mass. 521, 530; *Galdi* v. *Caribbean Sugar Co.* 327 Mass. 402, 407–408. But it is also clear that "courts look through the corporate form to the individuals in order to protect the public, prevent a fraud, or to accomplish some other essential justice." *Hallett* v. *Moore,* 282 Mass. 380, 399, citing *J. J. McCaskill Co.* v. *United States,* 216 U. S. 504, 515. *Southern Pac. Co.* v. *Lowe,* 247 U. S. 330, 337. *Gulf Oil Corp.* v. *Lewellyn,* 248 U. S. 71. See *Star Brewing Co.* v. *Flynn,* 237 Mass. 213, 217; *New England Theatres, Inc.* v. *Olympia Theatres, Inc.* 287 Mass. 485, 493; *Henry F. Michell Co.* v. *Fitzgerald,* 353 Mass. 318, 322.

In the recent decision of *My Bread Baking Co.* v. *Cumberland Farms, Inc.* 353 Mass. 614, we held a corporation liable for the torts of various satellite corporations even though the principal corporation did not own stock in any of the affiliates. The evidence in that case revealed that one Haseotes was the secretary, treasurer and a stockholder of Cumberland Farms, Inc. The Haseotes family also owned all of the stock in numerous other corporations operating retail stores which sold the dairy products of Cumberland

Farms, Inc. Although the satellite corporations were not
the subsidiaries of Cumberland Farms, Inc., they all had the
same officers, operated as a single enterprise from a single
headquarters and used the name of Cumberland Farms, Inc.
as a trade name. From this evidence we inferred that
Haseotes was a dominant figure in the enterprise, and that
the store managers of the various retail outlets followed his
orders and acted as agents of the principal corporation.
With reference to the question of when employees of one
corporation may be treated as the agents of another, we
said:

"A corporation or other person controlling a corporation
and directing, or participating actively in (see *Refrigeration
Discount Corp.* v. *Catino*, 330 Mass. 230, 234–236), its
operations may become subject to civil or criminal liability
on principles of agency or of causation. See *Common-
wealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 579–580. See also
*Rock-Ola Mfg. Corp.* v. *Music & Television Corp.* 339 Mass.
416, 422–423. This may sometimes occur where corpora-
tions are formed, or availed of, to carry out the objectives
and purposes of the corporations or persons controlling them.
See *Rice* v. *Price*, 340 Mass. 502, 511–512; *Centmont Corp.* v.
*Marsch*, 68 F. 2d 460, 464–465 (1st Cir.), cert. den. 291 U. S.
680. See also *Finnish Temperance Soc. Sovittaja* v. *Finnish
Socialistic Publishing Co.* 238 Mass. 345, 354–356; *Henry F.
Michell Co.* v. *Fitzgerald*, . . . [353 Mass.] 318, 321–322.
The circumstances in which one corporation, or a person
controlling it, may become liable for the acts or torts of an
affiliate or a subsidiary under common control have been
frequently discussed. Although common ownership of the
stock of two or more corporations together with common
management, standing alone, will not give rise to liability on
the part of one corporation for the acts of another corpora-
tion or its employees, additional facts may be such as to
permit the conclusion that an agency or similar relationship
exists between the entities. Particularly is this true (a)
when there is active and direct participation by the repre-
sentatives of one corporation, apparently exercising some

form of pervasive control, in the activities of another and
there is some fraudulent or injurious consequence of the
intercorporate relationship, or (b) when there is a confused
intermingling of activity of two or more corporations en-
gaged in a common enterprise with substantial disregard of
the separate nature of the corporate entities, or serious
ambiguity about the manner and capacity in which the
various corporations and their respective representatives
are acting." Pp. 618–619.

We are of opinion that the standards enunciated above
apply with equal validity to the case before us. Here, there
is a clear interpenetration of corporate officers and directors
between Beneficial and Beneficial Management. Beneficial's
president, two vice-presidents, and two directors were all
directors of Beneficial Management. One of the directors
of Beneficial was the president and another was the senior
vice-president, and a third was a vice-president of Beneficial
Management. The duality of corporate authority in these
top executives reflects the extent of control and participation
exercised by Beneficial over Beneficial Management.

Also of significance is the fact that Beneficial owned all
of the stock of Beneficial Management and supplied operat-
ing funds to it. Additionally, the business services furnished
by Beneficial Management were provided essentially as a
part of the business operations of Beneficial. In this regard,
Beneficial Management emerges as but a division of the
Beneficial Finance "System" and an adjunct to Beneficial.
This mixture of business operations was considered impor-
tant in the case of *United States* v. *Brown & Sharpe Mfg. Co.*
141 F. Supp. 520, 526 (D. R.I.), where the court said at
p. 526: "The mere fact that one corporation owns all of the
capital stock of a subsidiary corporation, standing alone, is
not enough to warrant the disregard of their separate legal
entities or sufficient to establish the subsidiary as the agent
of the parent corporation. More is required. But where
it is also shown that the business conducted by the sub-
sidiary is a part of the business of the parent corporation,
and where such ownership of stock in a subsidiary is em-

ployed not for the purpose of participating in the affairs of the subsidiary in a manner normal and usual with stockholders but for the purpose of making it a mere agent or department of the parent corporation, the courts will look through the form to the realities of the relation between the corporations and will hold that in such cases the subsidiary is a mere agent or department for carrying on the business of the parent corporation." See *National Labor Relations Bd.* v. *Deena Artware, Inc.* 361 U. S. 398, 403, and *Joseph R. Foard Co.* v. *State*, 219 Fed. 827, 829 (4th Cir.). In the case of *Sisco-Hamilton Co.* v. *Lennon*, 240 F. 2d 68, 69 (7th Cir.), it was also noted that the operations of each of four separate corporations were geared to the operations of the others. The court there stated: "The record demonstrates existence of four cognate corporations all geared to the activities of one another under the parent's control. Under this intimate relationship it would be unjust to fall back on sterile technicalities consisting only of identities as the sole bar to recovery for negligence by one or more of the subsidiaries."

We regard the foregoing language particularly applicable to the circumstances before us. Beneficial Management was demonstrably "geared" to the operations of Beneficial as well as those of the three Massachusetts trusts. This factor was considered in the *My Bread* case, 353 Mass. 614, where we referred to "a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities." P. 619.

We also consider noteworthy the fact that the entire consumer finance business of Beneficial was operated under the name of Beneficial Finance Company. It seems obvious that Beneficial derives a substantial amount of publicity and good will by representing to the public and its shareholders that it operates as a single, integral, mutually supporting entity. The *My Bread* case also noted this factor in ascertaining an agency relationship between many apparently distinct corporations. *Supra*, at 620. See *National*

*Labor Relations Bd.* v. *Deena Artware, Inc.* 361 U. S. 398, 403.

Beneficial argues that the standards enunciated in the *My Bread* case "may be justifiable in a civil suit for damages" but that they "should not apply in a criminal case" where a defendant "is entitled to a presumption of innocence and the burden [is] on the prosecution to prove the defendant's guilt beyond a reasonable doubt."

The fact that this is a criminal case does not alter our view nor does it warrant adopting a rule different from that in the *My Bread* case. The traditional protection afforded a criminal defendant by placing the burden on the prosecution to prove guilt beyond a reasonable doubt and by clothing the defendant with a presumption of innocence is not undermined by subjecting a parent corporation to criminal responsibility on the grounds that it fully controls and participates in the operations of its subsidiary which commits the criminal act. This is the rule of our cases and it was so cited in the *My Bread* case. In the *My Bread* case, citing *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 579–580 (a criminal case concerning larceny by false pretences), we said that "[a] corporation . . . controlling a corporation and directing, or participating actively in . . . its operations may become subject to *civil or criminal liability* on principles of agency or causation" (emphasis supplied). *My Bread, supra*, at 618. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 402; *Commonwealth* v. *Nichols*, 10 Met. 259; *Commonwealth* v. *Riley*, 210 Mass. 387, 395–396.

Thus, we discern no valid reason for not applying the standards of the *My Bread* case in looking behind the corporate structure of the defendant Beneficial. The interest of the Commonwealth in protecting itself and its citizens from the criminal acts of foreign corporations is of much greater importance than the right of one person to pursue a civil remedy against a foreign corporate defendant. The inherent power of the Commonwealth to prosecute those who violate the law, whether they be individuals or cor-

porations, dictates that such offenders should not be permitted to insulate themselves from criminal prosecution by shielding themselves behind instrumentalities which they promulgate to conceal their criminal acts. This is especially true of large endocratic corporations which are structured to enable them to create a flow of authority from the upper echelons of directors and officers to lower ranks of corporate executives. Such a structure makes the responsibility for a criminal act more easily susceptible of concealment. Even greater beclouding of responsibility by a corporate principal takes place where a corporation such as Beneficial creates subsidiaries and business trusts to carry out its everyday administration and business operations. We find it appalling to allow such a corporate structure to shield those corporate entities which directly or indirectly receive the monetary benefits of criminal activity and at the same time avoid the sanctions which may be imposed upon those corporate employees who commit the actual criminal act.

In view of everything we have said above, we hold that there is sufficient evidence to support a finding that there existed between the defendants Farrell and Glynn and the corporation Beneficial Management a relationship of agency with the corporation Beneficial which empowered Farrell and Glynn to act on behalf of Beneficial in dealing with Hanley in his official capacity and also in connection with the Rate Board proceedings. Beneficial's motion for a directed verdict on the conspiracy indictment was properly denied.

### D.   Conduct of the First Trial.

Various defendants assert that certain features of the judge's conduct of the trial constituted reversible error.

1. Several of these arguments relate to the judge's handling of the jury. First, Household urges that the judge took insufficient precautions to guard the jury against the possible adverse effects of certain publicity, both before and during the trial. Pratt and Barber join in these arguments.

Shortly before the selection of the jury, the Commonwealth elected to "nolle pross" two indictments against Edward A. Counihan, Third, then the Commissioner of Banks. Assistant Attorney General Travers stated that the indictments were "nolle prossed" because a codefendant had decided not to supply the Commonwealth with testimony essential to proof of guilt under the indictments. The Boston Globe and the Boston Traveler on that day carried stories concerning the "nolle pross," and quoted Mr. Travers's statement. Motions for a continuance and for a mistrial were denied. The rulings were within the discretion of the judge, particularly in the absence of a clear showing of prejudice.

During the empanelling of the jury, it became apparent that some of the veniremen had formed opinions with respect to the case on the basis of pre-trial publicity, and had discussed the matter among themselves. The judge inquired, inter alia, of each prospective juror whether he or she (1) had any interest in the case, or in its result; (2) had formed or expressed any opinion as to the innocence or guilt of any of the defendants; (3) was conscious of any bias or prejudice as to the case or as to any of the parties for any reason whatever; and (4) was sensible of any bias or prejudice as to loan companies or finance companies. The judge eventually excused 100 jurors for cause.

Household moved that the judge further poll the prospective jurors to determine (1) what, if anything, they had read concerning the trial; (2) what had occurred during pre-trial discussions among the veniremen; and (3) whether such reading or discussion had created any bias in the minds of the jurors. The judge declined to put these further questions to the jurors.

We agree with the judge's reasoning that the purpose of questioning prospective jurors is to determine whether they are free from interest, bias and prejudice, rather than to find out how they may have come to have an improper attitude. G. L. (Ter. Ed.) c. 234, § 28. The decision not to ask the further questions requested by the defendants

was within the sound discretion of the judge. *Commonwealth* v. *Geagan,* 339 Mass. 487, 502–508, cert. den. sub nom. *Geagan* v. *Massachusetts,* 361 U. S. 895. *Commonwealth* v. *Nassar,* 351 Mass. 37, 40–41. *Commonwealth* v. *Nassar,* 354 Mass. 249, 252–254. *Commonwealth* v. *Ricard,* 355 Mass. 509, 510–511. Although it would have been entirely proper to poll the jurors, *Commonwealth* v. *Crehan,* 345 Mass. 609, 615, the judge also might have been reluctant to call the attention of the jurors to possible sources of adverse publicity. *Taylor* v. *Creeley,* 257 Mass. 21, 26. Each of the jurors eventually selected stated that he had no opinion, bias, or prejudice with respect to the case or any of the defendants. The judge noted that he had "no reason to believe that any juror answered a question untruthfully." Cf. *Marshall* v. *United States,* 360 U. S. 310, 312–313.

Three other articles published during the trial were also the basis of various defence motions. During the Commonwealth's opening statement, Mr. Travers stated that "the Commonwealth will present evidence of a trip by Martin Hanley and one Jerome Troy to Washington" to pick up the "package from Barber." The following day, an article in the Boston Globe accurately quoted Attorney General Brooke as stating that "[t]here was no intention to implicate Judge Troy in the crime at all. . . . We don't propose that the judge knew the nature of the trip." The early edition of the Boston Globe on August 18, 1966, carried a page one headline, "Brooke Says Judge Troy in the Clear." A motion for a mistrial, and a motion to poll the jury concerning their knowledge of the publications were denied. The judge ruled that the defendants had failed to establish that they were prejudiced by the newspaper accounts.

Later in the trial, on September 10, 1966, The Saturday Evening Post published a long interview with Attorney General Brooke, then campaigning for the United States Senate. The article included the following statements: "Brooke is honest and sincere, and in Massachusetts politics that *is* out of the ordinary . . . . He won the at-

torney generalship in 1962 . . . and immediately began indicting Democrats. . . . While some indictments have turned sour — conspiracy and bribery cases usually depend on one of the parties to a crime admitting that he is a crook, and sometimes the parties change their minds — there is no shortage of new ones. . . . Brooke, who had no primary opposition, campaigned against sin. In this case sin is alleged to infect some of the state's principal small-loan companies, whose officers are accused of conspiring with state officials to keep loan rates high." The judge denied a motion for a mistrial and a motion to poll the jury concerning the article, again ruling that "the publication and the distribution of the article in question will not deprive, nor reasonably could it deprive, the defendants of a trial before a jury whose verdict will be based solely on the evidence presented, or to be presented in open court during the course of this trial."

Finally, on October 29, 1966, near the end of the first trial, an article in the Boston Herald reported that the "Consumers' Council," a government body (see St. 1963, c. 773), had recommended the abolition of the Rate Board "because of the past activities concerning bribery and the solicitation and acceptance of bribes and the manipulations of this Board by its members and by the industry which it regulates." The judge again denied motions for a mistrial and for a poll of the jury.

The denial of the motion to poll the jury concerning the articles was within the judge's discretion. *Taylor* v. *Creeley,* 257 Mass. 21, 26. The motions for a mistrial, on the basis of publication alone, were also addressed to the judge's discretion. *Worcester Tel. & Gazette, Inc.* v. *Commonwealth,* 354 Mass. 578, 580–581. He determined that two of the articles were not prejudicial to the defendants. The article concerning the recommendation of the Consumers' Council, although it gave the judge somewhat greater pause, was cast in fairly general terms and did not specifically relate to the proceedings before the court. Furthermore, before denying the motion for a mistrial based on this article, the judge

instructed the jury as follows: "I repeat now what I have said to you on a number of occasions in the past, to the effect that ultimately, when you deliberate in your attempt to reach a verdict in this case, you must arrive at your decision solely on the basis of facts which may be agreed to by the parties and reported to you from time to time, plus the evidence which is presented during the course of the trial in open court and in your presence. Those are the limits of matters which you may consider as the basis for your verdict. I told you early in the trial, and I think I repeated later, that if you read or see or hear from any other source anything concerning this case or anything concerning the proceedings of the Court during your absence, you must totally disregard what you see or hear or learn in this manner, or from any such source, because it is not evidence and it is not to be considered by you in your ultimate decision of this case." Particularly in view of the judge's prompt, clear and forceful instruction, we cannot say that he abused his discretion in denying the motion for a mistrial. See *Commonwealth* v. *Eagan*, 357 Mass. 585, 588–589.

2. The judge also denied requests during the empanelling and again at the beginning of the trial that he instruct the jurors "not to read any newspaper accounts or listen [to] or watch radio or television reports concerning any of the proceedings in these cases." The defendants contend that his refusal to give these instructions constituted error. We do not agree.

It is, as the defendants urge, the recommendation of the American Bar Association Advisory Committee on Fair Trial and Free Press, chaired by a member of this court, that instructions such as those requested be given "[i]n any case that appears likely to be of significant public interest." See Standards Relating to Fair Trial and Free Press, § 3.5 (e), pp. 139–140, 144–145, published after the trial of these cases. In this case, however, absent a showing of prejudice, we do not see that failure to give this salutary warning constituted error.

The question whether newspaper publicity has engendered prejudice to defendants is one in which the trial judge has large discretion. *Marshall* v. *United States,* 360 U. S. 310, 312. "Whether a judge has abused his discretionary powers is to be determined by the special facts of each case." *Commonwealth* v. *Eagan,* 357 Mass. 585, 588. Our attention has not been called to alleged sources of prejudicial publicity other than those discussed above. This case involves no such massive publicity as was present in *Estes* v. *Texas,* 381 U. S. 532, or *Sheppard* v. *Maxwell,* 384 U. S. 333. The articles did not relate to matter ruled prejudicial by the judge, cf. *Marshall* v. *United States,* 360 U. S. 310, 311, or conceded by the prosecution to be prejudicial, cf. *Worcester Tel. & Gazette, Inc.* v. *Commonwealth,* 354 Mass. 578, 579–580, or to criminal convictions, inadmissible for important independent reasons. Cf. *Commonwealth* v. *Crehan,* 345 Mass. 609, 610–611, and G. L. c. 233, § 21, as amended through St. 1950, c. 426. The case last mentioned is further distinguishable upon the ground that here the judge's prompt, clear, and forceful instructions to the jury, quoted above, were hardly susceptible of misunderstanding by the jury. Cf. *Commonwealth* v. *Crehan, supra,* at 611–612, 614–615. The instructions given were, in the circumstances, sufficiently *strong* to counteract the possible effect of the adverse publicity. See *Commonwealth* v. *Eagan,* 357 Mass. 585, 589.

3. Household, Barber, Pratt, Glynn and Farrell contend that it was error for the judge to submit four special questions to the jury, to wit: (1A.) Whether a bribe was given, (1B.) If yes, in what city and State. (2.) Whether a bribe was offered, and (3.) Whether a bribe was promised. In commenting to the jury upon these questions, the judge stated, "[A]s to each such count the Court is asking the jury to answer some special questions and then to give its verdict." The defendants contend that once the jury answered the special questions, the general verdicts constituted "hollow affirmations" of matters already decided, depriving the defendants of their rights to due process and fair trial.

Their argument is that the jury's reliance upon special questions may undermine the generality of their verdict under G. L. c. 278, § 11, which provides as follows: "The jury . . . after having received the instructions of the court, shall decide, in their discretion, by a general verdict, both the fact and the law involved in the issue, or they may, at their election, find a special verdict."

It is well settled that in civil cases the trial judge has the power to submit special questions to be answered by the jury as supplementary to a general verdict. E.g., *Hill* v. *Hayes*, 199 Mass. 411, 417; Note, "Common-Law Power and Duty of Court to Submit Proper Special Interrogatories to Jury," 15 Anno. Cas. 469. The defendants urge that criminal cases be distinguished and placed principal reliance on the case of *United States* v. *Spock*, 416 F. 2d 165, 180–183 (1st Cir.).

It may well be that with respect to the matter of special questions different considerations are operative in the two classes of cases. See *Skidmore* v. *Baltimore & O. R.R.* 167 F. 2d 54, 70 (2d Cir.), cert. den. 335 U. S. 816. We note, however, that even in a criminal case, the use of special questions may in certain circumstances serve as an aid to an appellate court (cf. *Stromberg* v. *California* 283 U. S. 359, 367–368), or be otherwise helpful to the proof or disposition of the case. See authorities cited in *United States* v. *Spock*, 416 F. 2d 165, 182, at n. 41. We do not agree with the defendants' contention that the four questions here submitted were such as to lead "the jurors down the guilty trail." In any event, "[t]he answers were not inconsistent with and were superseded by the verdicts. If the answers be considered as incorporated in the verdicts and thereby a part of them, the validity of the verdicts is not affected." *Commonwealth* v. *Bartholomew*, 326 Mass. 218, 221.

4. Pratt and Barber argue that it was error for the judge to refuse to poll the individual jurors after the return of their verdicts. The settled law of this Commonwealth is otherwise. *Commonwealth* v. *Goldenberg*, 338 Mass. 377, 386. See

*Hernandez* v. *Delgrado*, 375 F. 2d 584, 585–586 (1st Cir.).

5. The defendants also assign as error various elements of the judge's charge to the jury. Pratt objects to the judge's failure to instruct that an agreement "to participate in the unlawful combination" is essential to a finding of guilt under the conspiracy indictments. Liberty and Woodcock were denied a requested instruction that the jury, in order to find them guilty, must find that Woodcock's words at the Commodore meeting were "coupled with a then present intent. . . . of joining, participating and actively assisting in an illegal venture." These requested instructions were adequately covered by the judge's charge which included, inter alia, the statement that "the Commonwealth must prove as to a particular defendant . . . that he, by his own actions, words, or conduct entered into an agreement with one or more other persons to commit a crime. Now, this is not the same thing as talking to somebody about somebody else's committing a crime." The judge was not obliged to adopt the exact wording of the instructions requested by the defendants. *Commonwealth* v. *Beal*, 314 Mass. 210, 231.

6. Household contends that the judge's instructions permitted the jury to find Household guilty of a conspiracy (a) with its own employees, or (b) between its own employees. See *Poller* v. *Columbia Bdcst. Sys. Inc.* 284 F. 2d 599, 603 (D. C. Cir.), revd. on other grounds 368 U. S. 464, 469; *Pearson* v. *Youngstown Sheet & Tube Co.* 332 F. 2d 439 (7th Cir.), cert. den. 379 U. S. 914. However, the charge as a whole sufficiently informed the jurors that in order to find Household guilty, they must first find that the individual employees, Pratt or Barber or both, had conspired with someone outside of the corporation. In any event, the guilty verdicts returned against the other defendants on the conspiracy indictments involving Household clearly show that Household was not being held to account merely for an intra-corporate agreement.

7. The judge denied Household's request for an instruction that if a gift, offer, or promise were made to Hanley

with the sole intent that he pass it on to the members of the Rate Board, Household could not be found guilty of the bribery of Hanley under G. L. (Ter. Ed.) c. 268, § 7. In *Commonwealth* v. *Barker,* 311 Mass. 82, 84, 90, the defendant (in a companion case) in a prosecution for accepting a bribe insisted at trial that he had received the money only for the purpose of giving it to another municipal officer, and an instruction similar to that requested by Household was given. In the present case there was considerable evidence that at least part of the "program" was to go to Hanley himself. The judge, "[h]aving given the jury correct rules for their guidance . . . is not required to go further and discuss possible findings of fact upon which a defendant might be acquitted. *Commonwealth* v. *Greenberg,* 339 Mass. 557, 585.

8. Household, Barber, and Pratt urge that there was no evidence on which the jury could find that the bribe was designed to influence Hanley's conduct in his official capacity (see G. L. c. 268, § 7), since his actions before the Rate Board were not authorized by statute, regulation or established usage. However, the jury could have found that the defendants believed Hanley was a key figure at the rate hearings, and that Hanley "used the real *or supposed* power of . . . [his] office to obtain money for himself . . . in violation of his public duty, and that under color of his office he exercised *de facto* the power needed to accomplish what he set out to do" (emphasis supplied). *Commonwealth* v. *Avery,* 301 Mass. 605, 608. If, in such circumstances, the acceptance of a bribe is proscribed, as the *Avery* decision held, we perceive no reason why the same considerations of policy should not, under the statute, forbid the offer or promise of a bribe.

9. Household, Barber, and Pratt also claim error in the judge's charge to the jury that if Garfinkle was a member of the Rate Board, and if Hanley was Supervisor of Loan Agencies, then each was an "officer" within the meaning of the statute, as matter of law. The defendants argue that in giving this instruction the judge impermissibly in-

vaded the fact-finding province of the jury and in effect, directed a verdict for the Commonwealth as to one element of the offence charged. This argument cannot prevail. It is true that whether the duties of a particular defendant are of a character to bring him within the ambit of a statute is a question which may properly be left to the jury. *Commonwealth* v. *Tsaffaras*, 250 Mass. 445, 448. *Commonwealth* v. *Dowe*, 315 Mass. 217, 225–226. But here the judge carefully and correctly instructed the jury that the burden was on the Commonwealth to establish that the person allegedly bribed was an "officer." He did not direct a finding that Garfinkle and Hanley were "officers" under the statute. The charge was addressed, rather, to the meaning of the statutory term.

10. Liberty and Woodcock argue that the judge committed error in refusing to instruct the jury that the "absence of a prior inconsistent statement can itself be an inconsistent statement," for purposes of impeaching a witness's testimony. Their theory is that the jury should have been explicitly informed that they were "entitled to believe that Heath's trial testimony was newly fabricated" because of his earlier failure to mention any statement by Woodcock at the Commodore Hotel meeting. The omission of a single item, however, from Heath's earlier lengthy accounts of the meeting hardly warrants the inference that his testimony at trial was newly fabricated. The judge was not obliged to burden the minds of the jurors with every conceivably helpful technicality of the law of evidence. His charge accurately stated the law in this Commonwealth as to prior inconsistent statements.

11. Likewise the judge's instructions concerning adherence to the conspiracy by means of silent acquiescence, as challenged by Liberty and Woodcock, fairly stated the law in this Commonwealth. Acquiescence in a conspiracy need not be indicated by words. *Commonwealth* v. *Favulli*, 352 Mass. 95, 113. See *United States* v. *Palladino*, 203 F. Supp. 35, 37–38 (D. Mass.). See also *supra*, p. 251. of this opinion.

12. The final objections to the charge, raised by Household and joined in by Pratt and Barber, relate to the establishment of the defendants' corrupt intent as an element of the crime of bribery. First, it is argued that the judge erred in refusing to charge that if one attempts through offering something of value only to secure something to which he believes he is legally entitled, then that belief should be considered as bearing on whether he had a corrupt intent. There was some evidence that Household believed it was entitled to a continuation of the existing rate on small loans because of certain statutory language allegedly limiting the authority of the Rate Board. There was no evidence, however, that Household believed it had a legal right to pay Hanley to maintain the existing rate. Cases such as Commonwealth v. Ballou, 283 Mass. 304, 314, are therefore not on point. The judge correctly charged that belief in the legality of the 1ate was no defence if the jury should find that notwithstanding and apart from that belief the defendants did actually bribe a public officer. To hold otherwise would be to create a major and illogical exception to the substantive offence of bribery. Household's position was adequately reflected in the judge's charge that the jury could consider Household's belief (as to the rate change) as bearing on whether Household had a motive to bribe, and hence on whether Household did in fact offer a bribe.

Household also contends that it was error to charge that a "gift or gratuity" was something which the defendant "was not *legally obligated* or required to give or to pay," on the ground that this instruction "excluded from the jury's consideration whether the offer might have been made under *compulsion* in fact," i.e., involuntarily. Apart from the fact that there was no request for an instruction that the jury consider the voluntariness of the promises to pay Hanley and Garfinkle (see Commonwealth v. Enwright, 259 Mass. 152, 158–159), we feel it helpful to repeat what we said in Commonwealth v. Polian, 288 Mass. 494, 499, as applicable to many facets of these proceedings: "Charges would be end-

less as well as confusing if a judge could be compelled to call attention to every subsidiary fact and every possible inference. . . . It is for the judge to decide to what extent he will state the evidence and discuss the possible inferences of fact that may be drawn from it."

13. The defendants also raise various objections to the judge's handling of evidentiary matters. Glynn, Farrell and Hanley assert that the judge committed error in hearing the Commonwealth ex parte on its applications for issuance of process to out-of-State witnesses, under G. L. c. 233, §§ 13A–13D. In its requests for process, the prosecution represented that one prospective out-of-State witness was "necessary and material . . . by reason of the fact that he agreed with others to pay a sum of money to [bribe] Martin J. Hanley, an executive officer of the Commonwealth of Massachusetts," and that a number of other persons were necessary and material witnesses because of their "personal knowledge that a sum of money was delivered to another for the purpose of being given to Martin J. Hanley." The judge's certificate issued under c. 233, § 13B, stated only that the testimony of a witness was material because of "personal knowledge that a sum of money was delivered to another for the purpose of being paid to an executive officer of the Commonwealth of Massachusetts." None of the prospective out-of-State witnesses actually testified at the trial.

The defendants' contention is twofold: First, that the ex parte hearing prejudiced the judge against the defendants and deprived them of their right to a fair trial; and second, that it deprived them of their right of confrontation under the Sixth Amendment.

As to the first point, we note that the Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings, adopted in Massachusetts as G. L. c. 233, § 13A–13D, contemplates that the materiality of the testimony of a witness be shown in the certificate of the judge of the demanding State, or else in separate proceedings commenced upon that certificate in the requested State.

See *People* v. *Cavanaugh*, 69 Cal. 2d 262; *Re Stamler*, 279 App. Div. (N. Y.) 908. Presumably, the judge of the demanding State is to satisfy himself that the testimony is in fact material. A bare allegation of materiality, on the part of the prosecution, may not afford a sufficient basis for this determination. *State* v. *Fouquette*, 67 Nev. 505, cert. den. 341 U. S. 932. Contrary to the defendants' contention, the judge here made no preliminary "findings of conspiracy" on the basis of the prosecution's representations. He merely discharged his duty under the statute. To hold that the prosecution's representations so prejudiced the judge as to preclude a fair trial would render useless the statutory procedure of G. L. c. 233, §§ 13A–13D. Neither the judge's certificate nor the representations were ever seen by the jurors, who, of course, were the finders of fact.

As to the second point concerning the claimed denial of the Sixth Amendment right of confrontation, we are not certain what rights of cross-examination and of representation by counsel are claimed to have been lost. A proceeding to compel the attendance of a witness, even if it is an aid to a separate criminal proceeding, is not necessarily itself criminal in nature. *Epstein* v. *People of State of New York*, 157 So. 2d 705, 707 (D. Ct. App. Fla.), which held that a Florida proceeding under the Uniform Witness Act, based on the certificate of a New York judge, was not criminal and did not require an opportunity for cross-examination. Here, the worst that could happen as a result of the defendants' inability to cross-examine the prosecution during the requests for process was that a witness would be summoned who should not have been summoned. If such a witness testified against the defendants, he would be subject to cross-examination. We therefore find that the defendants were not deprived of any Sixth Amendment rights by the ex parte hearings on the prosecution's requests for process. Even if the Sixth Amendment did apply, the error, if any, would be harmless, as none of the out-of-State witnesses testified. Consequently the triers of fact were not exposed to the prosecution's ex parte allegations. Cf. *Haller* v.

*Robbins,* 409 F. 2d 857, 859 (1st Cir.), where a detrimental hearsay statement as to the conduct of the criminal defendant was made ex parte by a prosecutor to the sentencing judge.

14. Several defendants take exception to the judge's admission and exclusion of evidence. Beneficial argues that it was error to admit two statements read by Mr. Robert G. Miller at the Rate Board hearing. In the first statement Mr. Miller said that he was "an attorney . . . [from the] State of New Jersey, representing the Beneficial Finance Companies which do business in Massachusetts," and that "we acknowledge the form of notice sent to us, telling us of this hearing." In the second, he requested that the hearings be terminated. It is contended that there was no evidence that Mr. Miller was an agent of Beneficial, and that therefore his statements were not admissible against Beneficial. Aside from the fact that the Massachusetts business trusts owned by Beneficial do business as Beneficial Finance Company, there was testimony by Heath that in 1960 and 1961 Mr. Miller had been present at various State House hearings relative to the small loans industry; that Mr. Miller attended the 1962 meeting at the Chatham Bars Inn to discuss changes in the form of the annual report, which was prepared by Beneficial; and that on November 8, 1962, the day before the meeting in the Commissioner's office to study procedures for the rate hearing, Mr. Miller shared a room with Glynn in the Parker House, where they were met by Heath. Robert S. Leadbetter, the assistant supervisor of small loans agencies, also testified that Mr. Miller represented Beneficial at the Rate Board hearings in 1962. Mr. Miller could have been found to be an agent of Beneficial.

15. Liberty and Woodcock contend that the judge erred in admitting against them certain evidence as to the conversations and acts of others. The constitutional issue raised by these contentions has been fully discussed in the treatment of defendants' motions for severance, *supra,* p. 219, and need not again be considered here.

These defendants concede that acts and statements of

co-conspirators made during the course of and in further-
ance of a conspiracy are admissible on a conspiracy indict-
ment. E.g., *Commonwealth* v. *Kiernan*, 348 Mass. 29, 59.
Nevertheless, they argue, first, that there was insufficient
evidence to link them with Glynn, Pratt, Heath, Hanley
and Garfinkle as co-conspirators. The findings and rulings
of the judge, amply supported by the evidence, were
otherwise.

Liberty and Woodcock next urge that particular conver-
sations of others were improperly admitted against them
because they were not in furtherance of the conspiracy
allegedly agreed to by Woodcock. Although the argument
appears to be highly technical it is but superficially so.
We have reviewed the evidence as to the various conversa-
tions, and find that in each case the evidence was probative,
in context, and that there was a proper basis for its admis-
sion. The same applies to the evidence of Hanley's trip to
Washington. "[I]t is not necessary that every piece of
evidence admitted should be sufficient by itself to prove the
crime. Evidence which would be colorless if it stood alone
may get a new complexion from other facts which are
proved, and in turn may corroborate the conclusion which
would be drawn from the other facts." *Commonwealth* v.
*Mulrey*, 170 Mass. 103, 110–111.

16. Liberty and Woodcock also argue that certain evi-
dence offered by them was improperly excluded. The tran-
script reveals that the evidence in one instance was imma-
terial and in another was hearsay properly objected to.
There was no error. A third objection relates to proposed
extension of cross-examination. "[I]t is settled that how
far the cross-examination of a witness may be deemed helpful
and relevant to the issues being tried, as well as to what
extent the accuracy, veracity or credibility of the witness
may be tested, must be left largely to the sound discretion
of the trial judge, and is not open to revision, unless it is
shown that such discretion has been exercised in a way that
results in the prejudice of a party to the cause by reason of
either too narrow restriction or too great breadth of in-

quiry.  *Jennings* v.. *Rooney,* 183 Mass. 577, 579, and cases cited.  *Gerber* v. *New York Central Railroad,* 288 Mass. 318, 321."  *Commonwealth* v. *Beal,* 314 Mass. 210, 229. We are of opinion that there was no abuse of discretion.

17. Hanley asserts that there was error in his joinder for trial with the other defendants.  On this point, we refer to our discussion on the question of severance in the pre-trial portion of this opinion, *supra,* p. 219.  No further elaboration is required.

18. Household contends that it was error for the judge to make a preliminary ruling that Hanley, who was not mentioned in Indictment 11910, could be found to have been a co-conspirator in the conspiracy to bribe Garfinkle charged in that indictment.  The defendants Barber and Pratt have adopted Household's argument.  At the time of the judge's ruling, during the third month of the trial, Household moved for a mistrial "on the ground that in effect the Indictment 11910 was being amended by adding the name of Hanley as a co-conspirator."  This motion was denied and Household duly excepted.

We agree with Household that the "offense must not only be proved as charged, but it must be charged as proved." *Commonwealth* v. *Ancillo,* 350 Mass. 427, 430.  The judge's ruling as to Hanley, however, did not amount to a fatal variance between the offence charged and the one proved because the indictment included as conspirators "divers other persons . . . unknown" in addition to those named. It is true that if "the persons alleged to be unknown to the grand jury were actually known to them . . . there is a variance between the allegation and the proof which vitiates the indictment."  *Commonwealth* v. *Galvin,* 310 Mass. 733, 735.  *Commonwealth* v. *Thornton,* 14 Gray, 41, 42.  *Commonwealth* v. *Merrick,* 255 Mass. 510, 513.  Household has failed to convince us, however, that the grand jury were aware of Hanley's activities in connection with the conspiracy to bribe Garfinkle to as great an extent as the judge was when he made his ruling.  Apparently Heath's testimony before the grand jury did not include certain facts

with respect to Hanley which were part of his testimony at the trial and crucial to the judge's ruling. The grand jury might well have been able to conclude that others not known to them were involved in the conspiracy and that Hanley was involved in conspiracies other than those with which he was charged. In these circumstances, Household has not rebutted the presumption that the assertion in an indictment that certain persons are unknown to the grand jury is a true statement. *Commonwealth* v. *Galvin*, 310 Mass. 733, 735. We need not decide whether in the circumstances of the case before us, even if a variance were shown, it was one which prejudiced Household's defence sufficiently to call for acquittal under G. L. (Ter. Ed.) c. 277, § 35.

19. Objection is made by Household, Beneficial, Glynn, Farrell, Liberty and Woodcock to the judge's selective removal as to certain defendants of limitations on forty-eight items of evidence. Barber and Pratt have adopted Household's argument. This issue arose in the following manner. Pursuant to motions of the Commonwealth, the judge made preliminary rulings during the trial that Barber, Pratt, Household, Farrell, Glynn, Beneficial, Woodcock, Liberty and Heath could have been found to have conspired to bribe Hanley as charged in Indictment 11900, and that the same persons or corporations plus Hanley could have been found to have conspired to bribe Garfinkle as charged in Indictment 11910. Simultaneously with the granting of these rulings, the judge lifted limitations on forty-eight items of evidence to the extent requested by the Commonwealth, without admitting this evidence against all of the conspirators. This evidence had originally been admitted against only one of their number. Several defendants duly excepted to these rulings. Shortly thereafter, the judge informed the jury of the changes in limitations by describing to them the portions of evidence in question and stating on which indictments, or counts, and against which additional defendants each portion could be considered. This procedure was also excepted to. Several defendants, in addition,

filed motions at this time for severance, or in the alternative, for a mistrial, which were denied by the judge. Finally, Household requested the judge to instruct the jury that if they were uncertain as to what evidence might be considered against a defendant, they must return a verdict of not guilty against that defendant. Household excepted to the failure of the judge to so instruct the jury.

Two grounds are offered to support the proposition that this expansion of the prior limitations on evidence was improper. The first focuses on the sheer number of limitations. It is claimed by Household, Beneficial, Liberty and Woodcock that the jury could not possibly have followed the judge's complex and intricate recital involving numerous items of evidence and a constantly changing array of defendants and counts and indictments. In addition, Household claims that only the instruction it requested could have insured a proper jury verdict.

The procedure followed here of initially admitting evidence subject to limitations and subsequently broadening these limitations and so informing the jury is well established in our law. *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133. *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50. *Commonwealth* v. *French,* 357 Mass. 356, 378–380. Its use was not made improper by the fact that this case was large and complex. This was a feature of the case which the judge had to deal with as best he could; we can think of no simpler way he could have informed the jury of the necessarily complex pattern of suspensions of prior limitations on evidence than the one he chose.

Nor was the instruction requested by Household necessary to insure that a guilty verdict rested only on evidence which it was proper for the jury to consider. In his instructions the judge cautioned the jury at length that they must recall and apply all limitations on all the evidence, giving effect to the changes made during the trial by him. Implicit in these instructions was the admonition that if the jury could not remember the limitations on a given item of evi-

dence they could not consider it. In fact, it is highly improbable that the jury could or did remember all the limitations on all the evidence, but to return a guilty verdict against a defendant it was necessary that they remember only the limitations on that part of the evidence which was critical to sustain a conviction against that defendant. These were emphasized by counsel for the defendants in their final arguments. There is no indication that the jury could not or did not comprehend the limitations. "We see no reason to depart from our rule that jurors are expected to follow instructions to disregard matters withdrawn from their consideration." *Commonwealth* v. *Eagan*, 357 Mass. 585, 589, and cases cited. See *Fairmount Glass Works* v. *Cub Fork Coal Co.* 287 U. S. 474, 485. The instruction requested by Household would have required the jury to perform an exceedingly difficult, if not impossible, task which was not necessary to the return of a verdict against a defendant based only on evidence admissible as to him or it.

The second ground for objection, raised by Beneficial, Glynn, Farrell, Liberty and Woodcock, is that, apart from their number, limitations were improperly expanded in two respects. First it is alleged that it was improper, under *Commonwealth* v. *Benesch*, 290 Mass. 125, 132, to admit evidence against some who could have been found to be co-conspirators but not all. There is nothing in the *Benesch* case, however, which requires that after a preliminary ruling of conspiracy, evidence originally admitted against one conspirator must be admitted against every other conspirator or not broadened at all. The defendants cannot complain that less evidence was broadened to apply to them than might properly have been. Nor have they introduced any indication that the selective broadening of evidence was intended to put, or in fact resulted in putting them in a worse position than other defendants who were subject to this procedure. In these circumstances we cannot say that the rule applied in the *Benesch* case precludes application of a rule allowing selective expansion as was here adopted by the judge. See *Commonwealth* v. *Kiernan*, 348 Mass. 29, 56–58.

The defendants also argue that the judge's alleged departure from the rule in the *Benesch* case impinges upon their Federal constitutional rights. Farrell and Glynn contend that "the substitution by the court of the arbitrary discretion of the prosecutor for the long-settled rule stated in *Commonwealth* v. *Benesch* deprived the defendants of a fair trial in violation of the Due Process Clause." The thrust of their contention is that the judge, in ruling on the defendants' motions to strike, abandoned his judicial responsibility to the prosecutor by allowing the prosecutor and the defendants to reach "mutual agreements" as to which evidence, theretofore admitted against a particular defendant, should be struck.[67] The defendant Glynn, in particular, relies on the ruling of the judge that "in the absence of any such agreement this court will rule on the motions to strike on the basis of what it understands to be the rules of evidence relating to a trial of this kind." In his oral argument, Glynn's counsel referred to the above language as "shockingly cynical."

To the contrary, we deem the above ruling of the judge to be a clear exposition of the fact that he would exercise his judicial responsibility in applying the rules of evidence. The judge made this clear when he specifically ruled that

---

[67] In support of this contention, the defendants rely on the judge's ruling in the second trial where he stated: "Wherever the Commonwealth has specifically limited evidence which it offered, this Court has not attempted to enlarge the scope of application as thus limited. That has been true whether the limitation was stated when evidence was originally offered, or was stated when the Commonwealth sought to enlarge the applicability of evidence. This Court has in some instances denied, but never enlarged the scope of application requested by the Commonwealth. We are not faced with the question of what this Court should do with evidence which it has heretofore ruled to be admissible as to a particular Defendant, either when originally offered or when limitations were enlarged, and which the Defendant now seeks to strike on the basis of the so-called 'rule of fairness,' and over the objections of the Commonwealth. This Court does not feel that it is bound or limited by the Commonwealth's statement of intent or of its 'rule of fairness'; and it does not consider anything which has occurred to this point as establishing a 'law of the case' requiring the striking of any evidence which is otherwise properly in the case. This Court will consider mutual agreements, if any, for the striking of evidence heretofore admitted as to any particular Defendant. However, in the absence of any such agreement, this Court will rule on the Motions to Strike on the basis of what it understands to be the rules of evidence relating to a trial of this kind."

"[t]his Court does not feel that it is bound or limited by the Commonwealth's statement of intent or of its 'rule of fairness'; and it does not consider anything which has occurred to this point as establishing a 'law of the case' requiring the striking of any evidence which is otherwise properly in the case." An examination of the transcript and the judge's rulings supports the foregoing disclaimer of judicial abdication to the prosecutor and reveals that the judge in actuality was extremely circumspect in admitting various items of evidence against the respective defendants and thereby minimized any possible prejudice.

Thus, Glynn's argument is reduced to the patently specious assertion that he was deprived of a fair trial because the prosecution did not offer and the judge did not admit all of the evidence against all of the defendants. It is beyond our comprehension how Glynn can claim prejudice from the fact that evidence which could only be damaging to his defence was not admitted against him. Indeed, it is apparent that the judge showed the greatest possible deference in protecting the defendants' rights by striking a balance between any conceivable harsh effect of admitting all of the evidence against all of the conspirators, regardless of the scope of their involvement in the conspiracy, and the totally impractical alternative of having eight separate trials.

Glynn and Farrell further claim that certain other expansions of the evidence were improper because the portions in question were originally admitted against Hanley and Garfinkle, "who . . . [were] not connected by finding or ruling with" the counts and indictments as to which the portions of evidence were expanded. The fact that these expansions were not based on the preliminary rulings of conspiracy does not, however, mean they were improper. As we have previously noted, the indictments in the first grouping were converse indictments, some charging those who gave the 1962 bribes and others charging those who accepted them. The same evidence, therefore, seen in the light of other evidence later admitted, might well have been relevant and proper in connection with both types of

indictments, although it was only originally admitted in connection with one.

With respect to the foregoing point, Beneficial also makes, apparently *for the first time*, the very peremptory argument that this procedure denied it the opportunity of cross-examination and therefore violated its right of confrontation. The Commonwealth asserts that the defendants failed to save adequate exceptions on this point and that it cannot now be considered by us. *Commonwealth* v. *Myers*, 356 Mass. 343, 346. *Commonwealth* v. *Foley*, 358 Mass. 233, 236. It is unclear whether the basis for this argument was adequately identified and exceptions saved. In any event, the transparent sophistry of this argument is illustrated by the fact that the defendants were well aware during the course of the trial that the judge could have admitted all of the evidence against all of them. Therefore their opportunity to cross-examine was in no way undermined by the fact that the judge chose not to admit certain evidence against certain defendants. Moreover, it was within the power of the defendants to request that witnesses be subject to recall. There was no error.

20. All of the defendants have appealed from the denial of their motions for a new trial. These motions were filed after the start of the second trial and were based on material made available to them by the prosecution during that trial. The defendants contend that portions of this material were relevant to their defence in the first trial and that it should have been made available to them at that time, since this material was then in possession of the prosecution. The judge held a hearing for three days on the various allegations contained in the several motions, and disposed of them together in a comprehensive decision.

The objections of the defendants fall into three different categories. We deal with each one separately, designating for each the defendants who rely on it and the rulings of the judge relating thereto.

Household's objection is directed at the expense vouchers (*supra* p. 247) of the witness Heath for each week from the

week ending September 8, 1962, through the one ending October 20, 1962. The defendants Barber, Pratt, Liberty and Woodcock have adopted Household's argument relating to these vouchers. It is contended by Household that the vouchers would have been valuable in impeaching part of Heath's testimony. Heath testified extensively about a luncheon meeting he had with Glynn and Pratt in Boston at Purcell's restaurant, "within a week or one or two days prior to October 17 [, 1962]." During this meeting the possibility of bribery in connection with the 1962 Rate Board hearings was first discussed.[68] The vouchers, however, cover every business day on which Heath was in Boston during this period and include an entry for every lunch time showing that Heath was entertaining guests other than Pratt and Glynn. Since the judge's instructions permitted the jury to find Household guilty if they found Pratt guilty, Household claims that the vouchers were sufficiently important to its defence that their nondisclosure by the prosecution calls for a new trial, regardless of the good or bad motives of the prosecution in not disclosing them.

The judge, in rejecting this argument, noted first that the vouchers were not as significant as the defendants claim. "The expense vouchers were not complete records of Heath's daily activities, but only records of expenditures for which he sought reimbursement from his employer. . . . [T]he absence of any entry for a luncheon at Purcell's Restaurant, or for any similar occasion or meeting, is not evidence that such luncheon or meeting did not occur. It may be evidence that Heath incurred no reimbursable expense for such a meeting, but it does not prove that the meeting did not take place." Among the judge's other findings relevant to this issue are the following: (1) "The total volume of records, documents and material turned over to the Attorney General by the Commission amounted

---

[68] In view of our disposition of the objection raised, we need not deal with the issue whether the defendants Liberty and Woodcock have standing to raise it. The testimony of Heath regarding the Purcell's meeting was not admitted against these defendants.

to the equivalent of the contents of about twenty-four (24) ordinary file drawers," not all of it germane to the indictments in the first grouping.  (2) "Prior to and during the trial, the Prosecutor caused copies to be made of a large volume of records, documents and material in his possession and which he thought might relate to the indictments on trial; he seasonably furnished the defendants with such copies. . . . In this connection the Prosecutor or persons acting for and under him made a reasonable and diligent search and examination of all the material in the Commonwealth's possession.  The Commonwealth seasonably delivered to the defendants either the originals or copies of all the material in its possession which the Prosecutor thought related to the indictments on trial and which he thought the defendants were entitled to receive."  (3) "[The disclosure by the Commonwealth] was probably the most full and complete disclosure ever made in the trial of a criminal case in this Court."  On these facts the judge concluded that "[t]he Commonwealth acted with full and complete reasonableness, diligence, and good faith in considering and deciding what material it was required to make available to the defendants in connection with said trial . . . [and] did not consciously, knowingly, intentionally, or otherwise suppress or withhold from the defendants any material which the defendants were entitled to see or receive in connection with said trial."

The judge's findings are supported by the evidence and his conclusions are not inconsistent with the Federal Constitutional principle that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady* v. *Maryland*, 373 U. S. 83, 87. The Supreme Court of the United States has to date refused to decide "whether the prosecution's constitutional duty to disclose extends to all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial."  *Giles* v. *Maryland*, 386 .

U. S. 66, 74. The *Giles* case, in fact, the court's most recent decision on the prosecution's duty to disclose, was decided by a 5 to 4 court and failed to produce even a majority opinion, despite the Court's avoidance of the broad questions presented to it. In this unsettled state of the law, we conclude that the prosecutor's duty to disclose must be measured by the directness of the materiality of the item of evidence in question to the defence taken together with the sheer volume of all the evidence in the hands of the prosecution. It is clear that the greater the body of evidence, the less feasible it is for the prosecutor to weigh each item deliberately and at length for its possible usefulness to the defendant in response to a general request by the defendant for disclosure of whatever the prosecution might have that might be useful. In such circumstances, the Federal Constitution does not require a new trial on the ground that the prosecutor's decision with respect to a marginally useful item of evidence was not what it might have been under ideal conditions. We can only expect and require under the due process clause "essential fairness of . . . procedure" (*Barbee* v. *Warden, Maryland Penitentiary*, 331 F. 2d 842, 846 [4th Cir.]) and good faith, not perfection.

The significance of the vouchers to the defence here, and the volume of evidence which the prosecution possessed in this case, are both sufficiently distinct from the comparable facts in the Supreme Court of the United States cases from 1935 requiring disclosure, to warrant a different result. The crimes involved in those cases were less complex (e.g. murder and rape-murder) and the evidence considerably less voluminous. Furthermore, in those cases the cardinal importance of the undisclosed facts to the defence was clear; in some the prosecution had acted questionably or in outright bad faith in concealing them. *Brady* v. *Maryland*, 373 U. S. 83. *Miller* v. *Pate*, 386 U. S. 1. *Mooney* v. *Holohan*, 294 U. S. 103. *Alcorta* v. *Texas*, 355 U. S. 28. *Napue* v. *Illinois*, 360 U. S. 264. See *Giles* v. *Maryland*, 386 U. S. 66.

Household stresses Mr. Travers's testimony that he made "a conscious, intentional decision not to produce this evidence" and that the vouchers were not therefore overlooked by the prosecution in deciding what to disclose. Household does not charge misconduct on the part of the prosecution in deciding not to produce the vouchers, but contends rather "that Mr. Travers improperly allocated to himself the functions of the court in determining their producibility and the functions of defense counsel in determining their usefulness." However, this argument ignores the fact that Mr. Travers had twenty-four file drawers full of materials relating to the indictments returned in February and May, 1964. It was necessary for him, therefore, to decide with respect to all the evidence he had whether he should make any given item available to the defendants, and this decision, of necessity, had to be based on the relevance and possible usefulness of the evidence to the defendants. Far from usurping a function which was not his, Mr. Travers was simply performing a necessary preliminary step to disclosure. Even Household does not suggest that he should automatically have handed over all twenty-four file drawers. Nor do we feel, even in the light of hindsight, that the vouchers would have been of sufficient importance to Household in its defence as to require a new trial because Mr. Travers exercised his judgment in the way he did.

The defendants Glynn and Farrell, in an argument adopted by Beneficial and Hanley, claim that Heath's vouchers for the period from June 1, 1962 to September 30, 1962, should have been made available to them. In an argument similar to Household's, they claim that the vouchers, covering every business day during the summer of 1962, would have been useful in impeaching Heath's testimony that three incriminating meetings involving himself, Glynn, and Hanley took place during that summer. Unlike Household, Glynn and Farrell allege in addition that the prosecution knowingly and in bad faith suppressed this evidence, pursuant to a "deal" with Heath that the vouchers would not be used at any trial. The judge found

that no such deal was made and this finding was not clearly erroneous. Their argument thus stands on the same footing as Household's. We reject it for the same reasons that we rejected Household's, weighing on the one hand the less than crucial importance of the vouchers, discussed at some length by the judge, and on the other the quantity of evidence in the hands of the prosecution.

Liberty and Woodcock object to the nondisclosure of two portions of Heath's grand jury testimony which it is alleged "would have materially affected his credibility" and to an alleged misrepresentation by the Commonwealth of "the consequences of cross-examining Heath on a portion of his grand jury testimony supplied only to these defendants." The first portion of Heath's grand jury testimony which it is alleged should have been produced at the first trial is his testimony on December 17, 1965, the last day Heath appeared before a grand jury before the start of the first trial, seven months later. It is alleged that this testimony was significant because "[i]n that testimony . . . [Heath] did not even name Woodcock as being among those present at the all-important Commodore [Hotel] meeting, much less have him say anything." It should be remembered, however, that Heath testified at great length and over a considerable period of time beginning in January, 1964. The judge found that "[n]either the defendants nor this Court can expect that on every date and on every page of the transcript of every statement made by the witness Heath, or by any other witness, the witness will give and repeat the aggregate of all of his testimony on any particular issue, event, occurrence, or case." At other times before the special grand jury which returned these indictments Heath specifically placed Woodcock at the meeting. In addition, it was brought out on cross-examination of Heath at the trial that about three years before he had not been sure whether Woodcock was present at the meeting. Thus, this evidence would have added little, if anything, to that which was already before the trial jury tending to cast doubt on the re-

liability of Heath's memory.   Plainly, at any rate, this evidence was not material.

The second portion of Heath's grand jury testimony which it is alleged was material to Liberty's and Woodcock's defence was a statement by Heath that he felt that Woodcock was trying to blackmail him in 1957.   Liberty and Woodcock claim that this statement could have been used by them to impeach Heath's testimony at the trial that the defendants were his friends and that in particular he was "on cordial terms with all of the [Liberty] personnel in my area."   However, as the judge noted, "[Heath] did not claim or testify that all the defendants were his friends at the time he was testifying.   If they were no longer friends at the time of trial, the reason is understandable.   Neither did he specify when they were all his friends.   Indeed, an examination of the entire transcript of his testimony at this trial indicates that he had worked with Woodcock for the same employer for a number of years before Woodcock left to go with Liberty, and that they were good friends 'over a period of years.'   That is not inconsistent with Heath's Grand Jury testimony about the 'blackmail' conversation with Woodcock.   Further, between the date of that conversation and the time of trial in this case, nine years had elapsed, and there was much evidence of friendship between Heath and Woodcock during the intervening period."   With respect to Heath's remark about the Liberty personnel in his area, the judge noted, "Woodcock was Liberty's Executive Vice-President at Liberty's home office in Missouri, and was not at any time part of the Liberty personnel in Heath's area."   Therefore, to the extent this evidence could in fact have been used to impeach Heath on a matter which was not crucial to the indictments on trial, it would have been of only minor importance.

Finally, Liberty and Woodcock allege that the prosecution improperly deterred defence counsel from cross-examining Heath with respect to his grand jury testimony that at the Commodore Hotel meeting Woodcock refused to pay any money to Hanley.   This portion of Heath's

grand jury testimony was made available in the first trial to Liberty and Woodcock only. The defendants did not bring up this exculpatory prior testimony on cross-examination of Heath, however, because they were warned by the Commonwealth that if they did "it would result in the introduction of evidence of another crime." Thinking that the other criminality referred to was that with which Liberty and Woodcock were charged in indictment 11908, yet to be tried, counsel decided not to inquire further. At the second trial, during which Heath's grand jury testimony with respect to indictment 11908 was first made available, it developed that Woodcock had made no statements incriminating him in connection with that indictment at the Commodore Hotel meeting. The criminality the prosecution was referring to, according to Mr. Travers's testimony on the defendants' motions for a new trial, was a third conspiracy, called the "legislative program," for which some defendants but not Liberty and Woodcock were indicted.

The defendants allege that the prosecution's statement was a conscious misrepresentation requiring a new trial. We disagree. As the judge noted, the statement of the prosecution was "perfectly correct, proper, and truthful" as it stood. The prosecution is not responsible for whatever interpretation may be made by defence counsel. We agree also with the judge that "[t]hese defendants were represented by able and experienced counsel who were free to weigh the statement and make their own decisions thereon, and they did so. They were free to continue cross-examination or not, as they saw fit. If they decided not to cross-examine further on any point, it was not because of any misrepresentation by the Commonwealth. It is not necessary for the Court or anyone else to indulge in the idle luxury of hindsight and thereby speculate whether the decision of counsel on matters of trial strategy was correct or not."

21. The final issue we treat with in the first trial relates to

the sufficiency of the evidence to allow the substantive indictments (offering bribes to Hanley and Garfinkle) to go to the jury. Pratt, Barber, Woodcock, Liberty, Beneficial and Household raised this point through motions for directed verdicts. Beneficial raises this question on appeal in conjunction with its argument as to the sufficiency of the evidence on the conspiracy indictment. Household raises it in connection with its attack on the judge's charge. Barber, Pratt and Household also challenge the admission of certain evidence admitted against it under the substantive indictment.

It is true, of course, that proof of a conspiracy, without more, does not justify a finding that a conspirator has committed the offence which is the object of the conspiracy. *Commonwealth* v. *Stasiun,* 349 Mass. 38, 47. We assume it is also established that to convict a defendant as a principal his scope of activity must surpass that of mere acquiescence and reach that of active participation. Cf. *Commonwealth* v. *French,* 357 Mass. 356, 391–392, (conviction of a conspirator as an accessory before the fact upheld), and cases cited.

The evidence we have previously recounted with respect to each of the corporate and individual defendants demonstrates that each of them actively participated in the offer to bribe Hanley and Garfinkle. Without reviewing this evidence again, suffice it to say that it shows that the defendants specifically delegated to one of the co-conspirators, namely Barber, the authority to offer a bribe to Hanley. One may be convicted as a principal where he delegates to an agent the authority to do the act. See *Commonwealth* v. *Dolan,* 304 Mass. 325, 339. We have previously discussed at length the question of an agent's authority to bind his corporation. We do not repeat it here. The judge properly admitted evidence of statements by Farrell, Glynn and Heath against Barber, Pratt and Household. There was no error in the denial of the defendants' motions for directed verdicts.

## PART III.

### THE SECOND TRIAL.

#### A. THE EVIDENCE.

In the opening statement of this opinion we explained that the evidence in the first trial centered around one particular event — the payment of bribe money to "fix" the 1962 rate hearings, whereas the evidence in the second trial covers a seven year period during which Hanley was continuously paid money to bestow various favors upon the small loans companies.

Stated in its aspect most favorable to the Commonwealth,[69] this evidence is summarized as follows:[70]   During the period covered by these indictments (1957–1963) different statutory limitations were imposed upon the making of "small loans." Before 1956, the law required that any person engaging in the business of making loans of $300 or less had first to obtain a license from the Commissioner of Banks. G. L. c. 140, § 96 (as amended through St. 1941, c. 158, § 1). In 1956 this statute was amended to apply to loans of $1,500 or less, and as we have seen, the limitation was extended to cover loans of $3,000 or less in 1962.

The Commissioner of Banks also had the power to establish regulations governing the granting of "small loans" licenses and the business conducted by the licensees. Licenses are granted for a one year period and at least once during the year the affairs of the licensees must be investigated. G. L. c. 140, § 97. All licensees must make a return to the Commissioner showing a trial balance of the books of the licensee "with such other information as may be called for by the commissioner in accordance with a blank

[69] A diligent examination of the transcript reveals that many of the facts set out in the Commonwealth's brief are accurately stated and therefore we have adopted portions therefrom.

[70] The same method for designating limitations on evidence and subsequent admissions as was used in reciting the facts in the first trial is used here. The following symbols refer to the defendants in this trial: H = Household; B = Beneficial; L = Local; G = Glynn; F = Farrell; N = Newhall; P = Pratt; Br = Barber; Hly = Hanley.

form to be furnished by him." G. L. c. 140, § 98. In order to assist him in carrying out these statutory functions, the Commissioner of Banks also has the power to appoint a deputy as supervisor of loan agencies. Hanley was appointed supervisor of loan agencies in February, 1950, and remained in this position at all times material to this case.

On October 1, 1953, comprehensive regulations governing the small loans business became effective. These regulations established a license fee of $200 and specified the form of license application. The regulations state that "[t]he total amount to be paid on any loans for interest and expenses shall not, in the aggregate, exceed an amount equivalent to 2% a month for a period terminating not later than one year after maturity, and to 6% per annum after the termination of said year, on the amount actually received by the borrower, computed on the unpaid balance."

The regulations vest substantial powers in the office of the supervisor to superintend the small loans industry. They provide that "[n]o change in the location of a licensed business shall take place without the prior written approval of the supervisor," and require that notice of changes of office managers be filed with the supervisor. In addition "[a]ll forms used in connection with the making and recording of loans . . . must have the prior approval of the supervisor." On or before November first of each year licensees are required to file an annual report "on a form furnished by the supervisor." Advertising material of the licensees was also regulated and ordinarily decided upon by the supervisor. In 1960, these regulations were amended. The amendments followed a number of meetings and public hearings held during the year 1960, and were preceded by temporary revisions.[71]

The division of loan agencies, of which Hanley was the supervisor, also had as its general responsibility the examination of licensees, the enforcement of consumer credit

---

[71] H, L, B, G. This limitation applies only to material in the sentence footnoted.

laws and regulations, and the general protection of the borrowing public. Within the division, the supervisor decided whether an applicant would be licensed and approval by the Commissioner of this decision was generally routine. The examinations of licensees by the division were conducted once a year by twenty-six examiners. An examiner was required to visit each of the licensed loan offices to check for overcharges or any violations of the law or the regulations.

During the years involved in these indictments there were approximately 325 licensed lending offices in the Commonwealth. About seventy per cent of these offices were so called "chain offices" — offices controlled by the same individual or company. The principal chain companies were Beneficial, Household and Public, which were known as "The Big 3," plus Seaboard Finance, Liberty Loan, and Local Finance Corporation. "The Big 3" had approximately 138 offices, of which Beneficial had fifty-eight and Household and Public about forty each.

At this point, we believe it helpful to identify the individual and corporate defendants as well as other companies and persons involved in the second trial.

During the period in question, Farrell, Glynn and Newhall were employed by Beneficial Management — the wholly owned subsidiary of Beneficial.[72] Farrell was a vice-president and director of Beneficial Management and head of the company's "public relations department." [73] In December, 1956, the defendant Newhall became regional director for public relations of Beneficial Management. His region included Massachusetts. He continued in these duties until the early part of 1958.[74] At that time, he was replaced as regional director for public relations in the

---

[72] Evidence concerning Beneficial Management's affiliation with Beneficial we described at length in the first trial opinion and we do not repeat it here.

[73] B

[74] N

Massachusetts region by the defendant Glynn, who was actually appointed in February, 1957.[75]

From 1957 through September of 1962, one Marlin E. Lerch was eastern director of public relations for Household.[76] In September or October of 1962, the defendant Barber replaced Lerch. Prior to that time Barber had been a regional director of public relations with responsibility for Washington, D. C., Pennsylvania and Maryland.[77] From 1957 through December, 1958, Warren Engle did public relations work in Massachusetts for Household.[78] In September or October of 1959 Pratt became Household's public relations representative with responsibility for the six New England States. He remained in this position until approximately October of 1963. In 1962, Barber succeeded Lerch as Pratt's superior.[79]

Local owned, during the years 1957 through 1963, approximately fourteen subsidiaries which were licensed to engage in the consumer loan business in the Commonwealth. From 1957 through 1962, one John McHenry, Sr., was the president of Local and the man who "ran the corporation."[80] He was in charge of its business and was responsible for public relations and trade associations. It was also his responsibility to deal with public officials. During the early part of this period one Michael E. Sands was assistant treasurer and chief auditor of Local.[81]

American Investment Company of Illinois, a holding company, operated a number of subsidiaries which were Massachusetts small loans licensees doing business under the name of Public Finance Company. Heath, who was one of the Commonwealth's principal witnesses, became an executive supervisor of the Boston division of American in

---

[75] G

[76] Lerch was indicted but not tried.

[77] Br

[78] H

[79] P

[80] McHenry died before the start of the trial.

[81] L

1949. In 1952 he became a vice-president. Heath held these positions until January, 1958. From about 1953, Heath had also been performing public relations in Massachusetts which included maintaining contact with Massachusetts supervisory officials. On January 8, 1958, Heath became regional director of industry relations for American. His duties in this position covered all of the New England States except Vermont. His immediate supervisor was one J. Miller Redfield, a vice-president of American, who was in charge of the industry relations department. Heath's duties involved maintaining good relations with members of the industry representing other companies, as well as dealing with legislative and supervisory officials. In connection with these duties Heath met with Hanley about three times a week, both socially and on business.[82]

Another important witness for the Commonwealth was one Louis Schwartz. Schwartz was president and trustee of Community Finance Company (Community) during the years here involved. Community was a Massachusetts trust that wholly owned a subsidiary corporation, Coleman Finance Company (Coleman). Coleman held three Massachusetts small loans licenses during the years 1957 through the fall of 1963. Schwartz made the policies of Coleman at all times material to this case.

Other individuals involved in the evidence in this trial are Woodcock of Liberty and one Calvert Bean, a high executive of Preferred Finance and State Loan and Finance Corporation.

In 1957, the Rate Board held rate hearings.[83] These hearings were held in the fall.[84] In December of 1956, or January, 1957, Schwartz was appointed chairman of a special committee of the Massachusetts Consumer Finance Association, an industry trade association, which was gathering

---

[82] Hly

[83] H, B, L, N, G

[84] L, N, Hly

statistics for the forthcoming rate hearing. The purpose of the committee was to approach all licensed companies, to advise them of the statistics which the committee was collecting, to present the licensed companies with forms to put the statistics on, and to send that information to Haskins and Sells, certified public accountants.[85]

Beneficial was a member of the Massachusetts Consumer Finance Association from 1957 through 1960. Newhall represented Beneficial on the executive committee of this association from 1957 through early 1958, at which time he was replaced by Glynn.[86] Household was a member of the association during 1957 and part of 1958. Household was represented on the executive committee by Lerch and Engle. Lerch was Engle's supervisor.[87] Local was represented on the executive committee of the association by McHenry, its president, and was a member from 1957 through 1961.[88] Other members included Merchants Acceptance Corporation (MAC) represented by one Charles McDermott, Jr., its president.

Schwartz testified that he saw Hanley three times concerning the work of this special committee. On one of these occasions, about June 15, 1957, Schwartz ate lunch with Hanley and Heath at the Parker House in Boston. At the beginning of this lunch, the three of them were discussing rates in general when Hanley said to Heath: "Unless they dig up $50,000 before the Regulatory Hearing — They'd better dig up $50,000 before the Regulatory Hearing, or else." Hanley then said "that he could present a convincing case for a rate of 1.59 percent per month." Schwartz said that "this was an impossible rate and that . . . [he] would liquidate if we had such a rate." Heath said to Hanley: "You're crazy. They can never raise that kind of cash."

[85] H, B, L, N, G

[86] B

[87] H

[88] L

Hanley responded: "Well, I might be willing to take $25,000 a year, spread over instalments for two years."[89]

In his testimony Heath corroborated this incident. He testified that Hanley "pointed out what an important role he would play in the fixing of any rate by the Rate Board. He pointed out the statistics in his office would show that a small independent company . . . had shown conclusively over the years that they could operate at a rate of $1\frac{1}{2}$ per cent per month." Hanley also stated that "one of the largest finance companies in the nation had been successfully operating over a period of years above the licensed small loan limit at a rate of $1\frac{1}{2}\%$ a month." Hanley further said "it would not be too difficult to prove to the Rate Board that if one company could do it, the other companies could do it." Replying to Hanley, Heath said, "I am not a statistician, but I doubt very much if my company can successfully operate in the State of Massachusetts at a rate of $1\frac{1}{2}\%$ per month." Heath related that Schwartz told Hanley that "even if the big chains could operate at a figure of $1\frac{1}{2}\%$ a month, it would be the death knell of the small independent operator such as he, and he would in substance have to go out of business." Heath testified that Hanley then responded to Schwartz, that "upon payment of the sum of $50,000, he felt that the Rate Board would bring out a rate that would be easy to live with for the industry." Heath and Schwartz then declared that the industry could not "raise that kind of money," and Hanley indicated he might accept $25,000 over two years.[90]

Shortly after this luncheon meeting, Heath reported it to his superior, Redfield,[91] American's vice-president, and the man in charge of its industry relations department.

Schwartz testified that a day or two after the meeting with Heath and Hanley, he received a telephone call from

---

[89] Hly (B, N, G, L)

[90] L, N, Hly (B, G)

[91] N (B, G)

Newhall[92] who was then Beneficial's Regional Director for Public Relations.[93] Newhall asked Schwartz to come to Newark, New Jersey, the following day to attend a meeting concerning the gathering of statistics for the Rate Board hearings. Schwartz said that he would be there.[94]

The following morning Schwartz flew from Boston to Newark. He took a cab to the offices of Haskins & Sells, and went to the room where the conference was being held. He entered and found about twenty people in the room, sitting around a conference table. As Schwartz entered the room, Newhall said, "Mr. Schwartz of the Coleman Finance, Boston," and pointed to an empty seat. About an hour after Schwartz arrived Newhall stood up and said to Schwartz, "I understand you had luncheon with Mr. Hanley yesterday." Schwartz said, "Yes." Newhall asked, "Did he say anything about a rate?" Schwartz said, "Yes." Newhall asked, "What was it?" Schwartz told Newhall that "Mr. Hanley had suggested a rate of 1.59, and I wasn't sure whether it was 1.59 or 1.69 percent per month."[95]

Later that afternoon, after having had lunch in the same building in which the conference took place, Newhall approached Schwartz and said, "Louis, stay behind for a few minutes. We're going to have a private meeting of some of the men who come to Boston." Schwartz said, "Okay." Newhall then left the room leaving Schwartz alone. A few minutes later Newhall returned with Lerch of Household, Redfield of American and a representative of Family Finance Corporation (Family). Lerch and Redfield had not been present at the original meeting, but had been present at lunch. Newhall approached Schwartz and said, "Louis, I understand that Mr. Hanley, in addition to mentioning the rate, said that he was looking for $50,000 and would take it

---

[92] N (B, G)

[93] N

[94] N (B, G)

[95] N

in two instalments of $25,000 each, spread over two years."
Schwartz said, "That's right." Newhall, Lerch, Redfield
and the man from Family then went to the other side of the
room, where they had an animated discussion lasting about
five or ten minutes. At the end of their discussion Newhall
walked over to Schwartz and said, "We'll work something
out." After this conversation everyone went back to the
conference room. The meeting continued until about
4 P.M., when it broke up, and Schwartz returned to Boston.[96]

The following morning, while in his office, Schwartz re-
ceived a telephone call from Hanley.[97] Hanley told Schwartz
that he understood that Schwartz "had been in Newark the
day before and that they said that they would work some-
thing out for" him. He asked whether Schwartz knew
what they were going to work out and Schwartz said he
did not.[98]

About two or three days later Schwartz was at his office
when he received a telephone call from Newhall. Newhall
said, in substance, "that he was working on that matter and
was making some progress and that . . . [Schwartz's]
assessment was to be $2,000, payable in instalments over
two years." Schwartz said, "I don't know why I should
get involved in a matter that was a problem for the big
chains to straighten out." Newhall then told Schwartz, in
substance, that "[w]e have got to get the ball rolling be-
cause the hearing is taking place in September, and I
believe that I will be able to take care of the matter without
your help, and you can drop out of it." Schwartz said,
"O.K."[99]

Two weeks later Schwartz received another call from
Newhall. Newhall said that he was on his way down from
Maine, and asked whether Schwartz would be in his office.

_____

[96] N (B, H, G with the exception of the last sentence)

[97] N

[98] Hly

[99] N (B, G)

Schwartz said, "Yes." Newhall then said, "I will drop in to see you within an hour."[100]

About an hour later Newhall arrived at Schwartz's office. Schwartz was seated behind his desk. Newhall told Schwartz that he had "brought an envelope down for Mr. Hanley." He handed Schwartz the envelope, and just as Schwartz was about to put the envelope in his desk Newhall said, "Louis, you'd better count it because, if it's short, I will be responsible for it." Schwartz counted it. It was $2,000 in either hundreds or fifties. Schwartz said it was correct, and put it in his desk. Newhall then mentioned that Schwartz's office was conveniently located in Boston, and asked whether Schwartz would have any objection "if Charlie MacDermott and Jack McHenry, Sr., dropped an envelope off." Schwartz replied that he had no objections. Newhall also mentioned that "the assessment was to be paid in equal — in instalments over a period of two years, to coincide roughly with the income tax period, and that the first payment was to be in two instalments." Newhall stayed for a total of about fifteen minutes and after he left, Schwartz put the envelope in his private safe.[101]

The following day Schwartz received a telephone call from McHenry who asked whether Schwartz would be in. Schwartz replied that he would be. About ten minutes later McHenry arrived at Schwartz's office. McHenry handed Schwartz an envelope and said, "This is for Martin." The envelope felt as if there were several pieces of paper in it. McHenry then said, "Louis, I put your telephone number on the envelope. Will you please erase it?" Schwartz erased the telephone number, and put the envelope in his desk drawer. After McHenry left, Schwartz put the envelope in his private safe.[102]

---

[100] N (B, G)

[101] N (B, N, G)   MacDermott was president of Merchants Acceptance Corporation, or "MAC". McHenry was president of Local.

[102] L (B, N, G)

The following day, while Schwartz was in his office, he received a telephone call from Hanley, about 10:30 A.M. This was sometime in July of 1957. Hanley said, "I understand that you have something for me." Schwartz replied that he did and Hanley suggested that they have lunch. But an hour later Hanley again called and said that he was going to be "tied up" and that he would call Schwartz later that day at Schwartz's home. Before Schwartz left his office he went to his private safe and removed three envelopes. He added an envelope of his own containing $500 in large bills.[103] About 4 P.M. that afternoon Schwartz received a telephone call at his home from Hanley who asked, "Is it all right to come over to the house?" Schwartz replied, "Yes." About fifteen or twenty minutes later Hanley drove up to Schwartz's home, entered and went into the library. Schwartz was alone in the house and handed the envelopes to Hanley who left immediately.[104]

During the year 1958, Schwartz made approximately four more payments to Hanley. All of these payments were made in the men's room of the Parker House Grille and each was in the amount of $250. They were made in quarterly instalments on or about March 15, 1958,[105] June 15, 1958,[106] September 30, 1958,[107] and December 15, 1958.[108] Thus Schwartz paid Hanley, on behalf of Coleman, a total of $1,000 during 1958.

Near the end of 1958, Schwartz received a call from Glynn who asked him if he had seen Hanley lately. Schwartz said, "No I haven't seen him for about six months." Glynn responded, "Baloney! I saw Martin a few days ago, and he

---

[103] L, N, Hly (B, G)

[104] L, N (B, G)

[105] L, N, Hly 10272 (B, G)

[106] L, Hly counts 3 and 4 of 10272 (B, N, G)

[107] L, Hly 11993 and counts 5 and 6 of 10272 (B, N, G)

[108] L, N, Hly counts 7 and 8 of 10272 (B, G)

said you are the only one who paid his instalment or assessment on time."[109]

Heath testified that he paid Hanley a total of about $2,000 on behalf of American as its proportionate share during 1958. Cash payments of about $500 were made quarterly on or about March 15, 1958, June 15, 1958, September 15, 1958, and December 15, 1958.[110]

Heath also testified that in the summer of 1958 he attended a meeting in Hanley's office concerning schedule O of the annual report form for small loans licensees (delinquency schedule). Representatives of other companies in the industry were also present. The persons present included McHenry of Local, Glynn, regional public relations director for the Beneficial companies, Engle, who did public relations work in Massachusetts for Household, and others.[111] From time to time Edward Counihan, the Commissioner of Banks, was present. The industry representatives sought changes in schedule O. Hanley stated, in substance, that he had "no intention of backing off on Schedule O." He stated that he had an early appointment, and did not have time to discuss other matters which the industry was trying to bring into the meeting.[112] Just after this meeting, when only Heath and Hanley were present, Heath had another conversation with Hanley regarding schedule O. Heath said, in substance, "Schedule O would incur considerable expense on the part of American Investment Company." Hanley responded that he "would be willing to back off on Schedule O if the annual arrangement, which he stated in substance was nine months overdue, was taken care of." [113]

---

[109] G

[110] L, N (B, G)

[111] L, Hly 10272, 11993

[112] L, G, Hly 10272, 11993

[113] Hly 10272, 11993. Exhibit 168 (admitted for purpose of showing whether Heath, Redfield and American were conspirators — admitted against B, G, L, N [II 111 Tr. 6353]) is a letter to Redfield in which Heath describes

In the fall of 1958, Heath, Hanley, Glynn, Engle and two other persons went on a duck hunting trip to Canada. The idea for the trip originated with Hanley. The group first went to the Chateau Frontenac in Quebec and stayed overnight. The next day they went to the Isle de Grues in the St. Lawrence, about 100 or 150 miles from Quebec. They stayed on the island for four days, shooting geese or ducks. Glynn, Engle and Heath stopped at Valle's Restaurant in Portsmouth, New Hampshire. There they had an accounting of the various expenditures of the trip, so that the three of them shared equally. The total amount involved was somewhere between $1,500 and $1,800.[114]

In the early part of 1959, Heath spoke to Hanley concerning the scheduling of payments. Hanley objected to payments four times a year and wanted them paid twice a year — on March 15 and September 15. Heath reported this conversation to his superior, Redfield.[115]

Around March 15, 1959, Heath paid Hanley about $500 in hundred dollar bills.[116] On approximately the same date Schwartz gave Hanley $250 in the Parker House men's room.[117] Schwartz gave him an additional $250 in the same place between June 15 and June 30, 1959.[118]

Schwartz testified that during 1958 or early 1959, he had a telephone conversation with McHenry about the Hanley payments. McHenry said, "I am going out of town. I may be gone for ten days, possibly two weeks, and there is an instalment due Mr. Hanley. He raised the roof

---

the above events and adds that "I presume that it is possible that you have information of a different nature from some other source but from where I sit . . . Schedule O is definitely linked with the annual arrangement." Heath notes, in the course of exhibit 168, that "[i]n the Commissioner's presence . . . [Hanley] made reference to his favorite parable: 'What have you done for me lately?'"

[114] G, Hly all indictments except 10272, 11993, 11968 (B)

[115] Hly (B, L, G)

[116] L (B, G)

[117] L, Hly counts 9 and 10 of 10272 (B, G)

[118] L, Hly counts 11 and 12 of 10272 (B, G)

when I was late the last time and made an awful smell about it. Would it be all right if I send a payment up to your office with Mike Sands?" Schwartz just said, "O.K." That same day Sands, an employee of Local, arrived at Schwartz's office and handed him a sealed envelope. Schwartz put the envelope in his desk. A few minutes later, after Sands left, Schwartz put it in his private safe. A day or two after that Schwartz took the envelope out, added it to one of his own, and delivered both to Hanley. This took place in the Parker House men's room, on one of the occasions already described above.[119] Sands's testimony corroborated this incident.[120]

In late 1959, Heath, in a conversation with Glynn, told him about a suggestion made by Bean of State Loan and Finance that "he [Bean] and others in the industry might want to come into the present annual program, because those that were not in would have more difficulty, in his opinion, than those that were." Glynn told Heath that he was already aware of Bean's suggestion, having heard of it from his home office.[121]

In late 1959, or early 1960, Heath had another conversation with persons in the industry regarding Bean's suggestion. This took place in New York City in a function room at either the Roosevelt or the Commodore Hotel. A number of people were present, including Heath's superior, Redfield. Other persons present included Farrell and Glynn and Lerch.[122] The persons at the meeting were sitting around a table, in close proximity to each other. Several subjects were discussed at this meeting. One of these related to Hanley. Concerning Hanley, Farrell said, in substance, "Now we come to the problem of expanding the MJH annual program." A figure of $18,000 was mentioned by

---

[119] L, Hly 11993 and counts 5 and 6 of 10272 (B, N, G)

[120] L (B)

[121] G (B)

[122] F, G (B, H)

one of the persons present. Lerch, Farrell and Redfield, in substance, "stated that they were in favor of the program" and that the shares for the companies which they represented "were to be based on the percentage of the outstandings of the various individual companies." Farrell and Redfield stated in substance that they had knowledge that Schwartz and MacDermott, ". . . members of the previous program were unhappy about the burden they were carrying in that program, based on the smallness of their organization as compared to their share in the program." Farrell and Redfield stated that "if a readjustment was not made . . . these members might withdraw."[123]

During October, 1959, Schwartz was negotiating with McHenry concerning a sale of two of Schwartz's offices to Local. A sale was negotiated, and a contract signed. About a week before the date set for the passing of papers McHenry came to Schwartz's office. In the course of their conversation McHenry said to Schwartz, "I was up to Boston and saw Martin, and I told him I was interested in buying the two offices, and Martin said it was o.k., but he wanted $2,000 from . . . the buyer, and $2,000 from . . . the seller, to approve the deal." Schwartz said, "Do you think it is necessary? We're just selling the offices. Why the $2,000?" McHenry replied, "Well, that's the deal. Take it or leave it." Schwartz then said, "If that's the only way I can sell, I will have to pay the $2,000." Around December 20, 1959, Schwartz paid this $2,000 to Hanley. The payment, in large bills, was made at the Parker House Grille. On the day set for the passing of papers Schwartz was informed that Local had decided not to purchase the offices.[124] Shortly thereafter Schwartz sold these two offices to a third party.

Not long after the December payment to Hanley, Schwartz received a telephone call from Glynn.[125] Glynn said,

[123] F, G (B, H)

[124] L

[125] L

"Louis, Charlie MacDermott is kicking like the devil about his assessment, and we have cut it down to a thousand dollars, and we have cut your assessment down to $750." Schwartz said, "I took care of my assessment months ago." Glynn then said, "This is a brand new deal."   Schwartz said, "I don't see why I should have to pay $750.  What is it for?"   Glynn said, "Louis, you know we're having a terrible time with Hanley.   Everything we try to do he objects to, unless he's taken care of, and we've worked out something where he will agree to let us sell an office, move an office, change the name of the company, without any objection from him.   And you know, he is harassing us terribly." Schwartz told Glynn, "Well, to avoid harassment, I will have to go along with it, but I won't pay $750."   Glynn replied by saying, "Well, we couldn't bother with less than 500."   Schwartz said, "O.K."   Glynn also said that "Hanley objects to four instalments a year.   He now wants it twice a year, March and September." [126]

Early in 1960, subsequent to the filing of new temporary regulations by the small loans division, Heath conversed with Hanley about several matters in which American was interested.   Referring to American's head office, Heath said, "St. Louis desires the elimination of the Schedule N and O. Also, St. Louis wishes to get your permission . . . to file monthly reports on a short-form basis for the individual licensees and one composite long-form report for the total Massachusetts operation."   Hanley said that he would consider these requests; that he intended to be coöperative in the future; and that he was critical of the action of other people in the same area. [127]

On another occasion in early 1960 Hanley told Heath, in substance, "that the present temporary regulations were only temporary and that he might not be quite so understanding when it came to filing the permanent regulations

---

[126] G (B, H, F)

[127] Hly on all indictments except 10272, 11968 and 11993

because of the delay in the so-called 'Hanley Program.' "[128]

Between March 15 and March 30, 1960, Hanley received a payment of $250 from Schwartz in the men's room of the Parker House.[129] Hanley also received a payment from Heath in the amount of $2,325 in May of 1960.[130]

Heath received the funds which he paid to Hanley in May of 1960 from a Boston lawyer, one Mr. James Boudreau.[131] Prior to the May payment, Heath received a bill from Boudreau, dated April 13, 1960, and a covering letter. These are in evidence as exhibits. The letter, signed by Mr. Boudreau, states, "Dear Bill: Enclosed please find my bill to the Public Finance Company for legal services rendered. I hope this meets with your approval." The bill is in the amount of $6,500.[132] Upon receipt of the bill and covering letter Heath forwarded them to his superior, J. Miller Redfield.[133] On May 10, 1960, Redfield wrote to Heath stating that "[t]he Boudreau bill has been o.k.'d and the check will go out today. Just in case the IRS should challenge that bill in our books, I told Bruce [Snow] that it was for services rendered to you in connection with the study of the rate case and hearings and frequent consultations with you. You should advise Mr. B." "Mr. B" refers to Mr. Boudreau. The name "Bruce" refers to

---

[128] Hly on all indictments except 10272, 11968 and 11993 (B, H, F, G, P). In exhibit 173, Heath reported to Redfield, on March 29, 1960, that, "Marty is considerably perturbed at the moment at certain delays. He is now pointing out that the present regulations are only temporary and that because of such delay his attitude may not be quite so understanding when the new permanent regulations are issued. Last week he sent a telegram to Bob Miller and I understand this week he has sent one to DeWitt. Possibly Mr. Farrell has brought you up to date on this situation at your conference in St. Louis. I hope Beneficial can work this situation out this week. Further delay will only cause considerable loss of ground and make it much more difficult to obtain concessions from Marty which up to this episode could have been had for the asking." (Ex. 173, admitted as to B, H, G, F for the limited purpose of showing that Heath and Redfield were co-conspirators, II 111 Tr. 6353, 6372).

[129] L, G, Hly 10282 (B, H)

[130] F, G, Hly 11972 (B, H)

[131] G, F, Hly 11972

[132] G, F

[133] G, F, Hly 11972

Mr. Bruce Snow, general counsel for American, who approved all attorneys hired by the Company and all bills rendered to the Company. In fact Mr. Boudreau performed no legal services in connection with the rate case and there were no legal consultations.[134] A day or so before making his May, 1960, payment to Hanley, Heath went to Mr. Boudreau's law office in Pemberton Square, Boston, and received from him $3,000 in hundred dollar bills. This sum was a portion of the payment Mr. Boudreau had received from Public for the April 13, 1960, bill. Within a day or two of this meeting with Mr. Boudreau, Heath used these hundred dollar bills to make the May, 1960, payment to Hanley.[135] Mr. Boudreau testified that he received a check in payment of the April 13, 1960, bill, and that he performed no legal services for Public or American.[136]

During 1960, Hanley had a number of conversations with various persons in the industry concerning modification of the forms used in reports to the department and the forthcoming new regulations governing the activities of licensees. In early 1960, Hanley had a conversation with Heath in which he told Heath that he intended to approve the elimination of the long form monthly report for licensees. In May, 1960, prior to the time that Heath received his cash for the Hanley program from Mr. Boudreau, Heath had another conversation with Hanley concerning the monthly report form. Hanley said that he would eliminate the monthly report, "when other matters had been taken care of."[137]

---

[134] B, H, F, G

[135] G, F, Hly 11972

[136] B, H, G, F, Hly 11972. Near the end of May, 1960, Heath received a longhand memo from Redfield. Redfield's memo reads, in pertinent part, as follows: "Incidentally, I assume you have the proceeds of the attorney's fee in safety deposit box. Don Jr. wants a record of these things so please send me, confidentially, a statement showing you are holding these funds and then get me a report as they are expended so he can keep a running balance." (Admitted against B, H, F, G). Heath testified that the phrase "Don Jr." referred to Donald Barnes, Jr. — Admitted against B, H, G, F). In 1960 Barnes was a vice-president of American. At the time of trial he was president of American. (Admitted against B, H, G, F).

[137] Hly on all indictments except 10272, 11968, 11993 (B, F, G, H, P)

In July, 1960, Hanley met with Heath, Glynn, and perhaps two other persons at the Provincetown Inn, in Provincetown. At this meeting Hanley finally gave Heath written permission for American to file the short form monthly report. Hanley also sent a telegram to American's home office in St. Louis to the same effect. Hanley asked Heath to keep confidential the concession he had made to American regarding monthly reports and that Beneficial was the only other company that had been given permission not to file monthly reports. At the meeting the proposed regulations were also discussed. Shortly after this meeting the proposed form of permanent regulations was issued by the Bureau of Loan Agencies.[138]

Between September 15 and 30, 1960, Schwartz made another payment to Hanley.[139] About the same time, Heath paid Hanley $2,325.[140]

Heath obtained the funds from which he made this payment from a Boston attorney, one Mr. Stanley Berenson. Heath picked up the money from Mr. Berenson over a period of time in small amounts of $100 or $200. Mr. Berenson had sent a bill to Public earlier in 1960 to cover "general retainer." This bill was in the amount of $6,000. After receiving a check for this amount from Public, Mr. Berenson, at various times during the year, turned over $3,000 of the proceeds of the check to Heath. Heath used these funds for the October payment to Hanley.[141] Mr. Berenson corroborated this evidence in his testimony.[142]

In March of 1961, Schwartz had a telephone conversation with Hanley. Hanley asked Schwartz if he would like to have lunch and said, "We better eat at a different restaurant, because some of the legislators had remarked that I was always seen at the Parker House with somebody in the loan business." Schwartz suggested Cobb's restaurant on

---

[138] G, Hly on all indictments except 10272, 11968, 11993 (B, H, F, P)

[139] G, L, Hly 10281 (B, H)

[140] F, G, Hly 11970 (B, H, P)

[141] G, F, Hly 11970

[142] B, H, G, F, P, Hly 11970

the first floor of his office building at 18 Tremont Street. Hanley said, "O.K." Hanley had lunch and afterward went to the men's room where Schwartz gave Hanley an envelope containing $250, which Hanley put in his inside jacket pocket.[143]

In the spring of 1961, Heath had a telephone conversation with Glynn. Heath testified that "Mr. Glynn stated . . . he made a payment to Mr. Hanley for his company . . . [and] that in taking the envelope out of his pocket Mr. Hanley took the envelope. He further informed me there was an additional $825 in the envelope over and above the amount of the payment which Mr. Glynn was supposed to make. In substance, he then asked me if I would treat this as an advance on his part to me in order to avoid an embarrassing situation. I, in substance, agreed."[144]

Shortly thereafter, in April or May of 1961, Heath made another payment to Hanley. The amount of the payment was $1,500, and it was made in Boston. Heath obtained the funds with which he made this payment to Hanley from Mr. Berenson, from whom he had obtained the funds for the previous payment in October, 1960. He received the money in small amounts, such as $100, $200, $300 or $400 over a long period of time.[145]

Mr. Berenson testified that early in 1961, he had sent Public a bill for $6,300 and had received a check in full payment of the bill. During the year he paid to Heath $3,000 of the proceeds of the check in small bills at different times of the year.[146]

Early in September, 1961, Schwartz again paid Hanley $250 in the men's room of Cobb's restaurant.[147]

In September or October, 1961, Heath gave Hanley $1,500 in small bills. This money also came from the $3,000 fund

---

[143] G, L, Hly 10282 (B, H, P)

[144] F, G (B, H, P)

[145] F, G, Hly 11969 (B, H, P)

[146] B, H, G, F, P, Hly 11970, 11971

[147] G, L, Hly 10279 (B, H, P)

which Heath received from Mr. Berenson throughout 1961. Shortly thereafter, Heath gave Hanley an additional $825 which was the money received by Heath as a result of Glynn's "advance" to Heath in the spring of 1961.[148]

The defendant Pratt assumed his duties as Household's regional director of public relations for New England in 1959, and remained in that position until 1963. From early 1961 through the mid-summer of 1963, Heath met with Glynn and Pratt on a regular basis. Heath, Pratt and Glynn represented Public, Household and Beneficial, the "Big Three" in the industry. They met in various restaurants in Boston and, on occasion, at various motels in other States. The frequency with which the meetings were held varied from once every two or three weeks to once every two or three months. The meetings were most frequent around April 15 and September 15. In the industry the meetings of these three men were referred to as meetings of the "loose-knit committee." In the course of these meetings the payments to Hanley were referred to as the "MJH Program." At meetings of the "loose-knit committee," Heath made reports to Pratt and Glynn of the payments which he made to Hanley. On various occasions, as part of the meetings of the "loose-knit committee," Heath, Glynn and Pratt made calculations concerning the participants' shares in the "MJH Program." These calculations were made during the years 1961 and 1962. One of the calculation sheets is in evidence as an exhibit. Heath, Glynn and Pratt had conversations relating to calculations concerning the Hanley program.[149]

During either 1961 or 1962, Pratt stated to Glynn and Heath that Lerch would be in town to take care of a certain matter involving the Hanley program. On another occasion, he stated that Barber would be in town to take care of a certain matter.[150] Glynn, during this same period, often

---

[148] F, G, Hly 11969, 11971 (H, B, P)

[149] F, G, P, (B, H)

[150] P (B, H, F, G)

reported to Heath and Pratt on whether or not "Beneficial . . . [had] taken care of their commitment on the Hanley Program." In the same period Glynn reported to Heath and Pratt that he was unhappy with the method one company was using to get its contribution to the Hanley program to him. Glynn stated, in substance, that "Mr. Al Symmes of Seaboard Finance Company had sent a contribution to the Hanley Program by means of a cashier's check." [151]

About the last week in July, 1961, Heath received a longhand memo from Redfield. This memo reads in pertinent part as follows: "Last week I had the unfortunate experience of having my pocket secretary stolen. Among other items lost were my own notes and also your figures on our commitments in Mass. I assume you still have your copy of these figures so would appreciate your sending a copy on to me. I would like the total amount allocated to each company and also the distribution quotas."

As a result of receiving this letter Heath sent Redfield the information on a small sheet of paper which appears as follows: [152]

"MJH

| | |
|-----|------|
| BFC | 5250 |
| HFC | 4100 |
| AIC | 4650 |
| STA | 500 |
| Fam | 500 |
| Sea | 550 |
| Lib | 700 |
| | 1000 |
| Coleman | 500 |
| MAC | 800 |
| | 18,550" |

---

[151] G (B, H, F, P)
[152] B, F, G, H, P

Heath testified that, "MJH" stands for Hanley; "BFC" stands for Beneficial; "HFC" stands for Household; "AIC" stands for American; "STA" stands for State Finance; "Fam" stands for Family; "Sea" stands for Seaboard Finance; "Lib" stands for Liberty; "Coleman" stands for Coleman; and "MAC" stands for Merchants Acceptance Corporation. The numbers appearing in the column of figures represent the dollar contributions of the various companies to the Hanley program. The figures refer to the annual payment by these companies.[153]

Early in 1962, Heath had a conversation with Hanley concerning a request by Public to move one of its downtown Boston offices. Heath had been asked to see about obtaining approval of the movement of this office. Heath said to Hanley, "Mr. Lutz desires to move the Post Office Square office to Codman Square, Dorchester." Hanley said, "Boston is the largest city in the State of Massachusetts, comprised of various areas which of themselves exceed the population of many other cities and towns. I consider the various areas of Boston as individual towns for the purpose of any agreement I have with you people." Heath replied, saying, "St. Louis [American's head office] feels differently about the situation. They feel that this move comes under the overall umbrella of our agreement with you." To Heath's knowledge, this particular office was never moved.[154]

In March of 1962, Schwartz again had lunch with Hanley at Cobb's restaurant and handed Hanley an envelope containing $250, once again in the men's room.[155]

Around April 15, or May 1, 1962, Heath gave Hanley a payment of $2,325. Heath obtained the funds for this payment from Mr. Boudreau, in the manner previously described. Heath received $3,000 in cash from Mr. Boudreau

---

[153] B, F, G, H, P

[154] Hly on all indictments except 10272, 11968, 11993 (H, G, F, P)

[155] G, L, Hly 10278 (B, H, P)

at a meeting prior to the $2,325 payment made to Hanley
in April or May. Heath reported this meeting to Redfield.
Mr. Boudreau, prior to the time that Heath received
this sum, never performed any legal services for Heath's
company.[156]

In August, 1962, Heath attended a meeting at the
Chatham Bars Inn in Chatham, Massachusetts. This
meeting, arranged by Hanley, lasted four and one half
days. In addition to Hanley, two employees of the small
loans division were present. Glynn and Beneficial's at-
torney, one Mr. Bob Miller, were also present. During
this meeting they discussed certain changes sought by Bene-
ficial in the regulations. The Chatham Bars bill was paid
by Public and Beneficial.[157]

In the first or second week of September of 1962, Heath
made another payment to Hanley in the amount of $2,275.
"It was in the form of hundred-dollar bills with the ex-
ception of that part of it which could not be in [a] hundred
dollar bill." It was paid directly to Hanley. The source
of the funds was an attorney, one Mr. Frank E. Riley, Jr.[158]

In early July of 1962, Heath met with Messrs. Riley and
Boudreau in Mr. Boudreau's office. They then went to
lunch at the Parker House Grille. At lunch Mr. Riley
gave Heath his card. On July 27, 1962, Mr. Riley sent a
bill to Public in the amount of $6,000, although Mr. Riley
had not rendered legal services to either Public or American.
The bill stated that it was for "professional services ren-
dered during 1961–1962 in connection with the Uniform
Commercial Code; drafting local legislation; and atten-
dant conferences with company representatives." Mr. Riley
received a $6,000 check from Public in payment of this bill.

---

[156] G, F, Hly 10286 (B, H, P)

[157] G, Hly on 10273, 10276 through 10282, 10294, 10286, 11969–11972,
10275 (B, F, H, P). Beneficial and Public also paid the bills for meet-
ings held in June, 1960, at the Wequasset Inn in East Harwich, and a
motel on Nauset Beach. Glynn and Heath also paid the bill for meet-
ings at the Colonial Motel in Swampscott and the Provincetown Inn.
All of these meetings were held to discuss the regulations and pro-
posed changes.

[158] G, F, Hly 10286 (B, H, P)

From the proceeds of the payment of this check he gave $4,500 in cash to Mr. Boudreau.[159] After Mr. Riley gave this $4,500 to Mr. Boudreau, Heath received $3,000 of this sum in cash from Mr. Boudreau. Heath used these funds for his payment to Hanley.[160] In their testimony, Messrs. Riley and Boudreau corroborated Heath's testimony.[161]

Some time after September 15, 1962, Schwartz once again paid Hanley $250 just outside the men's room at Locke-Ober's.[162]

In the fall of 1962, about October 16 or 17, Heath attended a meeting in New York related to the Hanley program. About a week prior to that New York meeting, the members of the "loose-knit committee" met at Purcell's restaurant in Boston. At the meeting Glynn gave Heath a piece of paper. There were two other copies of this piece of paper at the meeting. Glynn had one copy in his possession, and Pratt had the other. At the time he gave the copy to Heath, Glynn said that "[t]his is an accounting of the program that I will use at the forthcoming meeting." [163]

A portion of this paper, which was introduced in evidence as exhibit 153, contains the following:[164]

|  | Due MH |
|---|---|
| "BE | 5250 |
| HO | 4100 |
| AI | 4650 |
| ST | 500 |
| FA | 500 |
| SE | 500 |
| LI | 700 |
|  | 16200" |

---

[159] Mr. Riley gave $4,500 to Mr. Boudreau, instead of $3,000, because he owed him $1,500 on a pre-existing debt.

[160] G, F, Hly 10275, 10286

[161] B, H, G, F, P, Hly 10275, 10286

[162] L, G, Hly 10227 (B, H, P)

[163] F, G, P (B, H, Br)

[164] G, F, P (B, H, Br)

The portion of this exhibit quoted above is in Glynn's handwriting. The abbreviations in the left hand column were used in the meetings of the "loose-knit committee." Heath testified that "BE" means Beneficial; "HO" means Household; "AI" means American Investment; "ST" means State; "FA" means Family; "SE" means Seaboard; and "LI" means Liberty. The phrase "Due MH" means money payable to Hanley.[165]

Following the meeting of the "loose-knit committee" at Purcell's, Heath, on the sixteenth or seventeenth of October, 1962, attended a meeting at the Commodore Hotel in New York. Heath went down by train, and stayed overnight at the Commodore. Heath went to the meeting approximately 9:30 in the morning. The meeting was held in a function room on the second floor. The meeting continued until the middle of the afternoon, with a break for lunch. Those attending the meeting were seated at a table. They included Heath of American, Woodcock of Liberty, Barber and Pratt of Household, Godshall of Family, Thomasch of State and Glynn and Farrell of Beneficial. Heath sat at about the middle of the table. Woodcock sat on his left. Pratt sat on his right. At the end of the table, to Heath's left, were Godshall and Thomasch. Across the table from Heath were Barber, Farrell, and Glynn. This was the seating arrangement in the latter part of the afternoon. Near the end of the meeting, Glynn arose and read aloud from the calculation sheet which is in evidence in part as exhibit 153.[166]

Glynn did not read from the calculation sheet in exactly the manner shown on exhibit 153. He used the names of the companies rather than the initials. Otherwise his reading was the same as is shown on exhibit 153, except that he used the expression the "Hanley Program" instead of "MH."[167]

In addition to what was stated on exhibit 153, Glynn stated, "Liberty owes $700 on the Hanley Program." At this point, "Woodcock interjected himself and interrupted

[165] F, G, P (B, H, Br)
[166] F, G, P, Br (B, H)
[167] F, G, P, Br (B, H)

the conversation." He said that "this matter should not have been brought up before this meeting, this matter was not supposed to be discussed during this meeting, and . . . he was very angry that he was being subjected to the discussion of this matter." Woodcock further stated that "Glynn should tell Mr. Hanley that Liberty had no intention of participating in the Hanley program this year." Glynn said, "Mr. Woodcock, why don't you tell him yourself?" Woodcock replied, "Well, you tell Hanley to see me." At about this point the meeting broke up.[168]

Approximately the third week in April, 1963, Heath made another $2,325 payment to Hanley in a corridor outside the men's room at the Durgin Park restaurant.[169] Schwartz also made a payment at this time.[170]

In September of 1963, Heath had a conversation with Glynn relating to the MJH Program. Heath told Glynn "that we had made our April payment to the MJH Program, but in my opinion we were not going to make a September payment." Glynn said to Heath that "Beneficial had made their April payment to Mr. Hanley and that he had no decision as to whether or not the September payment was going to be made." [171] Heath met with Barber of Household in the middle of September, 1963. Earlier that day Heath received a telephone call from Pratt who said, "Nat Barber is going to be in town at the Statler. He desires to talk to you. Will you come and see him?" Heath said that he would. Heath arrived at the Statler at about two in the afternoon. He went to the suite which was occupied by Barber. When Heath arrived, Pratt was there with Barber and a man who was introduced as a Household public relations representative from the midwest named McCormick. Shortly after Heath arrived McCormick and Pratt left. After Pratt left Heath had a conversation with

---

[168] F, G, P, Br (B, H)

[169] F, G, Hly 10284 (B, H, P, Br)

[170] G, L, Hly 10276 (B, H, P)

[171] G (B, H, F, Br, P)

Barber. Barber stated that he expected a call from Hanley
very shortly. The telephone rang, and there was a con-
versation. Following the telephone call, Barber said that
he was going to join Hanley at the Parker House and asked
Heath to remain in the room until he got back. Barber
then left and returned about two and one half hours later.
He then told Heath that "he thought the Hanley MJH
program should continue." Heath stated "that . . . [he]
thought the Hanley program was dead, finished, as far as
American Investment was concerned." Heath said that
this was "only my personal opinion, that the risk was too
great, and in my opinion American Investment would have
nothing further to do with the program." Barber replied
"that he was afraid that would be the position of Household
Finance from MacDonald down." Heath "again reiterated
that a decision such as this would have to be made at a
much higher echelon than either myself or Mr. Barber."
Barber then said that "he felt so deeply about the con-
tinuation of the MJH Program that, if necessary, he might
. . . make payments from monies set aside for another
purpose without the knowledge of his superiors at House-
hold Finance." [172]

Near the end of September, 1963, Schwartz made a final
payment to Hanley of $250 in the men's room of Cobb's
restaurant.[173] On October 24, 1963, after consulting with
counsel, Schwartz appeared and testified before the Massa-
chusetts Crime Commission.[174]

The foregoing evidence constitutes most of the essential
evidence in the second trial. Portions of this evidence will
be referred to in treating with the various issues raised by
the respective corporate and individual defendants.

---

[172] Br, P (as to telephone call) (B, H, F, G, P [remainder])

[173] G, Hly 10273 (B, H, P)

[174] N

### B. The Sufficiency Of The Evidence.

### The Individual Defendants.

1. *Pratt* — Pratt contends that the trial judge erred in allowing the Commonwealth's motions for extensions of the evidence and for a preliminary ruling of conspiracy. He also contends that the trial judge erred in denying his motion for a directed verdict. The grounds for both assignments of error rest in the contention by Pratt that the evidence linking him to the conspiracy was insufficient as matter of law to support the trial judge's rulings.

The evidence originally admitted against Pratt, and offered as tending to connect him to the conspiracies is as follows: Pratt's position at Household included meeting with legislators and other influential persons for the benefit of his company. He represented Household at a meeting of the Rate Board, meetings with supervisory officials of the small loans division, and meetings with other government officials.

From 1961 to 1963, Pratt also met regularly with Glynn of Beneficial and Heath of Public. During these meetings, Heath made reports to Pratt and Glynn concerning bribes paid to Hanley. The "MJH" program was explicitly discussed, and calculations concerning the shares of the three companies in the bribes were made.

Pratt was also present at the crucial Purcell's and Commodore Hotel meetings in October, 1962. We have previously recounted the details of these meetings. At these meetings Glynn distributed calculator sheets showing the shares of the various corporations in the bribery program. The sheet he gave to Heath is in evidence. Pratt's company was included on the sheets. It has not been shown that Pratt said anything at the Purcell's or Commodore Hotel meetings.

Pratt maintains that his presence at all of these meetings is consistent equally with innocence or guilt, and thus cannot be said to establish his guilt by legitimate proof, under the rule in *Commonwealth* v. *O'Brien*, 305 Mass. 393,

400. As in the first trial, he also relies on *Commonwealth* v. *Beal*, 314 Mass. 210, 222, claiming that he had "mere knowledge of an unlawful conspiracy" and cannot be said to have "actively participate[d] therein and . . . [done] something in furtherance of it."

Yet, the direct evidence of Pratt's participation in these many meetings is not consistent with innocence of the conspiracy or of mere knowledge without adherence to the unlawful agreement. Silence does not preclude proof of adherence to an unlawful agreement where other evidence points strongly to guilt. *Commonwealth* v. *Favulli*, 352 Mass. 95, 113. *Commonwealth* v. *Rudnick*, 318 Mass. 45, 57–59. Even in the case of *Commonwealth* v. *Beal, supra*, Beal's brother was held to have actively participated in the conspiracy, although his role was largely one of passive support. *Commonwealth* v. *Beal*, 314 Mass. 210, 222–223. Cf. *Egan* v. *United States*, 137 F. 2d 369, 378 (8th Cir.), cert. den. 320 U. S. 788. Pratt's passive support and presence at the many important meetings could be found by the jury as an element in the "concerted action" of the conspiracy. *Commonwealth* v. *Hunt*, 4 Met. 111, 123.

In any event, we are of opinion that Pratt's conduct surpassed merely that of passive support and that he committed *overt* acts in furtherance of the conspiracy. During the meetings with Glynn and Heath, Pratt joined in making calculations as to the relative shares in the bribery program. He also informed Glynn and Heath that his superior, Lerch, would be in town to take care of a "certain matter." That was obviously "with reference to the Hanley Program." Assisting the other conspirators in this way was evidence that Pratt *actively* sought to further the conspiracy and participated in the "concerted action toward . . . a common purpose" which is the essence of the crime. *Commonwealth* v. *Schnackenberg*, 356 Mass. 65, 74. *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 493–494. *Commonwealth* v. *Galvin*, 310 Mass. 733, 745–746.

2. *Barber* — Barber relies on the same argument as Pratt with regard to the sufficiency of the evidence. In his case,

however, there is even more evidence of overt acts in furtherance of the conspiracy to complement the evidence of his adherence to the unlawful agreement.

Barber was Pratt's superior and was supervisor of a number of public relations employees of Household on the eastern seaboard. He was the senior officer of Household present at the Commodore Hotel meeting in October, 1962, when Glynn read aloud the calculations of bribery shares in the Hanley program, including the share of Household. Barber did not raise an objection to the Hanley program, although Woodcock did.

In September, 1963, Barber had an extensive conversation with Heath at the Hotel Statler in Boston. This conversation removes any doubt as to the meaning of Barber's presence at the Commodore Hotel meeting. Barber stated to Heath "that he thought the Hanley MJH program should continue." Barber continued to say that "he felt so deeply about the continuation of the MJH Program that, if necessary, he might . . . make payments from monies set aside for another purpose without the knowledge of his superiors at Household Finance."

These statements furnish evidence that the reason for Barber's presence at the important Commodore Hotel meeting was his adherence to the conspiracy. But they also establish far more. During the Statler conversation, Heath had emphasized that he "thought" the "Hanley program was dead." Barber reacted by urging continuation of the conspiracy. This was an important *overt* act in furtherance of the conspiracy. It is of no importance whether Heath was still a party to the conspiracy. Barber was still a party to it, willing to obtain monies "without the knowledge of his superiors" to pursue it, and was, by his advocacy with Heath, actively seeking to promote its activities. "A conspiracy, especially one which contemplates a continuity of purpose and a continued performance of acts, is presumed to continue until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative show-

ing that they have withdrawn." *United States* v. *Etheridge,*
424 F. 2d 951, 964 (6th Cir.). See *Hyde* v. *United States,*
225 U. S. 347, 369–370.

The judge, therefore, properly ruled in the cases of Pratt
and Barber that the evidence admitted originally against
them was sufficient as matter of law to permit the jury to
find that these defendants conspired with others to bribe
Hanley. The judge thus properly admitted against these
individual defendants the evidence of the acts, knowledge,
and admissions of the other conspirators in furtherance of
the conspiracy (*Commonwealth* v. *Benesch,* 290 Mass. 125,
132–133) and properly denied their various motions for
directed verdicts. *Commonwealth* v. *Stasiun,* 349 Mass.
38, 51.

## C. THE SUFFICIENCY OF THE EVIDENCE.

### THE CORPORATE DEFENDANTS.

Having concluded that the evidence was sufficient to
establish that Pratt and Barber were part of a conspiracy
joined in by Farrell, Glynn, Newhall, and Lerch to bribe
Hanley, we again turn to the question whether the respec-
tive corporate defendants were parties to the conspiracy.
As in the first trial the defendants Beneficial and House-
hold, by way of motions for directed verdicts, attack the
legal sufficiency of the evidence to connect them to the
conspiracy. Similarly, they further assert that the stan-
dard for imposing corporate criminal liability, as applied
by the judge, was erroneous. The defendant, Local, also
attacks the sufficiency of the evidence.

1. *Standards of Criminal Responsibility* — With respect
to the correctness of the standard applied by the judge for
holding a corporation criminally responsible for the acts
of its employees, officers, directors, or agents, we refer to
our discussion in the first trial portion of this opinion on
that point. What we have said there applies with equal
validity to the evidence before us in this trial. The cor-
porate defendants may properly be held responsible for the

acts of their agents, officers or employees if there is sufficient
evidence to show that the corporation had placed the agent
in a position where he possessed enough authority to act on
behalf of the corporation with respect to the particular
corporate activities associated with criminal conduct. Ap-
plying this standard to the evidence, we first consider the
evidence admitted against Household, then as against Bene-
ficial and finally, as against Local.

2. *Household* — Household was held criminally responsi-
ble for the conduct of Lerch, Barber and Pratt. Lerch
served as divisional director of public relations for House-
hold during the earlier part of the period covered by these
indictments. Subsequently, Lerch was replaced by Barber
who held the same title and performed the same duties as
Lerch. As divisional directors of public relations, Lerch
and Barber were the immediate superiors of Household's
public relations men in Massachusetts as well as in other
States in their division. Lerch's and Barber's superior was
the head of Household's entire public relations department,
who in the 1962 annual report was listed as H. L. Haugan,
a vice-president and director of public relations. In the
1958, 1959 and 1960 annual reports, Lerch is listed on the
same page where the president and vice-president are listed
under the heading "officers." In the 1962 and 1963 annual
reports, Barber is listed under the heading "Other Staff
Executives."

Pratt and Warren Engle were the public relations men
assigned to Massachusetts between 1960 and 1963. There
was ample evidence introduced at the trial, that over a
six year period Household's public relations men including
Lerch, Barber and Pratt regularly and customarily dealt
with legislators and small loans officials, as well as with
other industry representatives, concerning matters pertain-
ing to the small loans division, such as regulations, report
forms, license fees, and advertising.[175]   In addition, House-

---

[175] Pratt regularly attended meetings and public hearings with officials
from the small loans division and representatives of other companies in the
industry.   In March, 1960, his name appeared on the bureau's list under the

hold was represented by Lerch on the executive committee of the Massachusetts Consumer Finance Association during 1957 and 1958, which was active in areas dealing with the supervisor of loan agencies.

This six year pattern of sustained activity by Household's public relations men comports with the language of Justice Qua (later Chief Justice) in the case of *Hartigan* v. *Eastern Racing Assn. Inc.* 311 Mass. 368, 370, that "[a]cts habitually performed by an agent may import acquiescence by the principal and become evidence of his authority." See *Cowan* v. *Eastern Racing Assn. Inc.* 330 Mass. 135, 144. Cf. *C. F. Hovey Co., petitioner*, 254 Mass. 551, 555; Restatement 2d: Agency, § 43.

In addition, there is direct testimony by Don H. Ellis, a vice-president of Beneficial, that the duties of public relations men included dealing with legislators and governmental agencies pertaining to legislative matters, as well as matters involving complaints from "important" persons.[176]

We are of opinion that there is a strong and apparent nexus between Lerch's, Barber's and Pratt's duties for the principal, Household, and their conspiratorial activities. Cf. *Egan* v. *United States*, 137 F. 2d 369, 380. It is unnecessary for us to repeat all the evidence we have previously recited. The judge properly admitted against Household

heading "Household Finance Corporation" along with the names of Household's secretary, vice-president and controller. Pratt was present, representing Household, at meetings and hearings concerning revision of regulations on June 30, 1960, August 2, 1960, September 12, 1960, and October 11, 1960. On September 6, 1961, he was present representing Household at a hearing held at the State House concerning an increase in the small loans license fee. On January 10, 1961, and January 15, 1962, he was present representing Household at meetings concerning the annual report form.

In 1958, Engle attended at least one meeting with Leadbetter (assistant supervisor and rate analyst of the small loans division), Hanley, the Commissioner of Banks, and other industry representatives. Engle also spoke with Leadbetter from time to time.

On December 3, 1958, Lerch was present at a meeting at the State House with Hanley, Leadbetter, the Commissioner of Banks and other industry representatives.

[176] Ellis testified that the primary duty of a public relations man "is to enlighten people who formulate public opinion as to the virtues of our business, to enlighten them not only of the problems that we have but what we would like to do, what we are doing, and the need that we are fulfilling."

evidence of the acts, knowledge and admissions of other conspirators, and correctly ruled that there was sufficient evidence to submit the case to the jury.

3. *Beneficial* — Beneficial was held criminally responsible for the criminal activities of Farrell, Newhall and Glynn, formally the employees of Beneficial Management. As in the first trial, there is overwhelming evidence of the participation of these individuals in the conspiracy and Beneficial does not dispute this. Nor does it dispute that these individual defendants were authorized to handle the particular matters in which they were engaged at the time they committed the criminal acts. Beneficial's only essential argument, as in connection with the first trial, is that there is no evidence that these individuals were authorized by *Beneficial* to participate in the conspiracy to bribe Hanley. The thrust of this assertion is predicated upon the fact that none of the individual defendants were officers, directors or employees of Beneficial. It further asserts that there is no proof of agency.

In connection with the first trial, we determined that an agency relationship did exist between Beneficial and Farrell and Glynn. There, we stated the evidence pertaining to the interlocking corporate structure of Beneficial, Beneficial Management and the business trusts doing business in the Commonwealth under the name and style of Beneficial Finance Company. Much of that evidence was also introduced in the second trial and we perceive no need to repeat all of the details here. Briefly, it showed that (a) Beneficial wholly owned Beneficial Management; (b) there was an interpenetration of corporate officers between Beneficial and Beneficial Management; (c) there was a mixture and a dependency of business activities between the two corporations and (d) Beneficial held itself out as a single operating entity. With regard to our discussion of this evidence and the application of the *My Bread* case to the evidence, we refer to p. 289 et seq. of this opinion and apply the same reasoning to the evidence introduced at the second trial.

In addition, however, there was direct evidence at the

second trial that a high corporate official of Beneficial knowingly permitted Glynn to act on behalf of Beneficial in dealing with Hanley. On October 8, 1959, Jackson Collins, Beneficial's general counsel and a director of Beneficial, wrote to Francis X. Crowley, vice-president and comptroller of Beneficial Management, concerning "1958 Massachusetts Small Loan Report Schedule N — Consecutive Transactions by Present Borrowers." Collins stated that he disliked the language of this schedule and did not believe that most consecutive transactions by present borrowers were "renewals." He suggested that the word "transaction" be substituted. On October 13, 1959, Crowley replied to Collins, writing that "[u]nder the present situation in Massachusetts we do not believe that it would be feasible for either you or us to write to Mr. Hanley on this matter. We have, however, taken the liberty of sending a copy of your memorandum to Mr. Glynn. It is our thought that he can take this matter up with Mr. Hanley at an opportune time." Despite this admonition by Crowley that "the present situation in Massachusetts" did not feasibly warrant direct contact between high corporate officials of Beneficial and Hanley, Collins subsequently wrote to Hanley stating his position on the forms. Collins attached to his letter to Hanley a copy of the Crowley memo wherein it is stated that Glynn could "take this matter up with Mr. Hanley."

This correspondence, in its most favorable and least incriminating aspect to Beneficial, shows that an upper echelon corporate official of Beneficial acquiesced in the delegation of authority to Glynn to act on behalf of Beneficial in dealing with Hanley. Conversely, in its most incriminating aspect, the correspondence imports knowledge by a director of Beneficial that the "present situation in Massachusetts" referred to the fact that Hanley was being bribed to bestow favors on Beneficial, such as the changing of language in a "Small Loan Report Schedule," and that this director acquiesced in such criminal activity. In view of the evidence admitted against Farrell, Flynn and Newhall, the latter interpretation could reasonably be inferred

from the correspondence. In this regard, the correspondence is a prime illustration of a situation aptly described by Holmes, J. that "[t]he evidence by itself of course did not prove criminal conduct. But it is not necessary that every piece of evidence admitted should be sufficient by itself to prove the crime. Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts." *Commonwealth* v. *Mulrey*, 170 Mass. 103, 110.

The evidence, taken as a whole, was more than sufficient to support a finding that Beneficial conspired to bribe Hanley through the agency of Farrell, Glynn and Newhall. The judge correctly admitted the acts, knowledge and admissions of other conspirators against Beneficial on the conspiracy indictment and, therefore, there was no error in the denial of its motion for a directed verdict.

4. *Local* — Local was held criminally responsible for the acts and statements of McHenry, its president, who died before the trial. Local does not contest the authority of McHenry to commit it to the conspiracy to bribe Hanley, but argues simply that there is insufficient evidence to show that McHenry participated in the conspiracy.

We disagree. The evidence shows: (1) in the summer of 1957, McHenry gave Schwartz an envelope and said, "This is for Martin." McHenry asked Schwartz to erase Schwartz's telephone number on the envelope. The envelope felt as though it had several pieces of paper in it. Schwartz gave it to Hanley when he (Schwartz) paid his own bribe money, and after Hanley had called and said, "I understand you have something for me"; (2) during 1958 or 1959, Schwartz talked with McHenry on the telephone about the Hanley payments. McHenry said, "I am going out of town. I may be gone for ten days, possibly two weeks, and there is an installment due Mr. Hanley. He raised the roof when I was late the last time and made an awful smell about it. Would it be all right if I send a payment up to your office with Mike Sands?" Sands corroborated the fact that

he delivered the envelope to Schwartz. Schwartz testified that he delivered it to Hanley; (3) there was testimony by Schwartz that he and McHenry agreed to pay $2,000 to Hanley as a bribe in exchange for Hanley's approval of the sale of two of Schwartz's offices. Schwartz paid Hanley, but the sale was never made.

This evidence, together with Schwartz's numerous payments to Hanley, more than supports the conclusion that Local through McHenry conspired to bribe Hanley. Local's assertion that the evidence is colorless is without merit. McHenry's use of the words "payment" and "installment" in the context of the other evidence creates a reasonable inference that these "payments" or "installments" were bribes.

Similarly, there is no substance in Local's argument that even if Schwartz conspired with McHenry, there is no evidence to connect them with the others. It is sufficient if the evidence shows "concerted action toward the accomplishment of a common purpose." *Commonwealth* v. *Galvin*, 310 Mass. 733, 745. It is not necessary that each defendant have communicated or dealt directly with each other defendant. *Commonwealth* v. *French*, 357 Mass. 356, 379–380.

There was no error in the admission of the acts and statements of other conspirators against it, nor in the denial of Local's motion for a directed verdict on the conspiracy indictment.

### D. Conduct of the Trial.

As in connection with the first trial, various defendants allege error regarding the judge's conduct of the trial. Some of these arguments are essentially similar to those raised in the first trial and, therefore, we deal with them summarily.

1. Household argues that the conspiracy indictment should have been dismissed because of the six year statute of limitations, and the other defendants adopt this claim. The argument appears to be based primarily on the theory that the only way the Commonwealth could avoid a con-

flict with the principle of double jeopardy was by a ruling
that conspiracy was not a continuing offence. We have
already rejected this contention, noting that the indict-
ments, with their bills of particulars and "Representations
of Evidence in [S]upport of Motion for Joinder or Group-
ing," made it clear that the two indictments charged sepa-
rate conspiracies, the first conspiracy being to bribe Hanley
in connection with the 1962 hearing alone, and the second
being a continuing conspiracy to pay Hanley annual sums
from 1957 through most of 1963. (*Supra*, p. 224.)    In dis-
posing of the double jeopardy issue, therefore, we in no way
undermined the rule that a conspiracy is a "continuing
offence." As to such an offence the statute of limitations
does not begin to run until the date on which the continuing
offence ends. *Commonwealth* v. *Ross*, 248 Mass. 15, 18.
*Commonwealth* v. *Geagan*, 339 Mass. 487, 518–519. The
date of the conspiracy indictment is May 8, 1964, which is
within the six year period of limitation applicable here,
since it continued from 1957 to the date of the indictment.

The further argument that allegation and proof of an
overt act was necessary to sustain the indictment against
the statute of limitations attack is equally lacking in sub-
stance. It is the law of this Commonwealth that there is
no requirement for any overt act, or allegation thereof, to
constitute the crime of conspiracy. *Commonwealth* v. *Judd*,
2 Mass. 329, 336–337. Nor is there any requirement for
allegation and proof of renewal of the conspiracy during
the six year period of limitation as distinguished from con-
tinuance of the conspiracy. Household's plea in bar and
motion to quash were rightly denied and the assignments
of error of Household and other defendants based on the
statute of limitations must be rejected.

2. Household, Barber and Pratt contend that the judge
took insufficient precautions to guard the jury against the
possible adverse effects of publicity, both before and during
the trial, and therefore a mistrial should have been de-
clared. The facts relied upon by the defendants are identical
to those relied upon in connection with the first trial and

the issues presented have been previously discussed at length. (*Supra,* p. 294.) Suffice it to say that from a careful examination of the record of the second trial we are satisfied that the judge did not abuse his discretion either in refusing to poll the prospective jurors concerning their pre-trial readings or discussions of the case, or in refusing to instruct them not to read articles or watch and listen to news broadcasts during the trial.

3. Similarly, we treated at some length in connection with the first trial, *supra,* p. 305, the defendants' argument that the judge erred in hearing the Commonwealth *ex parte* on its applications for issuance of process to out-of-State witnesses. We need not elaborate further.

4. Local offered to prove that Schwartz and Heath knew the results of the first trial and the sentences imposed on the defendants in that trial by the judge and the sanctions imposed on the defendants by the Department of Banking. Local contends that the refusal of the judge to admit this evidence was error since it was essential to show that Schwartz and Heath were motivated by bias or personal interest.

In support of this contention, we consider the case of *United States* v. *Colonial Motor Inn, Inc.* 440 F. 2d 1227 (1st Cir.). There, the defendant in a criminal prosecution made an offer of proof to show the personal interest and motivation of a key government witness. This witness could have incriminated herself if her testimony had not corroborated the government's theory of the case. The jury were unaware of this fact. In addition, her testimony pertained to a crucial issue in the case. In holding that the defendant was entitled to show the personal interest of the witness, the court noted that the prosecution in its final argument relied upon the impartiality of the witness, stating that she had "nothing to gain or lose," when in fact the defendant's offer of proof would have contradicted this statement.

We think the above case is distinguishable on its facts from the case before us. Here, unlike the foregoing situation,

the jury were informed of the personal participation of Heath and Schwartz in the criminal activities of the various defendants, because the defendants *incriminated themselves* with their *own testimony.* Therefore, it was self-evident that Heath and Schwartz, since they were not named as defendants in the trial, had a personal interest in testifying for the Commonwealth. In this regard, the position of Heath and Schwartz in this case is similar to the position of one Shea in the case cited above, about which the court said: "[I]f the witness had been Shea himself, cross-examination on the subject of the tax consequences of admitting a taxable receipt might well have been excluded as superfluous, his interest being self-evident." *United States* v. *Colonial Motor Inn, Inc.* 440 F. 2d 1227, 1228 (1st Cir.).

In addition, extensive evidence was elicited from Heath and Schwartz concerning their involvement in the consumer finance industry. The jury were thus well-informed of the benefits these witnesses might obtain should the major loan companies go out of business in the Commonwealth. Secondly, the possibility of prejudice to the other defendants outweighed the alleged benefit asserted by Local, especially since the personal interest of the witnesses was obvious. Thus, we find no difficulty in holding that the judge did not abuse his discretion as to the scope of proper cross-examination in excluding the offered evidence. *Commonwealth* v. *French,* 357 Mass. 356, 404. *Commonwealth* v. *Nassar,* 351 Mass. 37, 43–44. *Chevillard* v. *United States,* 155 F. 2d 929, 935 (9th Cir.).

5. Local contends that the judge erred in admitting against it certain letters and memoranda which were taken from Heath's files. These exhibits were admitted for the limited purpose of showing that Heath, Redfield and American had participated in the conspiracy. They were admitted almost a month after the judge's preliminary ruling that the evidence warranted a finding of a conspiracy which included Local, American, Redfield and Heath. Of course, once such a preliminary ruling has been made, "the acts and declarations of one conspirator in pursuance of the

common object are admissible against the other conspirators." *Commonwealth* v. *French,* 357 Mass. 356, 379, quoting *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50. These exhibits, being the means by which one conspirator advised another of the progress of the conspiracy, were certainly declarations in the pursuance of the object of the conspiracy. There was no error in admitting them against all the members of the conspiracy, including Local.

6. Hanley's contention that he was the victim of "selective prosecution" in violation of the equal protection clause of the United States Constitution is not supported by the record. Hanley's offer of proof was, in substance, that not all the public officials known by the Attorney General to have received bribes were indicted, and that various members of the Crime Commission had stated that they were particularly interested in "getting him." Such proof would be insufficient to support a claim of selective enforcement, which requires a showing of some arbitrary classification, such as race or religion, upon which prosecutions are being based. *Yick Wo* v. *Hopkins,* 118 U. S. 356. *Oyler* v. *Boles,* 368 U. S. 448, 456. Mere failure to punish other offenders by itself is no basis for a holding that there was a denial of equal protection. *Moss* v. *Hornig,* 314 F. 2d 89, 92 (2d Cir.). Indeed, it may be altogether appropriate to pick out one, or a number of offenders, from a group whose conduct or position is such that a striking example of them can be made "in the expectation that general compliance will follow and that further prosecutions will be unnecessary." *People* v. *Utica Daw's Drug Co.* 16 App. Div. (N. Y.) 12, 21. Hanley, as the principal public figure involved in the case before us, certainly has no standing to complain of his indictment under any of these standards, especially since he was not the only public official against whom indictments were returned.

7. The defendant Pratt asserts that Heath, on cross-examination, recanted his direct testimony that Pratt had a copy of exhibit 153 (*supra,* p. 348) in his possession at the meeting of the "loose knit committee" at Purcell's

in October, 1962. From a careful reading of Heath's testimony on cross-examination we are persuaded there was no renunciation of his direct testimony concerning exhibit 153. To the contrary, Heath's testimony on cross-examination was consistent with his direct testimony which placed exhibit 153 in Pratt's hands at the meeting of the conspirators.

8. Household contends that the jury should have been instructed that if a witness is shown to have testified falsely concerning a material matter the jury have a right to reject all of his testimony. Household argues that Schwartz's and Heath's financial interests in the outcome of the trial and their dislike of Hanley may have motivated them to testify falsely. Household also points to certain allegedly inconsistent statements.

The record reveals that the jury were adequately instructed on these points. They were instructed that they must consider contradiction and inconsistencies "in deciding whether . . . [they were] going to believe any or all of" the testimony of witnesses. The jury were also instructed to consider carefully the interest of a witness in a conviction, or the personal feeling of a witness toward a defendant. The charge as a whole and in context adequately covered the relevant factors to be considered in the evaluation of testimony. *Commonwealth* v. *Greenberg*, 339 Mass. 557, 585. There was no error in refusing to give the instructions requested. *Ducharme* v. *Holyoke St. Ry.* 203 Mass. 384, 397.

9. Beneficial contends that the judge erred in refusing to allow its motion for a mistrial based on the length of time which elapsed from the time Beneficial rested its case and the time the case was submitted to the jury. The second trial required 222 trial days. The Commonwealth rested on March 6, 1968, and Beneficial rested on March 21, 1968. All of the other defendants except Hanley, who rested on May 27, rested during March or April. The case went to the jury on June 7, 1968.

Beneficial concedes that the judge could not have let its case go to the jury before the others, because such a pro-

cedure would prejudice the other defendants. The judge was thus left with little choice but to proceed as he did. While there may be cases of such a nature that a period of two months between the time when a defendant rests and the time when a conspiracy case is submitted to a jury is so prejudicial as to be a denial of a fair trial, this is not one of them. Had all but one defendant rested immediately, the mere fact that the remaining defendant chose to put on a defence that consumed two or three more months of trial does not automatically call for a mistrial. Otherwise conspiracy cases could seldom be tried to conclusion. As we held in *Commonwealth* v. *French*, 357 Mass. 356, 397, the receiving of further evidence from other codefendants after their alleged co-conspirator had rested is within the sound discretion of the judge. We see no abuse of discretion.

10. Pratt and Barber argue that it was error for the judge to refuse to poll the individual jurors after the return of the verdicts. However, as we noted, *supra*, p. 300, the settled law of this Commonwealth is otherwise. *Commonwealth* v. *Goldenberg*, 338 Mass. 377, 386.

11. Hanley, who appeared pro se in the second trial, contends that his convictions must be reversed because the judge did not comply with our Rule 3:10 in advising him of his right to counsel. He further asserts that the judge committed error in permitting him to appear pro se and in conducting certain proceedings in his absence.

With respect to the contention charging a failure to follow Rule 3:10, it should be noted that Hanley was represented by counsel in the first trial. After that trial his attorney made a motion to withdraw, at which time the judge said to Hanley: "There is a standing order in Suffolk County that a lawyer who once files an appearance for a Defendant in a criminal case may not withdraw that appearance without leave of court." Hanley then informed the court that he understood, but preferred to appear pro se in the second trial. The judge was further informed that Hanley was a law school graduate and a member of the Massachusetts Bar.

It is apparently Hanley's contention that his convictions should be reversed on any or all of the three following grounds: (1) the judge did not advise him of his right to counsel as required by Rule 3:10; (2) the judge did not file a written certificate showing that he had waived counsel as required by Rule 3:10; and (3) he was incompetent to represent himself. While many members of the bar might concur with the third ground on the sole basis that an attorney should not represent himself, the defendant here fails to point to even one instance of his alleged incompetence. We are therefore not persuaded by this argument. The alleged ground that the judge did not advise him of his right to counsel is contrary to the record, which shows that the judge informed him that his attorney could not withdraw without the court's permission. That Hanley understood can be inferred from his expressed desire to represent himself in the second trial. In addition, since Hanley was an attorney, it was unnecessary for the judge to say more.

Another question presented by Hanley in this grouping of arguments is whether it was error for the judge to proceed with the trial without requiring Hanley to file a written waiver of counsel in accordance with Rule 3:10. There is no doubt that this requirement is an important one. The written waiver rule, however, was promulgated in order "to eliminate to the greatest possible extent all questions arising from lack of representation by counsel." *Mulcahy* v. *Commonwealth*, 352 Mass. 613, 615. Written waivers are required to avoid "ex post facto inquiries" concerning the right to counsel. *Cardran* v. *Commonwealth*, 356 Mass. 351, 353. In this case no such written memorandum was necessary to memorialize the waiver of counsel since the exchanges between Hanley and the judge on this subject appear in the transcript. It is therefore apparent that the purpose and spirit of the rule were fulfilled.

Hanley's final point that he was prejudiced by some proceedings that took place in his absence on December 4, 1967, is utterly without merit. The judge specifically said he would proceed only with matters that did not affect or ·

involve Hanley and this is precisely what the judge did. The only matters covered in Hanley's absence were the direction of verdicts with respect to other defendants.

12. Household, Beneficial, Glynn, Farrell and Newhall object to the expansion by the judge of limitations on sixty-six items of evidence during the course of the trial. The objection raised is in all respects similar to that raised by these defendants and others to the comparable procedure followed by the judge in the first trial. In the second trial, as in the first, the Commonwealth moved during the course of the trial for a preliminary ruling of conspiracy. It filed simultaneously a series of eight motions to expand the limitations on certain portions of the evidence. The judge made a preliminary ruling of conspiracy and expanded the limitations on certain portions of the evidence. Also, as in the first trial, the judge did not in every instance lift the original limitations so as to admit a given item of evidence against all the defendants who could have been found to be conspirators with the defendants against whom the evidence had been originally admitted. The instruction to the jury requested by Household relative to the limitations on the evidence, identical to the one requested by it in the first trial, was likewise omitted by the judge in the second trial.

The defendants have not made any arguments which were not dealt with by us in our discussion of this issue as it arose in the first trial. Therefore we refer to that portion of our opinion, *supra,* p. 310, which treats with this matter. We discern no need for further elaboration other than to note that the defendants' arguments with respect to the second trial are made weaker by two features of this trial. First, the judge stated that the reason he expanded the limitations was because he adopted the rationale suggested by the Commonwealth for the selective expansion of the limitations; namely, "to limit the acts and declarations of other co-conspirators, as to . . . [those] specific defendants who are in for only a limited time, to coincide roughly with the period of time that each co-conspirator

was a member of the conspiracy." To the extent that the judge found that the Commonwealth's motions did not "reflect the application of [that] point of view" he denied them. Secondly, the judge's instructions to the jury on the subject of remembering limitations were even more thorough than they were in the first trial. He explicitly told the jury that "[i]f you find yourselves in a state of mind where you are unable to recall whether particular evidence was or was not admitted as to a particular defendant or count, then you may not consider that evidence as to that defendant or count. A defendant is to be judged solely on the evidence which you can remember now, with all these limitations, was admitted as to him or it on the particular count as to which you are now or will then be trying to determine his or its innocence or guilt." The defendants' argument that the limitations "formed a senseless pattern" does not withstand analysis. There was no error.

13. It is claimed by Household that it was error for the judge to make a preliminary ruling that it could have been found that McHenry, who had died about a year and one-half before the grand jury returned any of the indictments here involved, and who was not mentioned in the conspiracy indictment, was a co-conspirator in the conspiracy charged in Indictment No. 11908. Barber, Pratt and Local have adopted Household's argument. This issue was raised by them, at the trial, by motions for a mistrial, which the judge denied. The motions were filed by the four defendants after the judge's preliminary ruling.

Household's argument is identical to the one it has levelled against the judge's similar ruling in the first trial, namely that it could have been found that Hanley was a co-conspirator in the conspiracy to bribe Garfinkle charged in Indictment No. 11910. We need not repeat that argument. The facts here are somewhat different, however, inasmuch as the judge found that "[t]he Special Grand Jury which returned . . . Indictment No. 11,908 knew the identity of John L. McHenry, Sr., and of his alleged participation in the alleged conspiracy at the time it returned this in-

dictment." Nonetheless, assuming that there was a variance between the allegations in the indictment and the proof offered at trial, it was not such as to call for a mistrial because, as the judge found in his decision on the motions, "the four (4) Defendants who are parties to the Motions involved . . . have not been prejudiced in their defense or in any other respect by the variance . . . . Nor have they been prejudiced by the action of this Court in respect to any ruling or preliminary finding that the late John L. McHenry, Sr., was a party to the conspiracy alleged in said indictment. (See: G. L. c. 277, § 35)."

14. Household argues that "the trial court erred in failing to recognize that the evidence [in the second trial] reflected two separate conspiracies, rather than the one charged in the indictment; and further erred in the instructions by which the case was submitted to the jury [on the question whether the evidence showed a single conspiracy or multiple conspiracies]." Household raised this point at four stages during and following the trial; it formed the basis for several motions filed by Household for a mistrial, a directed verdict, or a new trial. Household's argument on this point has been adopted by Local, Barber, and Pratt.

The issue whether the evidence has shown one conspiracy or several is one of fact which is normally a matter for the jury. *United States* v. *Varelli,* 407 F. 2d 735, 746 (7th Cir.). Household does not seem to contest this, but contends that there was insufficient evidence here of a single conspiracy to warrant submitting this question to the jury.

Household emphasizes the testimony of one conspirator, Schwartz, that he believed there were two separate and distinct plans: one to bribe ·Hanley in connection with the 1957 rate hearings of the Rate Board, involving payments spread out over two years, and the other to influence Hanley's decisions on routine administrative matters involving annual payments beginning in 1959. The fact that one conspirator was under the impression that there were two conspiracies, rather than one, is not determinative of whether

there was in fact one conspiracy or two. *Coates* v. *United States*, 59 F. 2d 173, 174 (9th Cir.). Furthermore, there was evidence to the contrary that the payments made to Hanley in 1957, 1958 and 1959 were for other matters in addition to the 1957 hearings, and that the payments after 1959 were connected with the earlier ones. Although the participants in the later payments were not identical to those who had made the earlier payments, this fact does not negate the existence of one conspiracy during the entire period. *United States* v. *Varelli*, 407 F. 2d 735, 742 (7th Cir.). On the state of the evidence before him, the judge properly submitted the question whether there was a single conspiracy or multiple conspiracies to the jury.

The judge's instruction to the jury that they should acquit all of the defendants if they found that the evidence established the existence of more than one conspiracy from January 1, 1957, to May 8, 1964, was likewise correct. Household's objection that it precluded the jury from acquitting less than all of the defendants if they found that those defendants had not participated in a single conspiracy fails to take into consideration certain other portions of the judge's instructions. The jury were thoroughly cautioned that if they found "beyond a reasonable doubt that there was a single conspiracy as alleged . . . , then they must decide which, if any, of the defendants now on trial were parties to that agreement." The judge told them repeatedly that they "should consider separately from all the other defendants the question of whether . . . [a] defendant did or did not become a party to an agreement to bribe Martin J. Hanley." There was no error.

15. The final issue we deal with concerns Barber's and Pratt's assertions that the judge's instructions to the jury concerning participation in the conspiracy were error. As we have mentioned throughout this opinion no overt act need be shown in furtherance of the conspiracy and the purposes of the conspiracy do not have to be carried out. *Commonwealth* v. *Hunt*, 4 Met. 111, 125. *Commonwealth* v. *David*, 335 Mass. 686, 696. The instructions of the judge

were identical in all essential respects to the instructions in the first trial and were correct.

*All judgments affirmed.*